## FILED UNDER SEAL

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| JANE ROE | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL NO. 4:19-cv-00179-ALM-KPJ |
| v. | § | |
| | § | |
| LEIGHTON PAIGE PATTERSON, in his | § | |
| individual capacity; SOUTHWESTERN | § | |
| BAPTIST THEOLOGICAL SEMINARY | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S AMENDED ORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff Jane Roe and hereby files this Original Complaint against Leighton Paige Patterson and Southwestern Baptist Theological Seminary, Defendants, and for cause of action would show this Court and Jury as follows:

## INTRODUCTION

"*Break her down*" – These three short words made newspaper headlines, appeared in countless blogs and were heard as sound bites in story after story detailing the controversy that led to the downfall of a Southern Baptist icon. The "her" in this now notorious phrase is Jane Roe. This case is about "her."

This case is arises out of the multiple violent sexual assaults of Jane Roe on the campus of Southwestern Baptist Theological Seminary ("SWBTS") by a fellow student and SWBTS employee, SWBTS' failure to take any action to prevent the acts or protect Roe from the assaults, and SWBTS' and Leighton Paige Patterson's ("Paige Patterson" or "Patterson") negligent and intentional acts that resulted in further harm to her.

## PARTIES

1. Plaintiff Jane Roe is an individual who, at the time of the sexual assaults complained of herein, was a student attending Southwestern Baptist Theological Seminary. Plaintiff is a resident of the State of Alabama.

2. Defendant Leighton Paige Patterson ("Patterson") was, at the time of the sexual assaults complained of herein, President of SWBTS.  As President, Patterson was an agent of SWBTS.  Patterson is named here in his individual capacity. Patterson is a resident of Parker, Collin County, Texas, a location in the Eastern District of Texas. He may be served at 5206 Edgewater Court, Parker, Texas 75094.

3. Defendant SWBTS is a private non-profit institution of higher education with its primary campus located in Fort Worth, Tarrant County, Texas.  SWBTS is governed and operated by a Board of Trustees and may be served with process via its Interim President D. Jeffrey Bingham at 2001 W. Seminary Drive, Fort Worth, Texas 76115.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), which gives district courts original jurisdiction of all civil actions where the

amount in controversy exceeds the sum or value of $75,000 and is between citizens of different States.

5.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a) because the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

6.  Venue in this Court is proper under 28 U.S.C. § 1391 (b)(1), which provides that a civil action may be brought in a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located.

## GENERAL ALLEGATIONS

### Legal Framework

7.  The statistics related to stalking, dating violence and sexual assault on college campuses across the country are alarming despite a number of state and federal laws aimed at combating interpersonal violence.

8.  Part of the 2013 reauthorization of the Violence Against Women Act, the Campus Sexual Violence Elimination Act (Campus SaVE Act) requires institutions receiving federal funds to disclose incidents of domestic violence, dating violence, sexual assault, and stalking in annual campus crime statistic reports. The Campus SaVE Act instructs colleges and universities to provide prevention and awareness programs to students and employees designed to educate them on recognizing warning signs of abusive behavior.

9.  The Texas Penal Code criminalizes stalking. Under Tex. Pen. Code § 42.072,

   a) A person commits an offense if the person, on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct that:

(1)  constitutes an offense under Section 42.07, or that the actor knows or reasonably should know the other person will regard as threatening:

(A)  bodily injury or death for the other person;

(B)  bodily injury or death for a member of the other person's family or household or for an individual with whom the other person has a dating relationship; or

(C)  that an offense will be committed against the other person's property;

(2)  causes the other person, a member of the other person's family or household, or an individual with whom the other person has a dating relationship to be placed in fear of bodily injury or death or in fear that an offense will be committed against the other person's property, or to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and

(3)  would cause a reasonable person to:

(A)  fear bodily injury or death for himself or herself;

(B)  fear bodily injury or death for a member of the person's family or household or for an individual with whom the person has a dating relationship;

(C)  fear that an offense will be committed against the person's property; or

(D)  feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended.

10. In Texas, the statutory definition of "Family violence" includes dating violence. Tex. Fam. Code §71.004. In turn, dating violence is defined as an act committed against a victim with whom the actor has or has had a "relationship of a romantic or intimate nature." Tex. Fam. Code § 71.0021.  The term domestic violence is often used in reference to dating violence as well as spousal abuse.

11.  In Texas, "a peace officer who investigates a family violence allegation … shall advise any possible adult victim of all reasonable means to prevent further family violence, including giving written notice of a victim's legal rights and remedies and of the

availability of shelter or other community services for family violence victims." Tex.

Code Crim. Proc. art. 5.04(b).

12. The Texas Penal Code criminalizes sexual assault. Tex. Pen. Code §22.011. The penal

code defines sexual assault and provides that the act is "without the consent" under the

following circumstances:

- the actor compels the other person to submit or participate by the use of physical force, violence or coercion

- the actor compels the other person to submit or participate by threatening to use force or violence against the other person or to cause harm to the other person, and the other person believes that the actor has the present ability to execute the threat.

13. The Texas Education Code requires postsecondary educational institutions to adopt a

policy on sexual assault that includes definitions of prohibited behavior, sanctions for

violations, and protocols for reporting and responding to reports. Tex. Educ. Code

§51.9363.

14. Even before Plaintiff Jane Roe arrived on campus in 2014, SWBTS was not a safe place

for young women. Void of even the most basic standards of support for victims required

by state and federal law, SWBTS had put in place a construct in which sexual harassment

and violence were ignored or – at times – even celebrated by its leaders. Through

intimidation and victim-blaming, any young woman who dared speak up was shamed

into silence.

15.  SWBTS' failure to educate students about stalking, dating violence, sexual harassment

and sexual assault combined with the very public examples set by SWBTS president

Paige Patterson to foster a culture of hostility toward women and created condition that

substantially increased Roe's chances of being assaulted. Risk became reality when

SWBTS and Patterson welcomed a sexual predator with a criminal history and violent

past as a student and hired him as an employee.

