UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| JANE ROE | § | |
| | § | |
| v. | § | CIVIL NO. 4:19-CV-179-SDJ |
| | § | |
| LEIGHTON PAIGE PATTERSON, | § | |
| ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Jane Roe's Motion for Sanctions and Entry of Default Judgment Against Defendant Southwestern Baptist Theological Seminary, (Dkt. #356), and Plaintiff Jane Roe's Supplemental Motion for Sanctions Against Defendant Southwestern Baptist Theological Seminary, (Dkt. #375). The Court, having reviewed the motions, the parties' subsequent briefing, the record, the relevant case law, and the parties' arguments presented at the December 6, 2022, hearing on these motions, has concluded that the motions should be **DENIED**.

## I. BACKGROUND

On March 11, 2019, Plaintiff Jane Roe filed her original complaint against Defendant Southwestern Baptist Theological Seminary ("SWBTS") and Defendant Leighton Paige Patterson, asserting various causes of action relating to Roe's alleged sexual assault by former SWBTS student-employee John Doe. (Dkt. #1). On February 21, 2020, Roe served SWBTS with her First Request for Production, (Dkt. #375 at 8), requesting in part:

> ALL DOCUMENTS maintained by the SWBTS Police Department concerning reports and/or investigations of dating violence, domestic abuse, stalking, sexual assault, retaliation and/or harassment from 2010 to 2018, and any COMMUNICATIONS by or between SWBTS

1

police department officers, SWBTS administration and/or third parties concerning these reports and/or investigations.

(Dkt. #377-16 at 21).

In response to this and other requests, SWBTS corporate representative Colby Adams led campus-wide document searches for any discovery responsive to Roe's requests, (Dkt. #365-1 at 1–2), which efforts included routine correspondence with current SWBTS Police Chief Kevin Collins. (Dkt. #393 at 17). In connection with several of its motions for partial summary judgment, SWBTS relied on affidavits from Adams, wherein Adams stated that he was "familiar with and [had] personal knowledge of SWBTS's records and documents." (Dkt. #257-2 at 1). And in these motions for partial summary judgment, SWBTS stated that then-SWBTS Police Chief John Nichols had received no other complaints of sexual assault outside of the instant complaint by Plaintiff Jane Roe, (Dkt. #173 at 16, #174 at 12, #257 at 15–16), which was consistent with the fact that SWBTS had not produced any other reports or complaints of sexual assault in response to Roe's discovery requests.

However, in response to SWBTS's most recent motions for partial summary judgment, Roe filed certain declarations from former SWBTS students who claimed to have reported instances of sexual assault or harassment to SWBTS during the time period Roe sought discovery. (Dkt. #292-4, #292-5, #292-51). Upon learning of the identities of these students, SWBTS went back into its records and supplemented certain of its disclosures, now producing a police report made by one of the students Roe identified, which report alleged sexual assault by an SWBTS graduate student / adjunct professor.

2

In apparent response to SWBTS's supplementation, on October 4, 2022, Roe filed her first motion for sanctions and entry of default judgment against SWBTS, asserting that "SWBTS concealed evidence of other reports of sexual harassment and sexual assault," that "key SWBTS witnesses committed perjury," that "SWBTS failed to comply with this Court's discovery order overruling its assertion of attorney client privilege," and that "SWBTS deliberately misled the Court and mischaracterized the summary judgment record." (Dkt. #356 at 7–8, 14, 16) (cleaned up). After that motion had been fully briefed by the parties, Roe filed a supplemental motion for sanctions and entry of default judgment against SWBTS, renewing her previous argument that SWBTS had concealed evidence throughout discovery.

In her supplemental motion, Roe alleges that SWBTS's corporate representative Colby Adams had actual, personal knowledge of at least one former student's police report of sexual assault that SWBTS failed to disclose throughout discovery, only producing that report following Roe's submission of a declaration from that student. In light of this failure, Roe asserts that SWBTS's "pattern of deception precludes a fair adjudication of this case." (Dkt. #375 at 12) (cleaned up). The Court held a hearing on these motions. The parties submitted evidence at the hearing, including the testimony of both Adams and Chief Collins. (Dkt. #389, #390, #391, #393).

## II. LEGAL STANDARDS

Roe moves for sanctions and entry of default judgment against SWBTS on two separate grounds: Federal Rule of Civil Procedure 37(b) and the Court's inherent power. At the outset, the Court notes that the Fifth Circuit has characterized this

kind of death-penalty sanction as a "draconian remedy" to be used only as a "remedy of last resort." *F.D.I.C. v. Conner*, 20 F.3d 1376, 1380–83 (5th Cir. 1994) (quoting *Batson v. Neal Spelce Assocs., Inc.*, 765 F.2d 511, 515 (5th Cir. 1985) (reversing a district court's dismissal of plaintiff's claims with prejudice under Federal Rule of Civil Procedure 37(b), even while acknowledging plaintiff's "miscreant behavior").

Federal Rule of Civil Procedure 37(b)(2)(A) provides that where a party "fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders." Specifically enumerated as a "further just order" is the Court's authority to render "a default judgment against the disobedient party." FED. R. CIV. P. 37(b)(2)(A)(vi). However, several factors must be satisfied before a default judgment can be entered based on a party's refusal to comply with a discovery order. Specifically, a court must conclude that:

> (1) the refusal to comply results from willfulness or bad faith and is accompanied by a clear record of delay or contumacious conduct; (2) the violation of the discovery order [is] attributable to the client instead of the attorney, (3) the violating party's misconduct substantially prejudice[d] the opposing party; and (4) a less drastic sanction would not substantially achieve the desired deterrent effect.

*Moore v. CITGO Ref. & Chem. Co., L.P.*, 735 F.3d 309, 316 (5th Cir. 2013) (cleaned up). Under Rule 37(b), the grant of a default judgment against a defendant for a violation of a court order is analyzed under the identical standard as a dismissal of a plaintiff's case for violation of a court order. *Pressey v. Patterson*, 898 F.2d 1018, 1021 n.2 (5th Cir. 1990).

In addition to their authority derived from statutes and rules, federal courts also possess "inherent power to manage their own affairs so as to achieve the orderly

and expeditious disposition of cases." *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1417 (5th Cir. 1995) (cleaned up) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)). The Supreme Court has non-exhaustively recognized as being within the scope of a federal court's inherent power the ability to "punish for contempts," to "vacate its own judgment upon proof that a fraud has been perpetrated upon the court," to "conduct an independent investigation in order to determine whether it has been the victim of fraud," to "bar from the courtroom a criminal defendant who disrupts a trial," to "dismiss an action on grounds of *forum non conveniens*," and to sua sponte "dismiss a suit for failure to prosecute," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), as well as the ability to sanction a party for attorney's fees for conduct which abuses the judicial process, *see, e.g., Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107–08, 137 S.Ct. 1178, 197 L.Ed.2d 585 (2017) (discussing generally a federal court's authority to assess attorney's fees as a sanction). The Fifth Circuit has gone further, stating that within a federal court's inherent power lies the ability to dismiss a case "as a sanction for a party's failure to obey court orders." *Woodson*, 57 F.3d at 1417 (citing *In re United Markets Int'l, Inc.*, 24 F.3d 650, 654 (5th Cir. 1994)).[1]