### Southwestern Baptist Theological Seminary

16. SWBTS is a private non-profit institution of higher education.

17. As explained in SWBTS 2014-15 Academic Catalog, "SWBTS is a corporation whose

sole member is the Southern Baptist Convention ("SBC"). It is administered by a 39 -

member Board of Trustees elected by the convention and serving staggered terms of

office…The seminary is guided by and subject to the Baptist Faith and Message as

adopted and amended by the Southern Baptist Convention."

18. Trustees appointed by the SBC elect faculty members and administrative officers.

Financial support is derived from the SBC's Cooperative Program, endowment earnings,

gifts and student fees.

19. With its main campus in Fort Worth, Texas, SWBTS is one of the largest seminaries in

the world. SWBTS is accredited by the Association of Theological Schools in the United

States and Canada and by the Southern Association of Colleges and Schools to award

bachelor's, master's, and doctoral degrees.

20. In a section entitled "Who can (or should) attend Southwestern?", the SWBTS 2014-15

Academic Catalog ("Catalog") warns: "As a Southern Baptist educational institution, the

seminary is redemptive, not rehabilitative, in nature. Therefore, a person should not come

to the seminary with serious family, health, emotional, or financial problems. The

pressures of study, church participation, family, finances, and other such factors weigh

heavily upon the seminary student and the student's family. These pressures can be a

vital factor affecting the physical and mental health of the student."

21. With regard to criminal history, the Catalog provides that "[i]ndividuals who have been convicted of a crime, other than a traffic violation or a similar misdemeanor where only a fine was assessed, should wait a minimum of two calendar years after the sentence has been served (including probation) before submitting an application."

22. The Catalog includes a section entitled "Ethical Conduct," which includes the requirement that students admitted to SWBTS "will conduct themselves in a manner deemed by the institution as conduct becoming of a Southern Baptist minister."

23. Violations of the ethical conduct policy include the following:

- Use or possession of beverage alcohol or illegal drugs

- Engaging in a lifestyle contrary to Biblical standards including but not limited to, heterosexual misconduct, homosexual or bisexual behavior, transgenderism or any other form of sexual misconduct.

- Behavior, verbal, physical, or emotional, which is demeaning, harassing or abusive of another person; and behavior that is profane or vulgar.

- Disrespect or abuse directed toward any faculty member, school administrator, or staff person.

- Students and their families are expected to dress in modest attire. The institution's position is that immodest clothing damages one's Christian testimony, so clothes such as short skirts, shorts, and tank tops are not appropriate. Hats, caps and shorts are not allowed in class or in chapel. Ear jewelry is prohibited for men and other body piercings are prohibited for both males and females.

- Members of the opposite sex who are not married may not be alone together in campus housing. Members of the opposite sex may visit each other in their apartments between the hours of 8:00 a.m. and 11 p.m. Sunday through Thursday, and between the hours of 8:00 a.m. and 12:00 a.m. Friday through Saturday, provided there are at least three people in the apartment at all times and no apartment mates object.

- Any student in the process of marital separation or divorce must notify the Vice President for Student Services and Communications and may be required to cease studies to give full attention to the protection and restoration of the family.

24. SWBTS' "Sexual Harassment Policy" as contained in the Catalog applies to workplace

discrimination. It defines sexual harassment as actions that "unreasonably impede with an individual's *work performance,*" or create an "intimidating, hostile or offensive *work environment* and purports to protect "the reporting *employee*." The policy imposes a 120-day deadline for reporting and provides that "[a]ccusations that are proven to be false and made with malicious intent will also be treated with the same level of severity."

25. Upon information and belief, SWBTS had a custom and practice of ignoring female students' complaints of sexual harassment and stalking behavior by male student-employees. Upon information and belief, SWBTS failed to investigate and summarily dismissed reports that a married male student employed in the security department used his position and access to security cameras to facilitate harassment of several female students.

26. The Catalog does not reflect any policy addressing the prevention, reporting or investigation of stalking, sexual assault or other interpersonal violence suffered by students.

27. During the 2014-15 and 2015-16 school years, SWBTS provided no training or education to students designed to assist them in preventing, recognizing or reporting stalking, sexual assault or other interpersonal violence.

28. During the 2014-15 and 2015-16 school years, SWBTS had no policies or procedures in place to prevent, recognize, report, investigate or resolve allegations of stalking, sexual abuse or other interpersonal violence.

29. SWBTS' "Weapons Policy" outlined in the Catalog provides that "[t]he possession or use of firearms or other weapons on seminary premises by any employee, student, vendor, or other visitor is strictly prohibited. Any exception to this policy must be authorized in

advance by the President."

30. According to the Catalog, "[s]tudents involved in a criminal or civil infraction are accountable to civil authorities but may also be subject to discipline by the institution. Neither Southwestern Baptist Theological Seminary nor the College at Southwestern will be bound to or limited by civil authority actions."

31. Further, according to the Catalog, "[t]he Vice President for Student Services, the Executive Vice President and the President of the institution have full authority to handle disciplinary matters, as they deem necessary."

32. In the 2013-14, 2014-15 and 2015-16 school years, SWBTS maintained a campus security department staffed by both full-time and part-time officers. Some of the officers, including the department's head, Chief John Nichols, were peace officers certified by the Texas Commission on Law Enforcement ("TCOLE"). The TCOLE-certified officers had all of the rights and duties of peace officers under the Texas Code of Criminal Procedure.

**Paige Patterson**

33. Known as "The Red Bishop," Paige Patterson was, for decades, one of the most powerful leaders in the history of the Southern Baptist Convention ("SBC"), the nation's largest Protestant denomination.