---

[1] *But see Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 207, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958) (stating that "whether a court has power to dismiss a complaint because of noncompliance with a production order *depends exclusively upon Rule 37*," and concluding that reliance upon inherent power for that result "can only obscure analysis of the problem" (emphasis added)); *Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1407 & n.20 (5th Cir. 1993) (noting "tension" between *Societe Internationale* and the line of cases which "establishes that the Rules are not always the exclusive source of a federal court's powers in civil cases"). The seemingly contradictory results of *Woodson* and *Societe Internationale* notwithstanding, at least one

"The ultimate touchstone of inherent powers is necessity," *Nat. Gas Pipeline Co. of Am.*, 2 F.3d at 1412, although this power must be exercised "with great caution," *Chambers*, 501 U.S. at 43 (quoting *Ex parte Burr*, 22 U.S. (9 Wheat.) 529, 531, 6 L.Ed. 152 (1824)). At bottom, a federal court's inherent power to impose sanctions is "more limited" than its power to sanction under an explicit rule or statute, and is confined solely "to instances of bad faith or willful abuse of the judicial process." *Pressey*, 898 F.2d at 1021; *see also Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (noting that "a specific finding" of whether a party's conduct "constituted or was tantamount to bad faith" must "precede *any* sanction under the court's inherent powers." (emphasis added)). The Supreme Court has further instructed that "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power," but that a court may nonetheless "rely on its inherent power" if it believes in its "informed discretion" that no rule or statute is "up to the task" of providing the necessary punishment for a litigant's improper conduct. *Chambers*, 501 U.S. at 50.

---

district court within the Fifth Circuit has reasoned that *Woodson* not only empowers a district court to dismiss a case when a plaintiff has engaged in sanctionable conduct, but that *Woodson* also empowers a court under its inherent authority to "impose default judgment . . . when necessary to deter bad faith or willful abuse of the judicial process." *Sarco Creek Ranch v. Greeson*, 167 F.Supp.3d 835, 845 (S.D. Tex. 2016) (Costa, J., sitting by designation) (cleaned up) (citing *Pressey*, 898 F.2d at 1021 n.2 for the proposition that "sanctions of default judgment and dismissal with prejudice are viewed 'interchangeably' in this circuit").

Of course, what constitutes bad faith, as opposed to carelessness or mistake, can at times be a difficult line to draw. The Fifth Circuit has identified instances where a party "practices a fraud upon the court or delays or disrupts the litigation or hampers a court order's enforcement" as examples of bad faith sufficient to invoke a federal court's inherent powers. *Williams v. Lockheed Martin Corp.*, 990 F.3d 852, 867 (5th Cir. 2021); *see also Goodyear Tire*, 581 U.S. at 105 (agreeing with the district court's characterization of a party's "repeated and deliberate" withholding of key discovery as "bad-faith behavior" aimed at "frustrat[ing] the resolution of [the] case on the merits" (cleaned up)). Critical to this inquiry is whether the conduct at issue demonstrates a litigant's intentional and knowing effort to disrupt, delay, or similarly compromise the course of litigation. As has been aptly explained by another court within this circuit:

> There is a line—perhaps at times a fine line—between a mistake or oversight that leads to inaccurate or incorrect testimony and a falsehood or intentional omission. Part of what defines that line is a matter of intent or willfulness. That is also what distinguishes discovery conduct that is sanctionable under the Court's inherent powers from that which is not properly subject to sanctions.

*Orchestrate HR, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 496 (N.D. Tex. 2016).

Finally, to impose the sanction of default judgment, the Court must assure itself that any finding that the sanctioned party has acted in bad faith or has otherwise willfully abused the judicial process is supported by clear and convincing evidence. *See In re Moore*, 739 F.3d 724, 729–30 (5th Cir. 2014) (noting that "[a] decision to invoke the inherent power to sanction requires a finding of bad faith or willful abuse of the judicial process . . . supported by clear and convincing proof."

(cleaned up)); *Sarco Creek Ranch*, 167 F.Supp.3d at 845–46 (reviewing the record for "clear and convincing" evidence of bad faith or willful abuse before entering the sanction of default judgment while observing that at least one unpublished Fifth Circuit decision has suggested "that the higher burden of clear and convincing evidence" is not required in attorney's fee sanction cases, citing *White v. Reg'l Adjustment Bureau, Inc.*, 632 F.App'x 234, 236 & n.1 (5th Cir. 2016) (per curiam)). This is a demanding standard, requiring "more than a preponderance of the evidence," and instead, evidence that is "so direct and weighty as to leave the factfinder with a firm belief in the truth of the facts of the case." *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001).

### III. DISCUSSION

#### A. Sanctions under Federal Rule of Civil Procedure 37(b)

Roe first argues that this Court should sanction SWBTS under Federal Rule of Civil Procedure 37(b) due to SWBTS's "repeated refusal to cooperate with discovery." (Dkt. #356 at 6). However, this argument fails at the start, as Roe has not established that SWBTS has violated a specific court order such that Rule 37(b) sanctions are proper.

The only Court order Roe identifies in either of her motions is this Court's order on Roe's Motion to Compel Discovery Responses (the "Compel Order"). (Dkt. #137). The Compel Order overruled several of SWBTS's assertions of privilege, holding in relevant part that SWBTS had a duty to produce all non-privileged documents relating to Roe's request for SWBTS's Trustee meeting minutes. In compliance with the Compel Order, SWBTS produced two sets of minutes. Roe maintains that the

minutes produced by SWBTS are noncompliant with the Compel Order, and she separately argues that SWBTS further failed to comply with the Compel Order by providing inadequate responses to certain of Roe's requests for admission.

### i. SWBTS's production of meeting minutes

With respect to SWBTS's production of meeting minutes, Roe makes two arguments. First, Roe argues that there should be an additional set of minutes relating to an executive committee meeting which occurred on May 22, 2018. *See* (Dkt. #356 at 15) ("No minutes from the May 22, 2018 meeting of the Executive Committee that occurred prior to the meeting of the full board was produced."). Second, Roe argues that, because the produced minutes show no redactions, SWBTS either **(1)** failed to produce the correct meeting minutes, or **(2)** made a bad faith assertion of privilege. None of Roe's accusations regarding SWBTS's production of meeting minutes has merit.

As to Roe's first argument, to the extent that Roe believes SWBTS failed to produce an "additional" set of meeting minutes, this complaint is not properly raised for the first time as a sanctions motion under Rule 37(b). When SWBTS first produced certain sets of Trustee meeting minutes that Roe believed to be deficient (which production occurred on November 24, 2021, (Dkt. #356 at 15)), Roe should have made a request under Federal Rule of Civil Procedure 34(a) to inspect SWBTS's records to confirm that no other relevant meeting minutes existed.[2] And if SWBTS resisted such

---

[2] Indeed, as stated by Adams at the December 6, 2022, motion hearing, all Trustee meeting minutes were kept "in a central location, digitally stored" "in a Dropbox folder . . . going back to I think 2007." (Dkt. #393 at 99).

a request, Roe could then have moved to compel under Federal Rule of Civil Procedure 37(a)(3)(B)(iv), which specifically provides for court intervention when a party "fails to produce documents or fails to respond that inspection will be permitted—or fails to permit inspection—as requested under Rule 34." Roe, however, did not make any such request or motion in response to SWBTS's production of meeting minutes. Instead, Roe waited nearly a full year after SWBTS produced the now complained-of minutes before filing a motion for sanctions requesting that the Court enter default judgment against SWBTS.