34. Patterson led the battle between theological conservatives and liberals in the SBC for more than a decade from the late 1970's to the early 1990's. To the conservatives, the movement is remembered as the "Conservative Resurgence." To the liberals, the "Fundamentalist Takeover." In any event, at the end, Patterson and his supporters succeeded in solidifying the conservatives' hold on the SBC.

35. Patterson has been described as a savvy political strategist who ruled through a

combination of fear and folksy humor.

36. Women and the place of women in the family and in church life became a central message for both Patterson and his wife, Dorothy Kelley Patterson.

37. Patterson served as President of the SBC from 1998-2000.

38. Patterson led Southeastern Baptist Theological Seminary from 1992 until 2003.

39. In 2003, the SWBTS Board of Trustees unanimously elected Patterson as the seminary's eighth president. His wife, Dorothy, joined him as a faculty member.

**Jane Roe**

40. A devout Christian, Plaintiff Jane Roe was raised by a watchful, caring and protective single mother and home-schooled in a conservative program.

41. As a young girl, Roe committed herself to maintaining the high moral standards and virtues her mother and church leaders instilled in her. She did not watch television. She did not drink alcohol. She did not smoke. She did not engage in sexual activity. She participated in a ceremony with other young teen girls in which she wrapped a gift box containing a white rose to be given to her future husband on their wedding day, symbolizing her commitment to save her virginity until marriage.

42. Roe received several invitations from Dorothy Patterson for Roe to attend SWBTS.

43. The opportunities SWBTS offered were exciting. SWBTS offered Roe a scholarship and, in addition to biblical studies, Roe would receive instruction in sewing, cooking and maintaining a Christian home.

44. Roe enrolled as an undergraduate student at SWBTS in the fall of 2014. Drawn to the Patterson-led school because of its purported commitment to the conservative Christian beliefs she and her family held so firmly, Roe was eager to pursue her formal education

in what she trusted would be a safe, nurturing environment.

45. Although apprehensive leaving her close-knit family, Roe was comfortable making the move to SWBTS; she believed she would be with like-minded young adults in an environment deliberately designed to enforce boundaries and foster appropriate male-female relationships.

46. Roe received several scholarships and participated in a work-study program.

### Jane Roe Meets SWBTS Seminary Student-Employee John Doe

47. In mid-September 2014, shortly after her arrival at SWBTS, Roe met John Doe.

48. Doe was a seminary student who was also employed as a plumber on campus. As a plumber, Doe was issued a uniform and keys, which gave him access to all campus buildings including the building where Roe lived and worked.

49. Doe took an immediate interest in Roe and began to pursue her relentlessly. He followed her. He left notes on her car. When she resisted his invitations to go on a date, he asked again. And again. And again.

50. The more Roe resisted, the more Doe persisted. He attempted to elicit her sympathy by telling her that he struggled with physical and mental health issues. He attempted to manipulate her by telling her that unless she agreed to date him, he would likely relapse and harm himself. He told her that he was suicidal because she would not date him. He claimed he could not eat and was losing weight because of her "cruel" rejection.

51. John Doe bragged to Roe that before he was admitted to SWBTS, he had had multiple sexual partners, abused drugs and alcohol, and had an extensive criminal history. John Doe claimed he had met personally with Dr. Patterson who assured him that his past would not preclude him from becoming a Baptist minister. Instead, Dr. Patterson

welcomed him to SWBTS. Patterson explained that because Doe was male and

unmarried, he had not broken any covenants by engaging in such promiscuity. Doe told

Roe that Patterson encouraged him to "fish" the pool of unmarried female students for a

suitable wife.

52. Unequipped to deal with Doe's aggressive pursuit and confused by Dr. Patterson's

apparent endorsement of Doe, Roe called her mother for help. Her mother attempted first

to discourage Doe but finally flatly told him to leave Roe alone. He did not.

53. In September 2014, on information and belief, SWBTS was on notice of Doe's criminal

behavior and the danger he posed to Roe. One of Roe's professors was informed of Doe's

stalking behavior towards Roe. The professor's only response was to let Roe know that

"the young man was welcome to come by and talk with [the professor] any time he

wanted."  No action was taken.

54. Undaunted, Doe embarked on a campaign of stalking, terror, manipulation and violence

against Jane Roe that culminated in multiple rapes and threats of further violence against

her and her family.

### Jane Roe Suffers Verbal Abuse, Physical Violence and Sexual Assault

55. The first rape occurred in October 2014. After attending a barbecue on campus, Roe fell

asleep in a lawn chair. She awoke to John Doe sexually assaulting her. He showed her a

gun and told her not to say anything. Shocked, frightened and confused, Roe went home

sobbing and bleeding from her injuries.

56. Beginning the next morning and continuing over the next two weeks, Doe threatened

murder and suicide repeatedly if she reported what he did, or if she did not "stay" with

him. Doe followed her everywhere she went and checked her texts to monitor her

communication.

57. Doe insisted the two were in a romantic relationship. When Roe resisted, telling him she did not want to have a relationship with him of <u>any</u> kind, he pushed her to floor and forced her to read his journal entries. Doe wrote in his journal that he would end his life if Roe did not maintain a relationship with him.

58. Doe was both verbally abusive and physically violent. He cursed at Roe, calling her derogatory and profane names. He brutally pulled her hair out in clumps and engaged in what he called "mock strangling" to the point that Roe almost lost consciousness several times. When he left bruises and marks on Roe's body, Doe laughed that she looked like she had been mauled by a bear. He sexually assaulted her, twice forcing her to take the morning after pill.

59. Doe vacillated between telling Roe that she was so beautiful that he was obsessed with her to telling her all the things wrong with the way she looked, from her flat chest to her heavy legs and "oversized calves." Doe criticized the way she dressed and did her makeup. (She began wearing heavy makeup to cover up the marks of his abuse). He criticized her personality and even the way she spoke and walked. He mocked her conservative upbringing and her love for reading the Bible. He insulted her intelligence level and her choice of major.