Further, the record before the Court shows that SWBTS complied fully with the Compel Order by producing the Trustee meeting minutes it previously identified as withheld. As asserted in the privilege log relevant to the Court's Compel Order, SWBTS claimed to be withholding only two sets of meeting minutes: "Minutes of May 22, 2018 meeting" and "Minutes of May 30, 2018 meeting." (Dkt. #139-2 at 6–7). And, in response to the Compel Order, SWBTS produced these minutes. Roe's first argument fails both procedurally and substantively.

Roe's second argument, premised on her suspicion that the lack of redactions to the produced meeting minutes means either that the correct minutes were not produced, or that any privilege previously asserted was made in bad faith, is equally unpersuasive. Again, Roe fails to point to any evidence that SWBTS produced the wrong set of meeting minutes. As described above, the record suggests the opposite— that SWBTS produced minutes for the meetings on May 22, 2018, and May 30, 2018, the same minutes that it had previously withheld based on its assertion of privilege.

As to Roe's assertion that the lack of redactions to the produced meeting minutes suggests that SWBTS's prior assertion of privilege was unfounded, even assuming arguendo that Roe is correct, such discovery misconduct would not, in and of itself, violate any order of this Court. Absent an identified violation of a court order, Federal Rule of Civil Procedure 37(b) has no application to the assertion of privilege complained-of by Roe. *See* FED. R. CIV. P. 37(b)(2)(A) (permitting sanctions where "a party . . . fails to obey *an order* to provide or permit discovery") (emphasis added). Roe's allegations of improper discovery behavior on the part of SWBTS, untethered to any specific court order, fail to implicate the provisions of Rule 37(b).

Beyond their procedural flaws, Roe's allegations of misconduct concerning SWBTS's production of meeting minutes also fail on the merits. In relevant part, the Compel Order on SWBTS's assertion of privilege held as follows: "(i) underlying facts discussed at any point in the Trustee Minutes are not privileged; (ii) anything discussed while Patterson or [Patterson's personal attorney] were present is not privileged; and (iii) anything discussed while any other third party to the attorney-client relationship between SWBTS, the Trustees, and [SWBTS Attorney Michael Anderson] was present is not privileged." (Dkt. #211 at 9). The Court concluded that "[t]he minutes should therefore be produced, with any privileged information contained in the minutes redacted." (Dkt. #211 at 12). Roe argues that, despite SWBTS's claim that the minutes included privileged information, "no redactions are reflected," and therefore it "strains credulity" that this is the information SWBTS fought to withhold on privilege grounds. (Dkt. #356 at 15). In short, Roe contends that

the lack of redactions to the minutes ultimately produced by SWBTS shows that SWBTS has failed to comply with the Compel Order.

As previously noted, a party seeking default judgment for the violation of a court order under Rule 37(b) bears the burden of establishing that "the refusal to comply [with the court order] results from willfulness or bad faith and is accompanied by a clear record of delay or contumacious conduct." *CITGO Ref. & Chem. Co., L.P.*, 735 F.3d at 316. Roe has failed to make such a showing, as nothing in the produced minutes shows "willfulness or bad faith" "accompanied by a clear record of delay or contumacious conduct" on the part of SWBTS. Contrary to Roe's assertions, it is not difficult to understand why SWBTS wished to protect the minutes from discovery, as they concern the details of the appointment of Patterson to a lifetime position at SWBTS, including his compensation and benefits package, and also reflect SWBTS's reversal of course on these matters. While the Court ultimately determined that anything discussed at these Trustee meetings in the presence of third parties was not privileged, this in no way establishes "willfulness or bad faith" on the part of SWBTS in asserting the privilege in the first instance.

Concerning the lack of redactions to the minutes, as counsel for SWBTS noted at the hearing, SWBTS specifically sought to shield details of Patterson's benefits package from the discovery process. In response to the Compel Order, however, it appears that SWBTS no longer seeks to protect such information as privileged or has otherwise conceded that the information does not qualify as privileged material.

Roe further argues that "[t]he minutes are otherwise suspect as inaccurate and incomplete," taking issue with such facts as "the minutes of the May 22, 2018 meeting only reflected that 11 persons were in attendance when almost the entire 40-member board was present," a discrepancy she alleges to be a "glaring omission[]" from the minutes. (Dkt. #356 at 15). To be sure, then-Chairman of the Board of Trustees Kevin Ueckert acknowledged that the attendance record reflected in the May 22, 2018, Trustee meeting minutes was not accurate. (Dkt. #358-22 at 6–7). However, Roe fails to explain how this and other clerical errors associated with the minutes rises to the level of bad faith—indeed, Roe's own briefing points to the opposite, as Roe notes that when asked to explain "why the [May 30, 2018] minutes contained blanks . . . instead of identifying trustees" by name, "Ueckert responded that the trustees 'asked to be anonymous.'" (Dkt. #356 at 15–16).

### ii. SWBTS's responses to certain requests for admission

Separately, Roe argues that SWBTS failed to comply with the Compel Order in connection with certain of Roe's requests for admission. Specifically, Roe avers that "SWBTS objected to 14 Requests for Admissions based on attorney client privilege," and that following the Court's Compel Order, "SWBTS did not withdraw its objections as directed," but instead had to be prompted by Roe. (Dkt. #356 at 16). Following this prompting, Roe asserts that "[a]lthough SWBTS withdrew its assertions of attorney-client privilege, it replaced its objections to seven of the Requests" with the following nonresponsive answer: "SWBTS [states] that after a reasonable inquiry, the information known to SWBTS or that can be readily obtained from SWBTS is

13

insufficient to enable SWBTS to admit or deny this request; therefore, deny." (Dkt. #356 at 16) (first quotation), (Dkt. #358-25 at 3–4) (second quotation).[3]

To the extent Roe contends that SWBTS's answers to certain requests for admission arguably were not the result of a "reasonable inquiry," which is the gist of her argument, she should have timely sought further court intervention, including asking that these requests be deemed "admitted." Of course, any such process would have required an opportunity for both parties to be heard and for the Court to analyze whether SWBTS failed to meet its discovery obligations in answering the identified admissions requests.

But Roe never initiated any such process. Instead, for many months Roe made no complaint about SWBTS's answers to these discovery requests, only to raise this issue shortly before trial and as part of a request for death penalty sanctions.[4] *See* (Dkt. #356 at 19) (requesting a default judgment against SWBTS, arguing that "[a]ny lesser sanction [than default judgment] would be ineffective"); (Dkt. #375 at 13–14) ("This is a case where the defendant's bad faith conduct is so consistent and has so permeated discovery that default judgment is the only sanction adequate to address the harm it has caused."). In so doing, Roe has put the cart before the horse; no

---

[3] While Roe alleges that SWBTS "replaced its objections to *seven* of the Requests" with nonresponsive answers, (Dkt. #356 at 16) (emphasis added), the Court notes that Roe's brief identifies only six allegedly problematic SWBTS answers, *see* (Dkt. #356 at 16 n.10), and likewise cited as the relevant exhibit for that proposition a portion of SWBTS's supplemental answers that also reflected only six allegedly deficient responses, *see* (Dkt. #358-25).