60. Doe detailed his violent past, relating stories in graphic detail of impaling a man with a metal rod during a fight, beating a man with a metal chain, even attempting to kill his own brother and torturing animals as a child. To further intimidate Roe, Doe showed her his hands, pointing out that his misshapen fingers and knuckles were a result of him breaking his fists on men's faces in bar fights.

61. Doe claimed was addicted to pornography at a young age and had molested girls starting in middle school. He told Roe that he had become addicted to both drugs and alcohol starting in junior high/high school.

62. John Doe disclosed to Roe that he got drunk shortly after arriving at seminary in 2013 and that he frequented bars and strip clubs throughout his time at SWBTS.

63. Doe kept firearms openly in his campus residence and in his vehicle. He boasted about fleeing from the police and about the weapons as he showed them to friends on campus, including other SWBTS employees. One such student-employee who worked in the Security Department of SWBTS confirmed to Roe he was aware Doe had guns on campus.

64. Doe kept a gun at his bedside and one behind each door in his campus residence. He would load the guns with bullets in front of Roe to emphasize that his threats were serious. He repeatedly threatened to "bury her in the Canadian soil" if she did not cooperate and do what he said.

65.  According to SWBTS' policies, possession of firearms is "strictly prohibited" unless specifically "authorized in advance by the president;" therefore, Doe either flagrantly violated this policy with the knowledge of at least one SWBTS security employee or was given permission to possess the weapons by Patterson. Doe used these firearms to terrorize Roe and ultimately to effectuate sexual assaults on campus.

66. John Doe boasted that in addition to escaping arrest for the physical assaults he described, he had gotten away with being a drug dealer and car thief.  The SWBTS security employee who was aware that Doe possessed weapons on campus added that Doe laughingly told him and others that he had run from the police during drug and gang-

related activities, even jumping out of a window once to "git away from the po-po."

67. Doe told Roe that if she ever told on him or made anyone suspect that anything was "off," he would be the first one to contradict her and he would be believed over her.

68. Roe did not know how to escape the situation without a murder or suicide or both. Roe cried out to God and prayed fervently that Doe would lose his obsession with her.

69. Abruptly, Doe lost interest, told Roe he was sick of her and began pursuing another woman. Relieved but still in fear for her safety and her family's safety, Roe remained silent and tried to avoid Doe as best she could.

70. Doe went to the building where Roe worked and lived during the daytime several times over the next several months for his job as a plumber. In performing his duties Doe learned the layout of the building and had access to Roe's daily schedule, as well as her housemates' and co-workers' schedules, which were posted by their supervisor. Doe knew  the building was not secure at certain hours and was aware that the large solid wooden front door had no peephole.

71. In April 2015, Doe raped Roe again.  Roe was at home alone on a Sunday evening consistent with the posted written schedule.  She heard a knock on the large solid wooden front door. Thinking it was her housemate or one of her friends coming home early from church, she opened the door slightly since there was no peephole. Doe pushed his way in, ignoring her as she told him that men were not allowed and he needed to leave. Doe told Roe that he was high on drugs that he obtained at the strip club in Fort Worth the night before. He seemed to have unusual strength as he dragged the 98-pound Roe upstairs by her pony tail and under her arms. She was forcibly raped at gunpoint  and suffered bleeding from the injuries she sustained for several months.

72. The following day, less than 24 hours later, Doe raped Roe again. The semester had just ended and the campus was nearly deserted; nevertheless, Roe was sent to restock the restrooms in an almost empty building. Wearing his SWBTS plumber's uniform, Doe entered the women's restroom where Roe was working and attacked her. Doe was once again armed with a handgun. This time, Doe took photographs of Roe during the assault and threatened he would post the photos on the internet if she said a word. High on drugs, he laughingly told her she was his "eighth or ninth virgin to f----."

73. Jane Roe's mental and physical health deteriorated as a result of the stalking and sexual assaults. She developed an eating disorder. Over the next several months, she struggled in silence, overwhelmed with grief, fear, shame and confusion.

74. Unaware that Roe had endured sexual assaults but growing increasingly concerned about her emotional and physical well-being, Roe's family moved to Fort Worth to support and care for her.

75. Roe finally told her family about the attacks.

**Jane Roe Reports Doe's Assaults to Patterson and SWBTS**

76. On August 15, 2015, Jane Roe sent Patterson an urgent email message. She asked Patterson to call her "*immediately*," explaining that she needed to speak with him about "*a serious situation about a young man who took advantage of me last semester on campus who is now seriously threatening our family*." She implored him, "*Please, we need to speak with you.*"

77. Patterson responded that he was in Cuba and could not call. He sent the following message to his office two days later on August 17, 2015:

*In the morning, [Jane Roe's] mother will call. She is nuts! She actually wanted to come see me tonight. Anyway, she wants an appointment to see me Wed. Just read her my*

*schedule. Set her up whenever it is possible. But do not let her push you around. Thanks. Paige.*

78. On August 20, 2015, Jane Roe finally met with Patterson. Several other SWBTS personnel were present – all male --including Dr. Charles Patrick, Vice President for Strategic Initiatives and Communications. During the meeting, Patterson asked Roe humiliating questions about the assaults, including whether Doe ejaculated and whether she had had her monthly period. Roe was shaken, shocked and embarrassed to be prodded for lurid and graphic details by a 73-year-old man in a room full of other men. Patterson seemed to enjoy making Roe even more uncomfortable with his questions.

79. Tearfully, Roe shared her concern with Patterson that she felt that she was "damaged goods" as a result of Doe's assaults and that no Godly man would ever want her. In response, Patterson told her that it was "a good thing" that she had been raped because the right man would not care if she was a virgin or not.

80. Patterson told Roe he was "too busy" to deal with her report of rape because it was the beginning of the semester. Frustrated, he told Roe's mother that he felt compelled to call the police only because the report was made to him on campus, explaining that had he received the report off-campus, he would not have needed to involve law enforcement.