[4] Roe brought her first motion for sanctions on October 4, 2022, noting that SWBTS provided the allegedly unsatisfactory answers on January 18, 2022. (Dkt. #356 at 16).

sanction can be imposed under Rule 37(b) absent a *proven* violation of a court order. Speculative assertions of such a violation, even if they raise questions about a party's discovery conduct, will not suffice.

Altogether, the Court concludes that Roe has failed to establish that SWBTS has engaged in any sanctionable conduct in connection with this Court's orders, much less sanctionable conduct demanding that a death-penalty default judgment be imposed against it.

## B. The Court's inherent power to sanction

In the alternative, and as emphasized in her supplemental motion for sanctions, Roe argues that the totality of SWBTS's alleged discovery misconduct is sufficient to permit the Court to invoke its inherent powers and enter default judgment against SWBTS. According to Roe, while "SWBTS' conduct does not fit squarely within the parameters of any one rule or statute," "SWBTS has demonstrated a broad pattern of deceit" that has prevented Roe from developing her case, such that default judgment is the only sufficient remedy. (Dkt. #375 at 12).

The Court's inherent power to sanction, invoked by Roe, is confined solely "to instances of bad faith or willful abuse of the judicial process," *Pressey*, 898 F.2d at 1021, and has no application here. That is because Roe has failed to establish that SWBTS has acted with bad faith or otherwise willfully abused the judicial process

through its discovery conduct, much less engaged in conducted meriting default judgment. The Court considers in turn each of Roe's allegations.[5]

### i. Allegations of perjury

A witness commits perjury if he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993) (citing 18 U.S.C. § 1621). The fact that a witness's testimony may be impeached, and even proved to be incorrect or inaccurate, does not mean that the witness committed perjury. As courts have long recognized, inconsistencies in deposition testimony can often "provide fertile ground for vigorous impeachment" while falling short of supporting a finding of perjury. *Montaño v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008). Here, Roe has alleged that two SWBTS witnesses, former SWBTS Police Chief John Nichols and former SWBTS Chaplain Dean Nichols, committed perjury when they gave their depositions, and even more, that SWBTS's attorneys suborned perjury in eliciting certain of this testimony. (Dkt. #356 at 8, 10). The Court disagrees.

Roe points to Chief Nichols's deposition testimony claiming that, other than Roe's report of sexual assault, he had never received any other such reports. However,

---

[5] The Court notes that, while not explicitly considered below, to the extent Roe argues that SWBTS's alleged violations of the Court's Compel Order constitutes an independent ground for sanctions under the Court's inherent power, that argument is necessarily foreclosed given that the Court has already determined that these alleged violations fail to satisfy the standard for sanctions under Federal Rule of Civil Procedure 37(b), as "the burden for imposing sanctions under a court's inherent power is higher than for sanctions under specific rules." *Sarco Creek Ranch*, 167 F.Supp.3d at 845.

Roe notes that SWBTS later produced a 2018 campus police report involving another student, R.B., who claimed to have been sexually assaulted by an SWBTS graduate student who also served as an adjunct professor. The record further shows that Chief Nichols was present during an interview of R.B. about this sexual assault allegation.

This evidence can surely be used to impeach Chief Nichols's testimony, but Roe has not shown that Chief Nichols willfully provided false testimony during his deposition. To understand why, it is helpful to examine the context of this testimony, and the history of R.B.'s allegations. To begin with, R.B.'s 2018 report to SWBTS concerned events that happened five years earlier, in 2013, at which time R.B. told a different story. As originally reported to SWBTS in 2013, R.B.'s sexual encounter with the adjunct professor was consensual, not an assault. (Dkt. #377-26 at 5). It was not until 2018 that R.B. came back to SWBTS, reframing the 2013 encounter as one of sexual assault. Thus, unlike Roe's allegations of repeated, violent rapes, R.B.'s allegations changed materially over time. As SWBTS itself has acknowledged, R.B.'s 2018 report should have been produced in discovery, and as evidenced by the errata submitted in connection with his deposition, Chief Nichols ultimately recalled receiving the 2018 report after reviewing R.B.'s declaration. However, given that Chief Nichols was deposed a number of years after these events had occurred, and that R.B.'s account of those events changed materially over time, the Court cannot

conclude that Chief Nichols willfully intended to provide false testimony, as opposed to providing answers marked by confusion, mistake, or faulty memory.[6]

With respect to Dean Nichols's testimony, Roe has, at best, identified inconsistencies that might serve as grounds for impeachment, but which all fall well short of perjury. Roe argues that Dean Nichols committed perjury in his deposition in three ways: **(1)** by denying "that he distributed or posted 'The Untold Truth' or the Sharpe 'Release of Facts,'"[7] when "posts from his Facebook account reflect[ed] that he did"; **(2)** by denying that he had spoken with any of the individuals who signed the Gary Loveless donor letter even though the record reveals an email from Gary Loveless on which Dean Nichols was blind copied;[8] and **(3)** by initially testifying "that

---

[6] To the extent Roe argues that both SWBTS and SWBTS's counsel "suborn[ed] perjury to discredit Plaintiff and advance its false narrative" in connection with Chief Nichols's deposition, (Dkt. #356 at 8, 10), as the Court concludes that Roe has failed to show that Chief Nichols committed perjury, these arguments are foreclosed. *See also In re Moore*, 739 F.3d at 733 (noting that, in an "inherent power dismissal" case," the "appeal turn[ed] on whether clear and convincing evidence demonstrate[d] that [appellant], not [appellant's counsel], willfully abused the judicial process," as "[n]either imputed bad faith nor suspicion alone justifies the invocation of the inherent power").

[7] "The Untold Truth" was a blog post written in defense of Patterson following Patterson's ouster from SWBTS. "The Untold Truth" was authored by Sharayah Colter, the wife of Scott Colter, with Scott Colter being Patterson's Chief of Staff while Patterson was employed by SWBTS. (Dkt. #280 at 20–21). The "Sharpe 'Release of Facts'" relates to a press release made by Patterson's former attorney, Shelby Sharpe, "to set the facts straight" concerning alleged "wide-spread misrepresentation and misinformation regarding Dr. Patterson." (Dkt. #280-29 at 2). Roe challenges both publications as being defamatory. (Dkt. #223 at 29–30 ¶¶ 129–40).

[8] Similar to "The Untold Truth" and the Sharpe "Release of Facts," the Gary Loveless donor letter was a document made in support of Patterson following his termination from SWBTS, submitted to the SWBTS Executive Committee of the Board of Trustees "to express [the signatories'] utter disdain for [SWBTS's] actions on May, 30, 2018, regarding Dr. Paige Patterson." (Dkt. #280-38). Roe challenges this letter as being defamatory. (Dkt. #223 at 29–30 ¶¶ 129–40).

Doe told him directly that he and Roe had consensual sexual relations" only later to testify that "he had no information that would verify" the truth of that statement in connection with the Loveless donor letter. (Dkt. #356 at 14).