81. When Roe's mother asked Patterson why a background check had not been performed on John Doe, he responded that checks were only done for employees not students. Doe was both a student <u>and</u> employee. Patterson acknowledged that often families sent their sons to SWBTS for him to "fix" them.

82. The Fort Worth Police Department ("Fort Worth PD") officer who came to take Roe's report was the brother of SWBTS Chief of Security (now SWBTS Chief of Police) John Nichols and the son of SWBTS and Fort Worth PD Chaplain, Dean Nichols.

83. Following Roe's report, SWBTS officials went to Doe's campus residence. They found a total of <u>nine</u> weapons, including a number of firearms in his dormitory and an assault rifle in his vehicle parked on campus. Roe's statement that Doe possessed multiple firearms on campus was substantiated.

84. Doe was summoned to Patterson's office and expelled from SWBTS based on the prohibited weapons. Patterson made certain that armed police officers/security guards were in the next room to ensure his own safety when meeting with Doe. SWBTS and Fort Worth PD agreed that because of Doe's threats against Roe and her family, the safest action would be to use the weapons policy violation as the basis for disciplinary action and to leave Roe out of it. Fort Worth PD cautioned Patterson and directed him to refrain from contacting Doe about the rape allegations since doing so could endanger Roe and her family.

85. Because Doe was armed and had threatened Roe and her family with violence, Roe was fearful of pursuing charges against him. Fort Worth PD officers told her that they understood her safety concerns. They advised Roe how to complete her written statement and assured her that she had time to decide whether she wanted to pursue a criminal complaint against him.

86. SWBTS offered no support or protection for Roe and her family. Neither Fort Worth PD nor SWBTS security offered Roe any victim support resources or information about obtaining a restraining order. Patterson refused to offer financial assistance for Roe to seek medical attention or counseling and callously rejected Roe's request for his prayers.

**"I have to break her down"**

87. On September 27, 2015, at 11:45 p.m., SWBTS Chief of Campus Security (now Chief of

Police) John Nichols wrote:

> *Dr. Patterson,*
>
> *I am back in town, and Dad has brought me up to speed with the development on [John Doe] and [Jane Roe]. I just wanted to ask if it would be possible for me to be there when you meet with [Jane Roe]. If not, I understand, I would just like to see this through, and hear what she has to say.*
>
> *Whatever you think is best, just let me know.*
>
> *John*

88. "Dad" in John Nichols' email refers to Dean Nichols, SWBTS chaplain and a former

police officer. Dean Nichols was not involved in Roe's report or any investigation and

had no reason to be aware of Roe's sexual assaults or Doe's expulsion based on his

possession of weapons.

89. On September 28, 2015, at 8:58 a.m., Patterson replied to John Nichols:

*Well we will see. I have to break her down and I may need no official types there but let me see. Paige.*

90. The meeting in which Patterson further interfered with a law enforcement investigation

into Roe's complaint and attempted to "break her down" occurred October 8, 2015.

(Patterson had already interfered by contacting Doe after being advised against it by Fort

Worth PD.)

91. Roe and her family (collectively "the Roes") arrived for a scheduled meeting with Candi

Finch, Assistant Professor of Theology in Women's Studies and assistant to Dorothy

Patterson. The Roes understood the purpose of the meeting to be an attempt to mend a

recent misunderstanding between Roe and Finch, which stemmed from a rift that dated back years.

92.   When the Roes arrived for the meeting with Finch, Patterson was present.

93.   The reason for the meeting – to resolve a conflict between Roe and Finch – was never addressed. Patterson quickly took control of the meeting and brought up Roe's rapes.

94.   During the meeting, without Roe's consent, Patterson disclosed the sexual assaults to Finch. Roe requested that Finch be excused from the meeting because she was not comfortable discussing this deeply personal and embarrassing subject in her presence. Patterson refused her request, telling Roe that if Finch left, her family would also have to leave. Uncomfortable proceeding alone with Patterson, Roe acquiesced.

95.   Patterson accused Roe of lying about the assaults and the firearms – despite being fully aware of the arsenal of weapons found in Doe's dormitory and despite having expelled Doe for possession of firearms.

96.   Patterson advised Roe that he had obtained a copy of her confidential police report. He further informed Roe that he had contacted John Doe to get "his side of the story," despite an express warning by Fort Worth Police Department officers that doing so could endanger Roe. Having been threatened repeatedly by Doe if she should say anything, Roe was disturbed and frightened to learn that Patterson had obtained a copy of the police report and disclosed her report to Doe.

97.   Patterson informed Roe that Doe claimed the two were engaged in a consensual sexual relationship and blurted out, "What about the nude photos you sent [Doe]?" Patterson declared he "did not know who to believe."

98. Stunned, Roe denied that she sent any photographs to Doe and insisted that she and Doe had not engaged in consensual sex. Roe reminded Patterson that Doe took photographs during the last rape, threatening to post them on the internet should she say anything. Notably, Patterson's attorney Shelby Sharpe, later admitted that Doe never produced any such photos and that there was no evidence that Roe sent such photos.

99. During the meeting, Jane Roe's mother asked Patterson why, with Doe's history, he had been admitted to SWTBS and hired as an employee, and why there had not been even so much as an apology from SWBTS for what had happened to Roe. In response, Patterson lunged across the table, firmly pointed his finger in her face and threatened to "unleash" lawyers on her if she dared question his leadership at SWBTS.

100.     Patterson demeaned Roe's family,  instructed them that they could not speak unless they raised their hands and mockingly questioned her mother about a divorce decades before.

101.     At the end of the meeting, Patterson seemed disappointed when he concluded that he had not "found any reason to expel" Roe. "So far, it's just your word against his," he told her.