As to Roe's first point, a witness's failure correctly to recall their social media activity may be grounds for impeachment, but does not support Roe's perjury allegation, at least not on this record. As to Roe's second point, it is unclear if this statement even constitutes an inconsistency—simply being blind copied on an email does not necessarily mean that the sender and the recipient have ever spoken. Likewise, with respect to the third statement, there is a clear distinction between an individual testifying to his own personal knowledge of a given event as compared to being asked whether that individual has "any information that would verify whether" that testimony is true.

Altogether, Roe has failed to identify any instances of perjury in this case, much less perjury attributable to SWBTS that is sufficient to merit default judgment. *See Montaño*, 535 F.3d at 564 (noting that perjury "may" justify dismissal as "one can imagine perjury cases in which a sanction of dismissal would be excessive." (cleaned up)).[9]

---

[9] The Court notes that, even if Roe had established that Chief Nichols or Dean Nichols committed perjury, neither of these witnesses was a corporate representative of SWBTS and neither witness was employed by SWBTS at the time of their depositions. (Dkt. #358-13 at 12); (Dkt. #358-14 at 19). It is therefore unclear to the Court, and Roe has not explained, how any perjured testimony of these witnesses—even if it existed—could be imputed to SWBTS.

### ii. Allegations of **mischaracterization of the summary judgment record**

Next, Roe argues that SWBTS's "voluminous briefing is rife with misstatements of law, mischaracterizations of fact and misrepresentations of the record," (Dkt. #356 at 17), and towards this end, highlights three examples: **(1)** SWBTS's varying characterization of a two-page "admissions procedures" document it produced in discovery; **(2)** SWBTS's record citations in support of its summary judgment argument that Roe and Doe were in a romantic relationship; and **(3)** SWBTS's summary judgment argument that "[a]s Patterson testified, it was Doe that informed him that Plaintiff had sent him nude photographs." (citing (Dkt. #259 at 24)).[10]

Concerning the "admissions procedures" document, the thrust of Roe's issue centers around the time period over which the handbook was in effect. In SWBTS's Third Supplemental Responses to Plaintiff's First Request for Production, SWBTS qualified the document as being "implemented after [August 20, 2015], in effect for 2015-2016 academic year." (Dkt. #358-6 at 5). Later, however, SWBTS cited this document seven times in support of its summary judgment argument that it acted properly in admitting Doe as a student, even though Doe was admitted as a student in May 2013, years before the "admissions procedures" document was put in effect. (Dkt. #257 at 8, 9, 10 (twice), 23, 30, 32 [Ex. B(14), (Dkt. #257-2 at 64–66)]).

---

[10] The Court notes that these arguments are properly directed in the first instance to a summary judgment response or surreply brief, and that in this case, while Roe did file both such briefs, in neither did she present any of these issues to the Court.

SWBTS's incorrect citations about the "admissions procedures" document are not indicative of bad faith or willful abuse of the judicial process. First, in each instance that SWBTS cited to the document, it did so as part of a string cite, with the admissions procedure document being cited either second or later within the citation, suggesting that the citation was of auxiliary, and not primary, importance, undercutting the inference that can be made as to the degree to which SWBTS "deliberately misled the Court." (Dkt. #356 at 18). Second, as has been repeatedly noted in this order, where one party relies on incorrect information, the opposing party has every right to refute those reliances, whether by impeachment, in a response brief, or otherwise. Without more, however, such missteps do little to support the imposition of death-penalty sanctions.

Roe also complains about two SWBTS record citations in support of its summary judgment argument that Roe and Doe were in a romantic relationship. The first involves the deposition testimony of Patricia Ennis, which SWBTS cites for the statement that "Doe told others, such as Dean Nichols with SWBTS, and his friend Rebecca Burk, that he was in a romantic relationship with Roe." (Dkt. #356 at 18, citing Ex. H p. 73-75).[11] But the referenced pages of Ennis's testimony concern her

---

[11] Roe does not challenge the other record citations in this paragraph for the proposition that Doe told others he was romantically involved with Roe. The Court notes that the other citations include "Ex. J p. 55, 115-116," which references portions of former SWBTS Police Chief John Nichols's deposition testimony relating to Chief Nichols's opinion that Roe and Doe were in a relationship, (Dkt. #257-10 at 9, 11), and "Ex. T p. 14:6-25; 15:1-20; 24:22-25; 25:1-4," which references portions of Rebecca Burk's deposition testimony wherein Burk testified that Doe told her that he and Roe were in a dating relationship, (Dkt. #257-20 at 3–5).

understanding that Roe would sometimes return to her campus housing late at night, not anything about Doe and Roe's relationship. Acknowledging its mistake, SWBTS asserts that instead of the citation to Ennis's deposition testimony, "the citation should have been to Exhibit A, *Plaintiff's Third Amended Complaint*, page 12, wherein Roe states that "Doe insisted the two were in a romantic relationship."" (Dkt. #373-1 at 3). The Court notes that SWBTS's proposed substitute citation to Roe's complaint also is not on point, because it concerns what Doe told Roe, not what Doe told "others."

The second errant citation occurs in the next sentence of SWBTS's brief, in which it cites the deposition testimony of Dean Nichols in support of the proposition that "Roe admits that Doe told others they were in a romantic relationship together." (Dkt. #356 at 18, citing "Ex. R p. 23-25"). The referenced testimony of Dean Nichols, however, states that, at some point, Doe came into his office and stated that "the relationship that [he] had with [Roe] was completely consensual." (Dkt. #257-18 at 24). While this testimony goes to the question whether Doe told others that he had a romantic relationship with Roe, it does not support SWBTS's contention that Roe herself admitted such a relationship.

Although Roe certainly has a point that SWBTS's inapt and inaccurate citations muddy the summary judgment record on the issues before the Court, these kinds of errors, unfortunately, are not unusual in litigation. Exposing such errors is the typical fare of summary judgment responses—rather than the gravamen of death penalty sanctions. If it were to consider such briefing errors to be an abuse of the

judicial process or to amount to bad faith whenever they occur, a widespread regime of sanctions would become the rule, rather than the exception, of practice before this Court. To the extent Roe urges the Court to go down this road, the Court rejects the invitation.

Concerning Roe's final "mischaracterization" argument, that of SWBTS's summary judgment statement concerning Patterson's alleged testimony relating to his knowledge of nude photographs of Roe, SWBTS again concedes its own error. Here, SWBTS acknowledges that instead of reading "[a]s Patterson testified, it was **Doe** that informed him that Plaintiff had sent **him** nude photographs," (Dkt. #259 at 24) (emphasis added), the challenged sentence should read "[a]s Patterson testified, it was **Dean Nichols** that informed him that Plaintiff had sent **Doe** nude photographs." (Dkt. #365 at 8). Such errors, while undesirable, routinely happen in litigation and do not amount to sanctionable conduct, much less conduct that can serve as grounds for default judgment, particularly without a showing of bad faith— which is absent here. *See, e.g., Alston v. Miss. Dept. of Transp.*, No. 4:16-CV-236-DMB-JMV, 2019 WL 3430771, at *2 (N.D. Miss. July 30, 2019), *aff'd*, 804 F.App'x 225 (5th Cir. 2020) (per curiam) (noting that "an inconsequential typographical error" failed to trigger the "Court's inherent authority to sanction, which only applies to instances of bad faith").