102.     Jane Roe left the meeting in tears, devastated that Patterson, the man she had looked to for support and protection, was now accusing her of lying about being violently raped. So hurt she wanted to die, Roe drove home recklessly at a high rate of speed. Consistent with his plan, Patterson had in fact attempted to "break her down" by forcing Roe to say that she lied so that he could expel her from SWBTS.  Although he left her emotionally devastated and broken, he failed to coerce a false confession out of her.

103.     Her confidence in Patterson and SWBTS was destroyed by Patterson's

confrontation in October 8 meeting. Crushed by Patterson's unexpected and unfounded

attack, Jane Roe decided she had no choice but to withdraw from SWBTS. One week

later, she did.

104.     Dorothy Patterson expressed her relief that Roe withdrew in an email to another

SWBTS faculty member. Responding to the faculty member who shared a message from

Jane Roe in which she informed him she was withdrawing and thanked him for his

assistance with scholarships, Mrs. Patterson wrote on October 21, 2015:

> *God is protecting us on this one. Very relieved! Dp*

105.     Mrs. Patterson's response directly to Roe expressed more of a threat than a sense

of relief:

> On October 22, 2015, Dorothy Patterson wrote:

> *[Jane]: You are certainly doing the right thing to move away from Southwestern. Just be careful of suggesting that I or my mother or my mother-in-love would have spoken to anyone as your mother did to Dr. Finch or the president. As the expression goes, every pot sits on its own bottom. Make your decision based on your own actions and reactions rather than casting blame on someone else. I, too, went through the Institute of Basic Youth Conflicts, and this is a foundational principle taught by Bill Gothard with which I happen to agree. I am breathing a prayer for you, for your mother, and for how you pursue your future before the Lord.*

> *Dorothy Kelley Patterson*

106.     Even more terrified for her safety after learning at Patterson had disclosed her

report to Doe, Roe left Fort Worth with her family and moved out of state.

**Patterson is Ousted from SWBTS**

107.     In April and May 2018, SWBTS' and Patterson's history and pattern of

dismissing, discrediting and demeaning abused women came under public scrutiny. In

early May 2018, thousands of Baptist women signed a letter calling for Patterson's ouster

due to his refusal to repudiate his longstanding and persistent remarks about women, including counseling victims of domestic abuse to stay with their husbands and making objectifying comments about a teenage girl.

108.    On May 22, 2018, Patterson was called before the full SWBTS Board of Trustees ("the Board"). Concerned that Patterson may have concealed the issues surrounding Jane Roe from SWBTS and the Board, then-counsel for Jane Roe forwarded information to the Board, including a copy of the "break her down" email message.

109.    Initially, the Board voted to move Patterson to "President emeritus" status and to allow the Pattersons to continue their plan to live on campus in their retirement.

110.    However, additional allegations of Patterson's wrongdoing surfaced – including his covering up a 2003 rape and misappropriating documents when he was president of another Southern Baptist seminary. On May 30, 2018, Patterson was removed as SWBTS President and stripped of all benefits.

111.    In a statement released June 1, 2018, SWBTS Board of Trustees Chairman Kevin Ueckert referenced the "break her down" email and wrote:

*The attitude expressed by Dr. Patterson in that email is antithetical to the core values of our faith and to SWBTS. Moreover, the correlation between what has been reported and also revealed in the student record regarding the 2003 allegation at Southeastern and the contents of the email are undeniable.*

112.    Ueckert's statement has been widely published on the internet.

**Patterson and his Proxies Launch a Public Assault on Jane Roe's Character**

113.    On May 31, 2018, Sharayah Colter, SWBTS student and wife of Patterson's SWBTS Chief of Staff Scott Colter, published a blog defending Patterson. Not only did Colter release personal confidential information about Roe without her consent, the

statements, which were widely published by media outlets, include false defamatory

information. Colter wrote:

*"Patterson immediately called police in response to a female student claiming she had been raped. **The accused man admitted to having sexual relations with the woman, but said it was consensual. The man also produced evidence to the police to that effect.** Southwestern's chief of police can confirm that the Fort Worth Police Department was called and responded. Patterson expelled the male student accused of rape. However, because the female student refused to press charges, Patterson had done all he could by calling the police, expelling the student and encouraging the woman multiple times to press charges."*

These statements are patently false. Doe did not produce evidence of any kind -

photographic or otherwise – establishing consensual sexual relations. Colter either

fabricated this information or, more likely, the false statements were relayed to her for the

purposes of distribution from one of several possible SWBTS agents: Patterson,

Patterson's Chief of Staff Scott Colter, Shelby Sharpe, SWBTS Chaplain Dean Nichols

or SWBTS Police Chief John Nichols.

114.    On June 4, 2018, Shelby Sharp, Patterson's attorney, issued a press release in

response to SWBTS Board Chairman Kevin Ueckert's statement. The release has since

been widely published on the internet. The release included more untruths aimed at

discrediting Roe, including that she had given "conflicting" and "contradictory"

statements. Attempting to explain the "break her down" message, the press release

maintained that Patterson would never meet with a female student alone. Rather, the

release claimed, Patterson simply did not want Roe to be intimidated by a police officer

as he tried to resolve her "conflicting statements." There were no conflicting or

contradictory statements. The written statement Roe gave to the Fort Worth PD on

August 20, 2015 was consistent with the report she made to Patterson the same day.  Roe

gave no other statements in the seven weeks that passed before she was ambushed by Patterson in the Finch meeting.