Overall, while it is clear that Roe has identified several instances of sloppy brief writing on the part of SWBTS, Roe has failed to show that these mistakes were wrought in bad faith or were done willfully to abuse the judicial process.

23

### iii. Allegations of the intentional concealment of records

Finally, Roe argues that both SWBTS and its counsel have intentionally engaged in the systematic concealment of records from discovery, preventing Roe from being able adequately to develop her case, such that a fair adjudication of this case is no longer possible, and that accordingly, default judgment is the only proper sanction. (Dkt. #356 at 7–8); (Dkt. #375 at 12–14).

Roe made her initial requests for production on February 21, 2020. In response to this request, SWBTS corporate representative Colby Adams testified that he "had a lengthy meeting with legal counsel," "emailed a request for production to multiple key stakeholders," and "engaged others . . . [who] were the department heads and individuals that would have had control over records for relevant departments." (Dkt. #393 at 55–56).

Adams testified to the nature of the SWBTS records he inherited, describing them both as "fairly disorganized" and "fairly antiquated in [terms of] the digitization of records," and that "before even receiving [the] requests for production," he "had already begun the process of . . . attempting to modernize those things." (Dkt. #393 at 57). In support of establishing the nature of SWBTS's physical records, SWBTS's counsel submitted as exhibits thirty-seven photographs of various locations across SWBTS where documents were stored. (Dkt. #391). Adams testified to his knowledge of the contents of the photographs, explaining that he "spent somewhere between 100 and 125 hours" himself in one room, (Dkt. #393 at 59), "75 to 100 hours" in another

room, (Dkt. #393 at 61), and that in a third location, Adams "personally went through every one of" "70 to 75 boxes of Dr. Patterson's presidential papers." (Dkt. #393 at 63).

These efforts notwithstanding, however, on July 27, 2022, in response to SWBTS's Motion for Partial Summary Judgment Regarding Plaintiff's Negligence and Gross Negligence Claims, (Dkt. #257), Roe submitted the declarations of six previously undisclosed former SWBTS students, each alleging various forms of misconduct they either experienced or witnessed while at SWBTS. (Dkt. #292-2, #292-3, #292-4, #292-5, #292-51, #292-52). Included among these declarations was the declaration of R.B., a former SWBTS student who declared that "[o]n August 27, 2018, [she] reported [sexual] assaults to SWBTS Dean Dr. Michael Wilkinson," who "immediately called SWBTS Campus Police," resulting in an interview at "the Campus Police Department offices." (Dkt. #292-51 at 3 ¶¶ 8–9). R.B. further declared that "Campus Police Chief John Nichols" was present at this interview. (Dkt. #292-51 at 3 ¶ 10).

In response to receiving R.B.'s declaration (and others), Adams testified that he renewed his efforts to ensure that he had produced all responsive documents in SWBTS's possession. Specifically, Adams testified that upon receipt of the declarations from the previously undisclosed women, he "sent a list of names to Chief Collins to do an extra search and to look further for anything [SWBTS] may have." (Dkt. #393 at 67). In response to these instructions, Adams testified that Chief

25

Collins discovered R.B.'s 2018 police report, (Dkt. #393 at 67–68), which was then produced to Roe on September 13, 2022, (Dkt. #356 at 7).[12]

Parallel to all of the above, however, R.B. was also communicating directly with both Adams and Chief Collins. As Chief Collins testified, within "the first couple of weeks" after becoming SWBTS Police Chief in early 2019, he was apprised of R.B.'s 2018 police report by one of his lieutenants, and on R.B.'s request, he soon thereafter spoke with R.B. (Dkt. #393 at 12–13). Chief Collins testified that R.B. "wanted to file a sexual assault report," and that following this request, he "directed [a lieutenant] to file that report with the district attorney's office." (Dkt. #393 at 15). The district attorney's office declined to move forward with R.B.'s report, (Dkt. #393 at 16), and ultimately, on June 13, 2022, a lieutenant emailed Chief Collins informing him that R.B.'s "Offense Report" had been given to R.B., along with other documents related to her report. (Dkt. #358-8 at 8).

On March 15, 2021, SWBTS Dean of Women Dr. Terri Stovall "scheduled a Zoom meeting with [R.B.] and Colby Adams," which meeting occurred on March 19, 2021. (Dkt. #375 at 6). In an updated declaration submitted along with Roe's supplemental motion, R.B. stated that during this March 19, 2021, meeting with Adams and Dr. Stovall, she requested "a copy of [her] statement to the police so that [she] could check the accuracy of it since [she] had never seen it." (Dkt. #377-15 at 3 ¶ 15). R.B. further declared that following this meeting, she "reached out [to Dr.

---

[12] Roe takes issue with this account, noting that the produced report "indicates that it was 'Printed on April 22, 2019.' (Ex. H, SWBTS 003203)." (Dkt. #366 at 2).

Stovall and Adams] via email on May 22, 2021, requesting an update," specifically "request[ing] a copy of [her] 2018 statement to [the] SWBTS police," (Dkt. #377-15 at 4 ¶ 16). R.B. states that "Mr. Adams responded via email on May 23, 2021," writing that "he had spoken with SWBTS Police Chief Collins, who was copied on the email, to clarify the procedure for obtaining [her] police report." (Dkt. #377-15 at 4 ¶ 18). Finally, R.B. declared that while speaking with both Adams and Dr. Stovall in another Zoom call on June 4, 2021, she "was informed that [she] had to submit a written request for [her] police report," which she did, ultimately culminating in her receipt of the police report "in June 2022," (Dkt. #377-15 at 4 ¶¶ 22–24).

The above discrepancies form the heart of Roe's arguments concerning SWBTS's alleged concealment of records.[13] Because these are significant deficiencies

---

[13] To the extent Roe also argues that SWBTS's belated production of an another student's suspension letter, W.W., also constitutes an independent ground for sanctions, (Dkt. #356 at 7), the Court rejects that argument. As characterized by Roe, W.W.'s declaration "described [how W.W. was] expelled for sexual misconduct after seeking counseling for an abusive relationship while the male student involved was not disciplined." (Dkt. #356 at 7). However, it is unclear to the Court how W.W.'s allegations are relevant to Roe's discovery requests, as again, W.W.'s declaration is devoid of any reference to any form of nonconsensual sexual conduct. In the Court's view, the thrust of W.W.'s declaration is that she was disproportionately punished for engaging in consensual sexual conduct as compared to her male partner. Indeed, this much is confirmed by the suspension letter itself, which plainly states that W.W. "acknowledged that [she] had an inappropriate sexual relationship" with another student. (Dkt. #358-7 at 2). However, this is not a discrimination case—this is a negligence and defamation case.

Additionally, to the extent Roe faults SWBTS for not producing records related to two other students, A.A. or M.M., following Roe's submission of declarations from these women, (Dkt. #356 at 7 n.1), again, as a matter of first impression to the Court, these complaints should have been brought as either motions to inspect records pursuant to Federal Rule of Civil Procedure 34 or as motions to compel pursuant to Federal Rule of Civil Procedure 37, not as a motion seeking default judgment. And in any event, as neither A.A. nor M.M. have submitted any direct proof that their reports were ever in fact submitted or otherwise made known to SWBTS, their presently unsubstantiated allegations cannot form the basis of

in SWBTS's discovery production, as SWBTS concedes, the Court must examine whether those deficiencies were the result of bad faith, such that the sanction of default judgment might be merited.