115.     On June 12, 2018, Shelby Sharp, speaking again for Patterson, told a different story to CNN when he claimed the "break her down" comments related to a dispute between Roe and one of her professors: "*It had to do with her being forthright to her family about another matter not related to the rape.*" Clearly it did not. As evidenced by the email exchange, Nichols had been "*brought up to speed*" regarding "[*John Doe and Jane Roe*]" and wanted to be to be present in the meeting to "*see it through and see what she has to say.*" (See ¶¶ 84-86)

116.     On June 29, 2018, Patterson's close friend and SWBTS benefactor Gary Loveless authored a letter to the SWBTS Executive Board demanding Patterson's reinstatement. The letter has since been widely published by various media outlets and appears on the internet. The letter includes patently false and defamatory statements including the following:

> "*In contrast, the facts regarding the 2015 Southwestern event referenced by Mr. Ueckert in his June 1 statement are well known. It is our understanding that you knew full well that **the female student's allegations of rape were false, that she had engaged in consensual sexual activities on more than one occasion and those acts had taken place in public buildings at the Seminary, and that campus security were shown the nude pictures she texted to the male student.** It is further our understanding that she begged Dr. Patterson not to call the police but he insisted he would and did so within six minutes of hearing her allegation.*
>
> *....*
>
> *The full Board understood and accepted Dr. Patterson's explanation of the phrase "breaking her down" that appeared in that email as being a statement of his desire to meet with her (without police present, but clearly, as was always his practice, with other Seminary personnel present) **an attempt to help her recant her false allegations of rape before she continued with such false statements to the police.** While the actual sentence for a criminal conviction of making false*

*statement to the police may vary from jurisdiction to jurisdiction, the criminal offense remains a permanent mark on an individual's record.*

There were no "nude pictures she texted to the male student." Shelby Sharp, the attorney purporting to represent both Patterson and SWBTS in 2016, admitted that Doe never produced any such photos and there was no evidence Roe ever sent any such photos. And, Roe had already given her statement to the police seven weeks before the meeting in which Patterson was supposedly attempting to "help her." Again, either Gary Loveless and the signatories to this letter fabricated this information or, more likely, the false statements were relayed to them for the purposes of distribution by one or more of several SWBTS agents, including but not limited to Patterson, Patterson's Chief of Staff Scott Colter, Shelby Sharp, SWBTS Chaplain Dean Nichols, and/or SWBTS Chief of Police John Nichols.

## CAUSES OF ACTION

### NEGLIGENCE

#### (Against Patterson and SWBTS)

117.    Roe incorporates all paragraphs of this Complaint as if fully set forth herein.

118.    At all times relevant, Defendants Patterson and SWBTS owed extensive duties to supervise Doe and protect Roe from his abuse.

119.    A special relationship existed between SWBTS and Doe as a seminary student and employee that gave rise to duty to train, supervise and control his actions to prevent harm to third parties.

120.    Defendants voluntarily undertook additional duties to protect Roe as an unmarried female student living and working on campus. Defendants failed to meet these

duties and instead took actions that increased the likelihood that she, and other female students, would be verbally abused, stalked, and/or physically or sexually assaulted by Doe or others.

121.     Defendants had a duty to take reasonable protective measures to protect Roe and other similarly situated students from the risk of dating and domestic violence, sexual abuse and/or sexual assault, such as the duty to properly warn, train or educate Roe and other students about how to avoid such a risk. This created a special relationship between Defendants and Roe, who was entrusted to Defendants' care. Defendants voluntarily accepted the entrusted care of Roe.

122.     Defendants, SWBTS and Patterson, by and through their agents, servants and employees, knew or reasonably should have known of Doe's dangerous and exploitive propensities, and the prevalence of sexual assault, dating violence and retaliatory conduct against reporters of sexual assault and domestic abuse at SWBTS and other universities and/or institutions of higher learning. With this knowledge, it was foreseeable that if Defendants did not adequately exercise or provide the duty of care owed to Roe and students in general, including but not limited to negligently hiring, supervising and retaining, female students would be vulnerable to sexual assault, domestic violence and retaliatory conduct by Doe and others.

123.     Defendants reinforced the perception that women were to remain silent and submissive and thereby affirmatively increased the likelihood that Roe, and other female students, would be assaulted by male students and/or employees, who knew they were unlikely to face any repercussions from their actions. By voluntarily entering an

affirmative course of action affecting the interests of Roe, Defendants assumed a duty to act with reasonable care.

124.     Defendants knew or reasonably should have known that Doe possessed <u>nine</u> prohibited weapons on campus. Defendants failed to enforce the SWBTS policy prohibiting the possession of firearms on campus and/or Patterson was negligent making an exception to the policy by authorizing Doe to possess weapons.

125.     Defendants failed to ensure that University employees involved in responding to allegations of sexual assault and dating violence were trained and educated to competently respond.

126.     Defendant SWBTS and Patterson breached their duty of care by engaging in conduct including, but not limited to:

   a.  Failing to assure adequate staff training to meet the behavior and social needs of all individuals, including sexual assault and domestic violence victims;

   b.  Failing to train faculty and staff to respond to allegations of sexual assault and domestic violence in a manner consistent with state and federal law;

   c.  Failing to supervise faculty and staff to ensure proper supervision, control, restraint and monitoring of student-employees;

   d.  Failing to properly train faculty and staff to screen the backgrounds (criminal and social) of student-employees;

   e.  Failing to properly train and/or educate the faculty and staff responsible for recruiting, caring for, and supervising student-employees with criminal and anti-social backgrounds;

   f.  Failing to appropriately monitor to ensure that student-employees are not brought

on to campus without regard to the safety of other students;

g.  Failing to implement safeguards for female students adequate to protect them from foreseeable criminal and anti-social activities;

h.  Sanctioning and carrying out untrained, informal investigations of reports that Doe and others have committed sexual assault and domestic violence;

i.  Failing to provide supervision and training in administration of counseling of victims of sexual assault following an attack and

j.  Ratifying the sexual misconduct and violent assaults committed by student - employees by failing to discourage such behavior in prior instances.

127.   But for the intentional and negligent acts and omissions of Defendants SWBTS and Patterson and their violations of the standards of care set forth herein, Roe would not have been injured.  Defendants' intentional and negligent acts and omissions therefore amount to negligence and negligent failure to warn, train and/or educate.