### a. SWBTS Police Chief Kevin Collins

The first question concerns the circumstances surrounding SWBTS's failure to produce R.B.'s police report. This issue was explored in detail during a hearing before the Court, and both Chief Collins and Adams testified at the hearing.

Chief Collins testified that upon his arrival at SWBTS to serve as Police Chief, he discovered that SWBTS's police department relied upon the database "Zuercher RMS, records management system," and that he "made a determination to change [from Zuercher], which was coming up for renewal." (Dkt. #393 at 7–8). In place of the Zuercher system, Chief Collins selected the "Omnigo" database, although he testified that the two databases "were not compatible," such that "to transfer information from Zuercher," he was required to utilize "a two-step process which involved removing criminal cases from the records management system in Zuercher, transfer[ing] them into a police secure share folder in [SWBTS's] system, and then ultimately transfer[ing] those onto the Omnigo system." (Dkt. #393 at 8). Chief Collins explained that while "[n]o data was lost" during this process, "[t]here was data

---

sanctions. What's more, in the case of A.A., even if SWBTS was indeed in possession of the reports she described making, these reports do not appear discoverable, as according to the articles attached to her declaration, they were all made sometime between 2004 and 2007, the period during which A.A. was a student at SWBTS, (Dkt. #292-4 at 2 ¶ 3), which timeframe is decidedly outside of the parties' agreed discovery period of 2010–2018, *see, e.g.*, (Dkt. #358-2 at 3).

of a noncriminal nature that was not transferred," such as records detailing "door unlocks, vehicle battery jumps" and the like. (Dkt. #393 at 10). Chief Collins affirmed that he "segregate[d] out all the alleged criminal incidents on campus," which incidents would have included "things like stalking, [and] things like harassment." (Dkt. #393 at 11).

Chief Collins confirmed that he found R.B.'s police report in the intermediate "holding folder" / "share file" that housed the Zuercher reports before they were transferred to the new database, Omnigo, and that he and his staff "didn't search [the] holding folder that [they] had transferred the Zuercher" files into in response to Roe's initial requests. (Dkt. #393 at 19–20). Chief Collins further affirmed that following receipt of R.B.'s declaration, he had "gone back and looked at" both the Zuercher and Omnigo databases, in addition to performing physical searches of certain document repositories, and he testified that he did not find any other reports of nonconsensual sexual conduct aside from R.B.'s report. (Dkt. #393 at 21–22).

The Court concludes that Chief Collins executed a reasonable, if incomplete, process to identify documents responsive to Roe's requests for production.[14] According

---

[14] While not explicitly argued in her briefing but alluded to during the hearing, *see* (Dkt. #393 at 39–43), to the extent that Roe further argues that R.B.'s initial communication with Chief Collins in early 2019 should have put him on notice of her report in connection with Roe's February 2020 production requests, this argument fails to establish bad faith. As discussed above in connection with Roe's allegations of perjury on the part of former SWBTS Police Chief Nichols, R.B. originally reported, in 2013, that the sexual encounter with the graduate student / adjunct professor was consensual, (Dkt. #377-26 at 5). It was not until 2018 that R.B. came back to SWBTS to recast that encounter as one of sexual assault. Given this, the Court declines to impute bad faith to Chief Collins for failing to recall R.B.'s report based solely on his own memory of a conversation that took place nearly a year before Roe's production requests were made.

to Chief Collins's testimony, he "thought [he] had submitted everything" "on that initial request," operating on the mistaken assumption that the Zuercher files had been successfully imported into the Omnigo database. (Dkt. #393 at 21). To this end, Chief Collins testified that he "didn't produce any of the Zuercher cases" in response to Roe's first requests for production, ostensibly because the Zuercher files had not yet been imported. (Dkt. #393 at 22). While Chief Collins's reliance on Omnigo ultimately proved infirm, the Court cannot say, based on this record, that it was carried out in bad faith, or with a willful intent to abuse the judicial process.

As Chief Collins testified, upon his arrival at SWBTS he was tasked with managing a department undergoing several changes, and those transitions were taking place in the backdrop of SWBTS's institution-wide changes following the departure of Patterson as its President. Chief Collins went through a process of upgrading the caliber of SWBTS's police department by, among other particulars, hiring a new regime of licensed peace officers. (Dkt. #393 at 30–31). In addition, the department overhauled its recordkeeping system, switching between two incompatible databases, (Dkt. #393 at 8), and Chief Collins noted that the physical location of the department's office had also changed at least two times since his arrival. (Dkt. #393 at 18). Finally, Roe's first set of production questions came on February 21, 2020, right at the beginning of the global COVID-19 pandemic. All of these circumstances appear to have contributed to SWBTS's failure to discover and produce R.B.'s police report. The Court concludes that Chief Collins's failure to locate,

and SWBTS's resulting failure to produce, R.B.'s police report did not occur as a result of bad faith, but rather through honest mistake.

### b. SWBTS Corporate Representative Colby Adams

A separate question is also raised, however, concerning SWBTS corporate representative Colby Adams's communications with R.B. in timeframes relevant to this issue. As noted above, Adams met with R.B. on March 19, 2021. (Dkt. #377-15 at 11). The record is silent as to why that meeting was scheduled in the first instance, and the record similarly does not include any contemporaneous notes summarizing the contents of the ultimate meeting that took place. However, over two months after that meeting took place, R.B. emailed Adams and Dr. Stovall the following:

> Hello there. I hope you both are well.
> I'm back from Africa but will be leaving for Central Asia in about a month. I never heard anything back from anyone at the school. I was wondering if there was an update. I'd like to get a copy of my statement from before, in 2018. If it's missing crucial details, I'd like to see about getting things corrected and (maybe) resubmitted. I'd like to get this resolved before joining the IMB and moving to Africa in January. I know you have expressed a desire to help me move forward, so please try to get back to me before I'm out of the country again.
> Thanks,

(Dkt. #377-15 at 10). Notably, this email is devoid of any explicit references to "sexual assault." Nor does it state that a "police report" had been filed. Moreover, as affirmed by Chief Collins, R.B. had indicated to him (Chief Collins) that "an administrative investigation" took place in 2013 at the time of R.B.'s encounter with the graduate student / adjunct professor. (Dkt. #393 at 14). Given that an administrative investigation had previously occurred in 2013, one in which the encounter was initially understood to be consensual, (Dkt. #377-15 at 6–7, ¶¶ 5, 7), it is not patently

unreasonable, if still perhaps naïve, to assume that a "statement" later made to a police department—a police department which itself supplanted a former security department—was not necessarily a report of sexual assault.