128.   As a result of the above-described conduct, Roe has suffered, and continues to suffer, great pain of mind and body, physical injury, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing Roe's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## PUBLIC DISCLOSURE OF PRIVATE FACTS

### (Against Patterson and SWBTS)

129.     Plaintiff incorporates herein all preceding allegations.

130.     The sexual assaults Jane Roe suffered and the details surrounding her report to

Patterson and SWBTS was private information not generally known to the public or of

legitimate public concern.

131.     Defendant SWBTS, through its agents and employees, publicly disclosed the

private information about Jane Roe to at least one SWBTS employee who had no

legitimate need to know or to enough people that it was reasonably likely the private fact

would become public knowledge.

132.     Defendant Patterson publicly disclosed the private information to one or more

persons so that it was reasonably likely the private fact would become public knowledge.

133.     Defendants first disclosed these private facts in 2015 and  continue to disclose

these private facts . Multiple disclosures were made in May, June and July 2018.


## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against Patterson and SWBTS)

134.     Plaintiff incorporates herein all preceding allegations.

135.     As a result of his status within the SBC and his position as President of SWBTS,

Patterson exerted tremendous influence over all students and employees at the seminary.

He was the ultimate authority on all matters. Patterson abused his position of trust and

authority to "break down" Jane Roe, who trusted Patterson to protect her. Patterson's

abuse was particularly egregious because he knew that Jane Roe was a fragile victim of

multiple violent sexual assaults who was particularly susceptible to further emotional distress.

136.     Defendant Patterson acted intentionally and recklessly by setting out to "break down" Jane Roe in a meeting with no other officials present. As set forth above, when Jane Roe reported the violence and rapes to Patterson, he reacted not with compassion and concern for her well-being, but instead with disdain, skepticism, and accusations. Patterson ultimately indicated to Jane Roe and her family that the rapes were a "good thing." Patterson even asked Jane Roe in front other SWBTS' officials if John Doe had ejaculated when he assaulted her and if she had missed her monthly period.

137.     Defendant Patterson ignored Roe's genuine and well-founded fear of Doe and disregarded law enforcement's directive not to contact Doe to question him about the rapes because doing so could endanger Roe. Patterson did exactly what law enforcement officers told him not to do: He called Doe, questioned him and disclosed Roe's report. Patterson did all this knowing that Doe had indeed been in possession of multiple firearms on campus. Patterson's actions put Roe and her family in danger and caused her extreme distress and anxiety.

138.     Moreover, Patterson not only disclosed the sexual assaults to another faculty member, Candi Finch, in the presence of and without the consent of Jane Roe, but he also told Jane Roe in front of Ms. Finch that he "did not know who to believe." In front of Ms. Finch, Patterson accused Jane Roe of lying about the sexual assaults and the firearms, of engaging consensual sexual activity and of sending nude photos to Doe. Patterson later said, when he thought he and Roe were alone, that "no rapist ever admits

to raping anyone; they ALL say it's consensual." He did not realize that Roe's mother was sitting a few feet away and heard him say this.

139.        Patterson's extreme and outrageous behavior continues to the present. The accusations he leveled at Roe in the October 8, 2015 meeting have been recast as "true facts" and have been widely published on the internet. Since May 2018, Patterson has published or caused to be published false statements, including statements that Roe lied to police, engaged in consensual sexual intercourse on multiple occasions on campus, and sent multiple nude photographs to Doe.

140.        Patterson's conduct is extreme and outrageous.

141.        Plaintiff suffered severe emotional distress.

142.        Defendant Patterson's extreme and outrageous conduct proximately caused Plaintiff severe emotional distress.

143.        No alternative cause of action exists against Patterson that would provide a remedy for the severe emotional distress caused by Patterson's conduct.

## GROSS NEGLIGENCE AND EXEMPLARY DAMAGES

### (Against Patterson and SWBTS)

144.        Plaintiff incorporates herein all preceding allegations.

145.        As evidenced by Patterson's email that he intended to "break down" Jane Roe upon meeting with her, Patterson acted intentionally, recklessly, and with malice with specific intent to cause substantial injury to Plaintiff Jane Roe. Patterson's actions, moreover, when viewed objectively from the Defendants' standpoint were taken with

conscious indifference to the rights, safety, and welfare of Jane Roe. Defendant Patterson is therefore personally liable for exemplary damages.

146.	Defendant SWBTS is liable for exemplary damages for its own conduct and for the conduct of Patterson. SWBTS' own acts and omissions, as set above, when viewed objectively from the SWBTS' standpoint at the time they occurred, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff. Moreover, SWBTS had actual, subjective awareness of the risk but proceeded with conscious indifference to the rights, safety, and welfare of Jane Roe.

147.	In addition, Defendant SWBTS is vicariously liable for Patterson's exemplary damages because (1) Patterson was an agent of SWBTS employed in a managerial capacity and was acting within the scope of his employment; (2) Patterson was an agent of SWBTS employed in a managerial capacity and SWBTS ratified his conduct; and (3) Patterson acted with malice and gross negligence as set out above.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff prays for damages; exemplary damages; costs; interest; statutory/civil penalties according to law; attorneys' fees and costs of litigation and such other relief as the court deems appropriate and just.

## PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS

Dated:  May 22, 2019

Respectfully submitted,

*/s/ Sheila P. Haddock*
Sheila P. Haddock
Attorney- in- Charge
Texas State Bar No. 00790810
sheila@zalkin.com

Alexander S. Zalkin (*pro hac vice pending*)
alex@zalkin.com
Irwin M. Zalkin (*pro hac vice pending*)
irwin@zalkin.com
THE ZALKIN LAW FIRM, P.C.
12555 High Bluff Drive, Ste. 301
San Diego CA  92130
Telephone: (858) 259-3011
Facsimile: (858) 259-3015

*Attorneys for Plaintiff Jane Roe*