Following up on R.B.'s email, on May 23, 2021, Adams emailed R.B., informing her that he had "spoken with our Chief of Police Kevin Collins to clarify the appropriate method to provide [R.B.'s] file," copying Chief Collins on the email. (Dkt. #377-15 at 10). Nothing in Adams's May 23, 2021, email is irreconcilable with his November 17, 2022, affidavit which stated that Adams understood his interactions with R.B. to be for the purposes of helping "care for a former student who had a disciplinary record due to a consensual relationship prohibited by SWBTS's policies, and was experiencing anxiety about those issues staying with her in the future." (Dkt. #381-2 at 2–3 ¶ 5). Nor is this email irreconcilable with Adams's December 6, 2022, testimony that R.B. never discussed her 2018 police report in any of the Zoom calls he participated in. (Dkt. #393 at 70–72) ("To be clear, I wasn't aware of the police report. I was aware of some statement that she had given, or a file that was maintained by police or they had a copy of, because I knew she wanted a copy of it. I was not aware of a police report."). Reviewing the record as it has been presented, the Court cannot conclude that Adams acted in bad faith in failing to produce R.B.'s 2018 police report in response to Roe's requests for production.

\* \* \*

In case law spanning several decades, the Fifth Circuit has repeatedly instructed that the sanction of default judgment is not to be meted out lightly. *See,*

*e.g.*, *Law Funder, L.L.C. v. Munoz*, 924 F.3d 753, 758 (5th Cir. 2019) (observing that "[o]ur caselaw imposes a heightened standard for litigation-ending sanctions"); *United States v. $49,000 Currency*, 330 F.3d 371, 376 (5th Cir. 2003) (noting that "the drastic measure [of default judgment] is only to be employed where a lesser sanction would not substantially achieve the desired deterrent effect"); *E.E.O.C. v. General Dynamics Corp.*, 999 F.2d 113, 119 (5th Cir. 1993) (instructing that "death penalty" sanctions "should be used as a lethal weapon only under extreme circumstances"). Consistent with this guidance, the Fifth Circuit has reversed a district court's imposition of death penalty sanctions even while noting that it was "not unconscious of [Appellant's] miscreant behavior" in the proceedings below. *Conner*, 20 F.3d at 1382.

"In circumstances . . . in which all of a litigant's conduct is deemed sanctionable," a court may readily turn to its inherent powers to address the conduct altogether. *Chambers*, 501 U.S. at 51. However, this is not such a situation. Indeed, as detailed above, Roe has failed to establish that SWBTS has engaged in any sanctionable conduct at all, much less identified a suite of conduct, all of which is sanctionable. The Court will not permit Roe to lay behind the log, silently amassing a catalog of alleged discovery violations throughout the course of litigation, only then to seek at the eleventh hour the death-penalty sanction of default judgment. The Federal Rules contain ample procedures for addressing the specific issues Roe has highlighted, yet Roe has failed to pursue any of these more tailored measures, instead claiming that default judgment is the only remedy sufficient in this case. It is clear

33

to the Court that default judgment, a "draconian remedy" to be used only as a "remedy of last resort," *Conner*, 20 F.3d at 1380, is not merited in this case. Accordingly, Roe's motions for sanctions—motions which seek only the remedy of default judgment—must be denied.[15]

Finally, the Court notes that, throughout Roe's motions, she consistently characterizes every error, misstep, incorrect citation or discovery deficiency of SWBTS that has occurred over the four-year history of this case as attributable to an overarching unethical, bad-faith approach to this litigation by SWBTS and its lawyers. This is both misguided and unfair. As it turns out, Roe's counsel has also made mistakes in this case, and has miscited cases, and even put forward an expert that Roe had to recall in an untimely manner and ask this Court to allow her to find a replacement. Without objection from SWBTS, the Court allowed Roe to replace her expert—a decision that substantially lengthened the discovery process in this case, and a decision that might have gone differently if SWBTS had objected.[16]

---

[15] Roe consistently has framed these motions as take-them-or-leave-them gambits. In advance of the default judgment hearing, the Court invited the parties, *including Roe*, "to discuss the potential need for a neutral third-party to conduct an independent review" of SWBTS's records. (Dkt. #385). However, Roe wholly declined to seek such alternative relief, or to argue for any sanction less than default, repeatedly and affirmatively disclaiming any lesser forms of relief. *See, e.g.,* (Dkt. #375 at 13–14) ("This is not a case involving spoliation or a discovery violation the Court could address through an adverse instruction or by excluding evidence. This is not a case where an award of attorney's fees would adequately deter future rule violations. This is a case where the defendant's bad faith conduct is so consistent and has so permeated discovery that default judgment is the only sanction adequate to address the harm it has caused.").

[16] In her Motion for Leave to Withdraw Expert and to Allow Late Designated Expert, (Dkt. #230), filed April 25, 2022, Roe requested permission to withdraw her psychological expert, Dr. Robert Geffner, because he had been disciplined by medical authorities in California, and requested further permission to designate a new expert. In her filing, Roe

Accusing fellow attorneys of misconduct is a serious charge that should be leveled only after the most sober consideration. The same is true of a request for death penalty sanctions. The motions before the Court cannot be said to have been premised on such sober reflection, which is unfortunate.

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED** that Plaintiff Jane Roe's Motion for Sanctions and Entry of Default Judgment Against Defendant Southwestern Baptist Theological Seminary, (Dkt. #356), and Plaintiff Jane Roe's Supplemental

---

noted that she had disclosed Dr. Geffner on January 11, 2021, and that she was unaware at that time of his disciplinary issues. (Dkt. #230 at 3). However, as noted by Defendants, "[t]he accusation resulting in the California disciplinary action was made . . . publicly available on June 25, 2020, and Plaintiff still named this expert on January 11, 2021, over 6 months later." (Dkt. #231 at 1); *see also Geffner v. Bd. of Psych.*, No. 22-STCP-12, 2022 Cal.Super.LEXIS 52661, at *8 (Cal. Sup. Ct., Los Angeles, June 30, 2022) ("On June 25, 2020, Respondent served Petitioner with an Accusation related to the incident seeking to revoke or suspend Petitioner's psychologist license."). A search of https://search.dca.ca.gov/ for first name "Robert," last name "Geffner," turns up only a single licensed psychologist, and selecting the "More Detail" button for that psychologist reveals a "Public Record Action" entry corresponding to the aforementioned "Accusation" that was posted on June 25, 2020. Yet despite all this, Defendants did not object to Roe's requested relief, and instead noted their view that "fundamental fairness and professionalism" required that Roe be allowed to designate a new expert, notwithstanding her lack of due diligence in selecting her original expert. (Dkt. #231 at 2).

This process ultimately required the previously scheduled August 15, 2022, trial date, (Dkt. #212 at 4), to be pushed back to October 31, 2022, (Dkt. #236 at 4). Then, this initial delay further snowballed due to various requests for extensions of time to complete the briefing on the now later-filed summary judgment motions, all of which extension requests were filed by Roe and were unopposed by Defendants. (Dkt. #269, #270, #273). Then, adding delay upon delay, Roe filed her initial sanctions motion on October 4, 2022, (Dkt. #356), less than one month before trial, which required the issuance of a Fifth Amended Scheduling Order setting the trial for February 13, 2023, (Dkt. #361 at 4). This scheduling order was then met with a supplemental sanctions motion filed by Roe on November 10, 2022, (Dkt. #375), a motion that asserted a raft of new allegations, and which ultimately required the issuance of the operative Sixth Amended Scheduling Order, setting a trial date of April 3, 2023, (Dkt. #404 at 4).

Motion for Sanctions Against Defendant Southwestern Baptist Theological Seminary, (Dkt. #375), are **DENIED**.

**So ORDERED and SIGNED this 7th day of March, 2023.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE