UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| JANE ROE | § | |
| | § | |
| v. | § | CIVIL NO. 4:19-CV-179-SDJ |
| | § | |
| LEIGHTON PAIGE PATTERSON, | § | |
| ET AL. | § | |

**MEMORANDUM OPINION AND ORDER**

Jane Roe alleges that, while she was a student at Southwestern Baptist Theological Seminary ("SWBTS"), she was repeatedly subjected to violent sexual assaults perpetrated by another SWBTS student, John Doe. Roe has sued SWBTS and its former president, Leighton Paige Patterson, asserting, among other claims, that SWBTS's and Patterson's negligence and gross negligence led to the sexual assaults she suffered. *See* (Dkt. #223).

Now pending before the Court are Patterson's Motion for Partial Summary Judgment on Negligence and Gross Negligence, (Dkt. #239), and SWBTS's Motion for Partial Summary Judgment Regarding Plaintiff's Negligence and Gross Negligence Claims, (Dkt. #257). Also before the Court are various objections to the summary judgment evidence. (Dkt. #296, #315). The Court, having reviewed the motions, the relevant briefing, the applicable law, and the parties' arguments presented at hearing, **GRANTS in part** and otherwise **DENIES as moot** the parties' objections to the summary judgment evidence, (Dkt. #296, #315), and **GRANTS** Defendants' negligence motions, (Dkt. #239, #257).

# I. Procedural Background

SWBTS is a private non-profit institution of higher education and is one of the largest seminaries in the world. (Dkt. #223 at 5–6 ¶¶ 16, 19). Patterson served as SWBTS's president from 2003 until 2018. (Dkt. #223 at 9–10, 22 ¶¶ 39, 110). According to her current complaint, Roe enrolled as an undergraduate student at SWBTS in the fall of 2014 after being drawn to the school because of its commitment to conservative Christian beliefs. (Dkt. #223 at 10 ¶ 44). Roe alleges that, after her arrival on campus as a student and a student-employee, she became the victim of repeated stalking, physical abuse, sexual abuse, and threats of violence towards herself and her family at the hands of John Doe, a seminary student and student-employee at SWBTS. (Dkt. #223 at 11–16 ¶¶ 47–75). As a student-employee, Doe worked as a plumber, which allowed him access to and knowledge of the buildings where Roe worked and lived. (Dkt. #223 at 15 ¶ 70).

The Court previously considered SWBTS's motion to dismiss and Patterson's motion for judgment on the pleadings, granting in part and denying in part those motions. *Roe v. Patterson*, No. 4:19-CV-179-SDJ, 2022 WL 672692 (E.D. Tex. Mar. 7, 2022). Concerning Roe's negligence claims, the Court found the following theories of liability to be well-pleaded: **(1)** that Patterson owed a duty to Roe under the Texas multifactor test; **(2)** that SWBTS was vicariously liable for the actions of Patterson; **(3)** that SWBTS owed a duty to Roe under the Texas multifactor test; **(4)** that SWBTS was liable for its failure to train or supervise Patterson; and **(5)** that SWBTS was liable for failing to supervise Doe as a student-plumber. *Id.* at *5–10.

## II. LEGAL STANDARD

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). If the moving party presents a motion for summary judgment that is properly supported by evidence, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).

The nonmoving party "must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). To defeat a motion for summary judgment, the nonmovant must present "significant probative evidence demonstrating the existence of a triable issue of fact." *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (citations omitted). Thus, "mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden." *Pickett v. IceCold2, LLC*, No. 4:17-CV-666, 2019 WL 1063369, at *2 (E.D. Tex. Mar. 6, 2019).

Further, as noted in the Court's local rules, in ruling on motions for summary judgment, the Court "will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy,

except to the extent that such facts are controverted in the responsive brief filed in opposition to the motion, as supported by proper summary judgment evidence." Local Rule CV-56(c).

### III. DISCUSSION

Sitting in diversity, the Court will apply the substantive law of Texas, the forum state. *Wisznia Co. v. Gen. Star Indem. Co.*, 759 F.3d 446, 448 (5th Cir. 2014). Federal courts look first to decisions of the Texas Supreme Court to resolve issues of Texas state law. *Hux v. S. Methodist Univ.*, 819 F.3d 776, 780 (5th Cir. 2016). If the Texas Supreme Court has not ruled on the issue, the federal court makes an "Erie guess," predicting what the Texas Supreme Court would do if faced with the same facts presented in the case. *Id.* Generally, state intermediate courts' decisions are the strongest indicator of what a state supreme court would do. *Id.* at 780–81. Therefore, the Court will look to Texas Supreme Court and intermediate appellate court decisions to construe Texas law applicable to Roe's claims.

### A. Negligence and the Texas Multifactor Test

Under Texas law, "[t]he elements of a negligence cause of action are a duty, a breach of that duty, and damages proximately caused by the breach of duty." *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). Here, Roe's negligence claims implicate the question whether SWBTS and Patterson owed Roe a duty to prevent Doe's alleged sexual assaults under the Texas multifactor or *Phillips* test, derived from the Texas Supreme Court's decision in *Greater Houston Transportation Company v. Phillips*, 801 S.W.2d 523 (Tex. 1990). The multifactor test recognizes that, when a duty has not been recognized under Texas law in

4

particular circumstances, as here, "the question is whether one should be." *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 503 (Tex. 2017); *see also Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 155 (Tex. 2022) (Young, J., concurring) ("Imposing a legal duty is no small thing, given the massive consequences that can flow from doing so or refusing to do so.").

The Texas Supreme Court has admonished that, "[b]efore a duty is recognized, courts must weigh the 'social, economic, and political questions and their application to the facts at hand.'" *Elephant Ins. Co.*, 644 S.W.3d at 145 (quoting *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 182 (Tex. 2004)). Specifically, courts must consider "several interrelated factors," which include "the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Phillips*, 801 S.W.2d at 525; *see also Humble Sand & Gravel, Inc.*, 146 S.W.3d at 182 (same). "Additional considerations include 'whether one party would generally have superior knowledge of the risk or a right to control the actor who caused the harm.'" *Elephant Ins. Co.*, 644 S.W.3d at 145 (quoting *Humble Sand & Gravel, Inc.*, 146 S.W.3d at 182). Among the *Phillips* factors, "foreseeability of the risk is the foremost and dominant consideration," *Phillips*, 801 S.W.2d at 525 (quotations omitted), although "foreseeability alone is not sufficient to justify the imposition of a duty." *Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287, 290–91 (Tex. 1996).

5

Once a court determines that a duty exists, it must then assess the issue of proximate cause. "The components of proximate cause are cause in fact and foreseeability." *Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d at 477 (citing *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992)). Cause in fact "requires proof that an act or omission was a substantial factor in bringing about injury which would not otherwise have occurred," *Prudential Ins. Co. of Am. v. Jefferson Assoc., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995), and this proof requirement will not be satisfied "if the defendant's negligence did no more than furnish a condition which made the injury possible." *Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d at 477 (citing *Bell v. Campbell*, 434 S.W.2d 117, 120 (Tex. 1968)). "Foreseeability means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others." *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549–50 (Tex. 1985). While foreseeability "does not require that a person anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence," *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 519 (Tex. 2019), it does require that plaintiff show more than "an extraordinary sequence of events whereby the defendant's conduct brings about the injury." *Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d at 478. "Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable." *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996).

**B. Summary Judgment Evidence**

At the Rule 12 stage of proceedings in this case, the Court concluded that Roe had adequately pleaded that both Patterson and SWBTS owed her a duty under the Texas multifactor test. *See Roe*, 2022 WL 672692, at *5–10. However, the pleading stage of the case is over, discovery is complete, and summary-judgment motions have been filed by Defendants seeking dismissal of Roe's negligence claims. The Court must now examine the evidence to determine whether there is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law. *Shepherd*, 920 F.3d at 282–83.

Because the summary-judgment record is extensive, the Court will begin by outlining the significant undisputed facts relevant to the summary-judgment motions, and then turn to the record evidence on disputed issues.

**i. Undisputed facts**

While much of the record is disputed, certain aspects of Roe's claims are undisputed and worth noting at the outset.

First, Doe was accepted as a student at SWBTS in May 2013. When Doe applied for admission, he disclosed that he had prior criminal charges for driving under the influence and public intoxication, but did not disclose that he was on probation at the time. Doe first became a student-employee plumber with SWBTS in August 2013, and in May 2014 he voluntarily resigned his part-time employment with SWBTS. Doe applied for and once again became a part-time student-employee plumber with SWBTS in January 2015. At that time, SWBTS conducted a

background check on Doe, which identified prior offenses of public intoxication in 2007, a DUI and driving under suspension, transporting an open container and possession of drug paraphernalia in 2007, and another DUI in 2011.

Second, Roe became a student at SWBTS in the fall of 2014. Roe also became a student-employee with SWBTS in August 2014. Roe and Doe met each other in the fall of 2014. Roe alleges that she was first assaulted by Doe in October 2014, and that he was continually verbally and physically violent towards her for two weeks following the alleged initial sexual assault. Roe further asserts that Doe then grew tired or sick of her and left her alone for months. In April 2015, however, Roe asserts that Doe again assaulted her twice, once at her residence and a second time in a women's restroom while wearing his plumber's uniform.[1]

Third, as a student-employee, Roe would have had SWBTS's Part-Time Employee Handbook, which expressly stated that harassment of any kind, including "sexual intimidation and exploitation" would not be tolerated, and individuals engaging in such behavior would be subject to disciplinary action, including termination. The Handbook further defined and gave examples of sexual harassment, which included "unwelcome or offensive sexual advances, requests for sexual impropriety, unwanted or uninvited verbal suggestions or comments of a sexual nature, or objectionable physical contact." The Handbook confirmed that whenever

---

[1] To be clear, it is undisputed that Roe has *made* these assertions and allegations about Doe's purported sexual assaults and other physically violent behavior. Defendants do not concede that Doe engaged in the conduct recounted by Roe. This lawsuit was filed years after the events occurred, and apparently months after Doe passed away, so Doe himself could not respond to Roe's allegations or otherwise provide evidence.

any such harassment was demonstrated and reported, SWBTS would take "necessary corrective actions" together with "measures to protect the reporting employee, and prevent further harassment." The Handbook also provided a means for reporting and investigating sexual harassment complaints.

Fourth, Roe never directly told Patterson or anyone at SWBTS of her concerns that Doe was stalking her. Nor did Roe make any sexual harassment, sexual assault, or any other complaint about Doe prior to August 2015. It is further undisputed that the first time Roe told Patterson and SWBTS that she had been raped by Doe was on August 20, 2015—the date she made her report to the school—months after the sexual assaults allegedly occurred. At that time, Patterson and SWBTS immediately notified local law enforcement authorities of Roe's outcry, and Roe was interviewed by the Fort Worth Police Department. Roe declined to pursue charges against Doe.

Finally, it is undisputed that throughout Doe's time at SWBTS, possession of firearms on campus was prohibited unless such possession was authorized in advance by Patterson. It is also undisputed that Doe violated this policy by possessing firearms.

### ii. Disputed facts

The crux of Roe's factual assertions against Patterson and SWBTS in support of her negligence claims are that these Defendants knew: **(1)** that Doe had firearms on the SWBTS campus in violation of the school's policy; **(2)** that Doe had a violent criminal past, which Patterson purportedly said was not a problem; and **(3)** that

SWBTS knew through an employee that Doe was stalking Roe. As described below, the record developed before the Court provides little support for Roe's allegations.

### a. Patterson's knowledge of Doe's firearms

Notably, Roe's only allegation of Patterson's knowledge that Doe possessed firearms comes from her complaint. There, Roe first alleged that "Doe kept firearms openly in his campus residence and in his vehicle." (Dkt. #223 at 13–14 ¶ 63). Then, Roe reasoned that because SWBTS policies "strictly prohibited" firearm possession, "Doe either flagrantly violated this policy with the knowledge of at least one SWBTS security employee *or was given permission to possess the weapons by Patterson*." (Dkt. #223 at 14 ¶ 65) (emphasis added).

However, the record is devoid of any evidence that could allow a factfinder to conclude that Doe "was given permission to possess the weapons by Patterson." Perhaps recognizing the absence of any evidence showing that Patterson authorized Doe to have firearms, Roe simply asserts in various ways that Patterson was a proponent of firearms and that Patterson permitted certain individuals to possess guns on campus.

But even taking such generalized allegations as true, none speak to Patterson's knowledge of *Doe* possessing firearms on campus. To the contrary, the evidence of record suggests only the opposite conclusion. It is undisputed that, following Roe's August 20, 2015, meeting with Patterson and others, wherein Roe notified Patterson that Doe had firearms in his dormitory, SWBTS officers performed a same-day search of Doe's dormitory, where they found several firearms, all of which were confiscated.

(Dkt. #285-35 at 2–6). And one week later, Doe was given notice of the official decision expelling him from SWBTS for "various infractions of the Ethical Code of Conduct and Lease agreement pertaining to weapons possession." (Dkt. #285-34 at 2).

On the record before the Court, there is no genuine dispute of material fact that Patterson had knowledge of Doe's firearm possession.

### b. Patterson's alleged statements to Doe

Separately, Roe alleges in a declaration submitted to the Court that Doe told her that he "had met personally with Dr. Patterson" and that Patterson "assured him that his criminal past would not preclude him from becoming a Baptist minister." (Dkt. #285-1 at 4 ¶ 19). Roe has further stated that Doe told her that Patterson encouraged him "to 'fish' the pool of unmarried female students at SWBTS for a suitable wife." (Dkt. #285-1 at 5 ¶ 19).

Defendants have objected to these statements in Roe's declaration as inadmissible hearsay. The Court agrees. All of these allegations are inadmissible hearsay within hearsay that cannot be presented in an admissible form at trial, and are therefore not proper summary-judgment evidence. *See, e.g., Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (observing that "the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible," although "the material may be presented in a form that would not, in itself, be admissible at trial") (quotations omitted).

In her sur-reply, Roe concedes that her allegations of what Doe told her Patterson told him are hearsay, but she nonetheless urges the Court to "use its

discretion" and conclude that these allegations are admissible under the "residual hearsay exception" of Federal Rule of Evidence 807. (Dkt. #305 at 3). "Rule 807's residual hearsay exception allows the admission of hearsay statements that are not covered by another exception if the statements have equivalent circumstantial guarantees of trustworthiness." *United States v. El-Mezain*, 664 F.3d 467, 497 (5th Cir. 2011) (cleaned up). However, the residual hearsay exception "is to be used only rarely, in truly exceptional cases," and the "proponent of the statement bears a heavy burden to come forward with indicia of both trustworthiness and probative force." *Id.* at 498 (cleaned up).

Whether there exists "equivalent circumstantial guarantees of trustworthiness" is the "lodestar of the residual hearsay exception analysis." *Id.* (cleaned up). On this point, Roe argues only that Doe's father confirmed that other statements Doe made at the same time to Roe, such as statements about his criminal history, alcohol and drug use, and violent past, were true. In Roe's view, this provides some guarantee of trustworthiness as to Doe's alleged contemporaneous statements about Patterson. Roe's argument falls well short of meeting the stringent requirements for application of the residual hearsay exception. Courts within the Fifth Circuit have previously credited statements as having sufficient guarantees of trustworthiness where the statements "were made long before any motive to fabricate arose," are corroborated by statements made by others "without any relation to the present controversy," and where the statements "were written and published nearly contemporaneously with the events in question." *Hicks v. Charles Pfizer & Co.*,

466 F.Supp.2d 799, 808–09 (E.D. Tex. 2005). Here, Roe's declaration bears none of those indicia: it was prepared solely for trial; years after the events in question were alleged to have occurred; and is not corroborated by anyone.

For all these reasons, the Court concludes that the relevant allegations of Roe's declaration do not bear sufficient guarantees of trustworthiness to merit their admission under Rule 807's residual hearsay exception.

### c. Patterson's involvement in Doe's admission

Roe also argues that Patterson has not conclusively established that he was not involved in Doe's admission process, which implicates Patterson's alleged knowledge of Doe's criminal background. (Dkt. #285 at 17–18); (Dkt. #305 at 3). However, this argument is flawed at the start, as it misapprehends the summary-judgment standard. The issue is whether Roe has introduced any evidence that creates a genuine dispute of material fact as to any issue in the case. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

Here, Roe cannot point to any evidence upon which a reasonable juror could find that Patterson was in fact involved in Doe's admission. Roe notes that "Patterson enjoyed sweeping authority and unfettered discretion to make decisions regarding admission . . . matters," and that "Patterson repeatedly ordered that the admissions

department make 'exceptions' and break SWBTS policies to admit applicants who did not meet the admissions criteria." (Dkt. #285 at 8–9). However, even taking both of these assertions as true, neither supports the inference that Patterson was specifically involved in the application of John Doe.

Roe references the deposition testimony from Kyle Walker, SWBTS's Director of Admissions, but Walker's testimony also does not create a triable issue of fact as to this issue. Specifically, Roe points to Walker's alleged "equivocal ambiguity" in answering whether he recalled discussing Doe's application with Patterson. (Dkt. #285 at 18). But even accepting that Walker's answer to that question was ambiguous, as the Court must, Roe points to no other evidence that supports the inference that Patterson was involved in Doe's application. That SWBTS's Director of Admissions could not unequivocally state that he did not discuss Doe with Patterson, standing alone, does not support the conclusion that Patterson was involved in Doe's application.[2]

### d. Patterson's knowledge of Roe's wellbeing

Roe further argues that Patterson testified at his deposition that, at some point, two students spoke to him about Roe's wellbeing. (Dkt. #285 at 19). Specifically, Patterson testified as follows:

---

[2] Moreover, even if Patterson had been made aware of Doe's "criminal background" as disclosed by Doe himself and confirmed through SWBTS's background check, Doe had not been convicted of any sex offense of any kind, or of any violent offense at all. *See supra* Part III.B.i. As explained below, knowledge that an individual had been convicted of only nonviolent crimes does not make foreseeable later instances of violent sexual assault by that individual. *See infra* Part III.D.i.

Q: Okay. So the two students who reported something of concern to you, what did they report?

A: One simply reported that they thought there were issues that she was having and that she ought to be given help or assistance of some kind, and I do not remember exactly what the other student said. He simply was expressing a concern.

Q: About [Roe]?

A: Yes.

Q: And her wellbeing?

A: Yes.

Q: Not that she had committed some violation of the Code of Ethics?

A: There was a hint there that maybe she had.

Q: What was the hint?

A: Well, I don't remember exactly how he said it, but there was an indication that there was a concern about what she was doing, how she was living.

(Dkt. #285-9 at 21). In his reply, Patterson argues that Roe "misrepresents the concerns of [the] two students, which, although not in the record, occurred after Plaintiff reported her alleged assaults, not before." (Dkt. #303 at 4). For her part, Roe has not challenged Patterson's contention that these statements were made after Roe's alleged assaults.

Based on this record, the Court concludes that Roe has not pointed to any evidence that could allow a factfinder to conclude that the aforementioned students' concerns were made known to Patterson before Roe was assaulted, such that they are relevant in the negligence inquiry. Even assuming, however, that the concerns referenced in the above-described testimony were made known to Patterson before

Roe was assaulted, they do not remotely suggest that Roe was the victim of sexual assault or sexual harassment, by Doe or anyone else.

**e. SWBTS's knowledge of Doe's firearms**

Roe has also argued that SWBTS had knowledge of Doe's firearms through either Patterson or through an unnamed student-employee who "worked in the Security Department of SWBTS [and] confirmed to [Roe that] he was aware Doe had guns on campus." (Dkt. #292-1 at 6–7 ¶ 36). The Court has already determined that no genuine dispute of material fact exists concerning Patterson's knowledge of Doe's firearms. *See supra* Part III.B.ii.a. Roe's assertions concerning SWBTS's alleged knowledge of Doe's possession of firearms fare no better on the record in this case.

As SWBTS correctly notes in its Objections to Roe's Negligence and Gross Negligence Summary Judgment Evidence, (Dkt. #315 at 2), the passage from Roe's declaration referencing the unnamed student-employee is hearsay, and therefore inadmissible. In response to SWBTS's objection, Roe fails to establish how this hearsay could be reduced to admissible form at trial.

Alternatively, Roe reasserts her conclusory and general allegations that "SWBTS, through Patterson, created a dangerous and oppressive environment for women on the campus of SWBTS," that "Patterson and others enthusiastically permitted guns on campus while ignoring women's reports of stalking, sexual harassment and assault," (Dkt. #292 at 22–23), and that "Doe openly possessed multiple guns on campus – including in his vehicles and his dormitory, even wearing one in his waistband at all times," (Dkt. #292 at 15). Roe further asserts that "Doe

16

visited the local gun range with other SWBTS students and made no effort to hide his weapons." (Dkt. #292 at 15).

None of these assertions, or Roe's various references to the record underlying such assertions, creates a genuine dispute of material fact as to whether SWBTS knew Doe possessed weapons on campus. In support of the more general allegations, Roe points to her own declaration, (Dkt. #292-1), the deposition testimony of Doe's father, (Dkt. #292-12), and the deposition testimony of Rebecca Burk, a friend of Doe's who attended SWBTS at the same time as Doe, (Dkt. #292-13). Again, none of the referenced evidence shows SWBTS's knowledge of Doe's possession of firearms on campus. As to Roe's declaration, Roe makes clear that while she (Roe) had knowledge of Doe's possession of firearms, she never made this fact known to SWBTS, or to anyone else. And the cited deposition testimony of both Doe's father and Burk are similarly unhelpful. Doe's father merely confirms that Doe was a gun enthusiast, and that Doe never tried to hide his possession of firearms from his father. Nothing in Doe's father's testimony supports the inference that SWBTS had knowledge of Doe's on-campus firearm possession. Burk's testimony is likewise unenlightening. Although she testified to having knowledge that Doe kept a firearm in his SWBTS apartment, as well as to her knowledge that Doe routinely carried a gun on his person, these statements in no way impute knowledge to SWBTS. Burk never testified that she informed anyone at SWBTS of Doe's gun possession, nor has it ever been alleged that Burk was an employee of SWBTS such that her knowledge of Doe's weapon possession can be imputed to SWBTS.

At bottom, the only admissible evidence in the record that bears on SWBTS's knowledge of Doe's on-campus firearm possession prior to Roe's alleged assaults supports the opposite conclusion to what Roe asserts. As soon as Roe reported to SWBTS that Doe had firearms, it conducted a same-day search of Doe's apartment, seized his weapons, and promptly expelled him from the seminary. There is simply no evidence in the record to show that SWBTS was somehow already aware of Doe's possession of firearms, but that it inexplicably waited for Roe's report to search Doe's apartment and expel him. Accordingly, there is no genuine dispute of material fact as to SWBTS's knowledge of Doe's firearms.

**f. SWBTS's knowledge of Doe's past criminal conduct**

In regard to SWBTS's knowledge of Roe's prior criminal convictions, there is no dispute between the parties concerning the record of Doe's prior convictions. *See supra* Part III.B.i. Instead, the dispute concerns the parties' characterization of Doe's criminal past, with Roe attempting to spin Doe's background as indicating a propensity for violence or sexual predation. But the record simply does not support Roe's attempted gloss.

Specifically, SWBTS was aware that Doe's application to the school noted that Doe had "been arrested for alcohol related charges," including "for DUI, and public intoxication," and that, as a result of a DUI, Doe had spent "a few days in jail." (Dkt. #292-29 at 5–6). These self-reported infractions were confirmed by Doe's January 2015 criminal background check, which revealed a number of alcohol-related offenses and one "Possession of Paraphernalia" offense. (Dkt. #292-33 at 2–9). None

18

of these offenses can be reasonably construed as indicating to SWBTS that Doe was violent or a sex predator.

### g. The "suspicious student" report

Roe has pointed to a "suspicious student" report concerning Doe that she maintains demonstrates SWBTS was on notice that Doe was a threat to other students. But the report does not support any such conclusion.

Indeed, nothing in the single-page "suspicious student" document could enable a factfinder to conclude that SWBTS was on notice of Doe's allegedly dangerous propensities. The two-paragraph report describes an encounter between Doe and two SWBTS campus police officers, noting that Doe "was very adamant about speaking with [then-SWBTS Police Chief John Nichols]," and that at some point in the interaction Doe "began to act more erratic stating that he needed to speak with Dean Nichols." (Dkt. #292-32 at 2).

The report concludes by noting that Doe was escorted to Dean Nichols's home, and that both officers then "cleared the scene." (Dkt. #292-32 at 2). There is no evidence that Dean Nichols or any other official with SWBTS took any action against Doe following this incident. Altogether, while not a model of clarity as to why the campus officers were interacting with Doe and why Doe wanted to speak with either John or Dean Nichols, nothing in the report can be said to have put SWBTS on notice

that Doe posed a danger to other students. The report merely describes an encounter between Doe and two officers that was resolved without issue.[3]

### h. SWBTS's knowledge of Doe's alleged stalking behavior towards Roe

The final purported factual basis which Roe asserts demonstrates a material issue of genuine fact relating to SWBTS's knowledge of the danger Doe represented to Roe pertains to her allegation that one of her SWBTS professors "was informed of Doe's stalking behavior," but that "[n]o action was taken" in response to this knowledge. (Dkt. #223 at 12 ¶ 53).

Specifically, Roe argues that "[i]n September 2014, [Roe's] mother called Lennie Knight, a long-time family friend and . . . wife of SWBTS' campus physician Dr. Richard Knight," wherein Roe's mother "reported to Mrs. Knight that [Roe] was having trouble with [a] seminary student who was stalking her and leaving notes on [Roe's] car and asked for Dr. Knight's help." (Dkt. #292 at 16–17). In support of this claim, Roe points to her own declaration, (Dkt. #292-1 at 5 ¶ 22), and to the deposition testimonies of: **(1)** Roe's mother; **(2)** Lennie Knight; and **(3)** Dr. Knight. (Dkt. #292 at 16–17 (citing Dkt. #292-10 at 6–7, #292-14 at 8–9, #292-15 at 5–8)). Specifically, Roe states in her declaration that she "asked [her] mom if she could tell Lennie about John Doe's aggressive behavior, and refusal to leave [her] alone, and ask Dr. Knight for help in the situation." (Dkt. #292-1 at 5 ¶ 22). Roe further states that her mother

---

[3] While the Court notes that its conclusions here with respect to the "suspicious student" report may well have been impacted if the "Confidential Report" referenced in the report were known and produced in the record, this singular uncertainty surrounding the event in question, without more, does not itself permit the inference that SWBTS was somehow on notice of Doe's allegedly dangerous dispositions.

"told Lennie that Doe was stalking me. Lennie's response was that Dr. Knight told her to tell me that 'the young man was welcome to come by and talk to him any time.'" (Dkt. #292-1 at 5 ¶ 22). For her part, Roe's mother testified that she told Lennie Knight that Doe "was stalking" Roe, and that Doe "wouldn't leave [Roe] alone." Roe's mother further testified that Lennie Knight responded by telling her that Doe should "go talk to Dr. Knight." (Dkt. #292-10 at 6–7).

Lennie Knight testified that "at some point," she spoke with Roe's mother about Roe "having trouble with a young man," (Dkt. #292-14 at 6–7), and that, either through Roe or Roe's mother, she learned that Doe had been leaving notes on Roe's car, (Dkt. #292-14 at 8–9). Lennie Knight further testified that she was unsure if Roe's mother ever told her that Doe "stalked" Roe. (Dkt. #292-14 at 18–19). Finally, Dr. Knight testified, at least initially, that Lennie Knight told him that Roe herself had spoken to Lennie Knight and told her that "a young man was interested in [Roe] and that [Roe] was not interested in him," (Dkt. #292-15 at 5), but then later testified that he was unsure of whether he learned of this information "directly [from his] wife or if [he] was present on speakerphone" when the information was revealed, (Dkt. #292-15 at 7). Dr. Knight further testified to knowing that Doe "was leaving little notes on [Roe's] car windshield." (Dkt. #292-15 at 8).

Concerning the statements made in Roe's declaration as to what Lennie Knight was told by Roe's mother, SWBTS has objected on hearsay grounds and the Court agrees. By way of her declaration, Roe seeks to establish what her mother told her (Roe) that she (Roe's mother) was told by Lennie Knight. Plainly, Roe is seeking to

establish the truth of what she is asserting—that is, what her mother told her concerning her mother's conversation with Lennie Knight. This statement would be inadmissible at trial and is therefore not proper summary-judgment evidence.

However, Roe's mother's testimony does not suffer from this same defect. As noted above, Roe's mother testified at her deposition that she told Lennie Knight that Doe "was stalking" Roe, and that Doe "wouldn't leave [Roe] alone." This statement is not being offered to establish that Doe was in fact "stalking" Roe, but only to establish that Lennie Knight had been told by Roe's mother that Roe believed that Doe was stalking her. Therefore, this statement is not hearsay, and is admissible.[4] And, although Lennie Knight testified that she does not recall being informed of Roe's view that she was being "stalked" by Doe, this conflict in testimony will be viewed in Roe's favor at the summary-judgment stage, such that the Court assumes Lennie Knight was indeed told by Roe's mother that Doe "was stalking" Roe.

This then brings the Court to the testimony of Dr. Knight. Dr. Knight testified that he had spoken with Lennie Knight about Roe's concerns that "there was a young man interested in [Roe] and that [Roe] was not interested in him." (Dkt. #292-15 at 5). Dr. Knight further testified that he did not recall if he learned of this information only from Lennie Knight or if he learned it by overhearing on "speakerphone" the actual conversation between Lennie and Roe's mother. (Dkt. #292-15 at 7). Given that

---

[4] The Court further notes that SWBTS does not challenge this statement on hearsay grounds, but only on relevance grounds. (Dkt. #315 at 7). As explained further, this testimony is undoubtedly relevant to Roe's claim, and easily clears the threshold for relevance imposed by Federal Rule of Evidence 401. *See, e.g., Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735, 741 (5th Cir. 2020) (noting "the low bar for relevance established by Rule 401").

the Court must accept Roe's mother's testimony that she told Lennie Knight that Roe was being "stalked" by Doe, coupled with Dr. Knight's testimony that he spoke with Lennie Knight about Roe's concerns, the Court concludes that there exists a triable issue of fact as to whether Dr. Knight was on notice of Roe's belief that she was being stalked by Doe.

Therefore, resolving this issue in favor of Roe, the Court assumes, for purposes of summary judgment, that SWBTS professor and campus physician Richard Knight was apprised, via Roe's mother, of Roe's apparent concern that Doe was stalking her and engaging in unwanted contact by leaving notes on Roe's windshield.

## C. Patterson's Negligence and Gross Negligence Motion

Patterson argues that Roe has failed to establish any negligence claim against him individually because he did not owe Roe any duty and because Roe's injury was unforeseeable. The Court agrees. Reviewing the evidence of record in the light most favorable to Roe, the Court concludes that there exists no genuine issue of material fact on essential elements of Roe's negligence and gross negligence claims against Patterson, such that summary judgment is warranted.

### i. Negligence

To be individually liable for negligence under Texas law, an individual acting as an agent or employee must have an independent duty of care to the plaintiff, separate from his employer's duty to the plaintiff. *Tri v. J.T.T.*, 162 S.W.3d 552, 562 (Tex. 2005) (citing *Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex. 1996)). Absent a

genuine issue of material fact that Patterson had a duty to Roe independent of SWBTS's duty to Roe, her negligence claim against him must fail.

Roe's contention that Patterson owed her a duty under Texas's multifactor test hinges on her contention that Patterson knew: **(1)** that Doe had firearms on the SWBTS campus in violation of the school's policy; and **(2)** that Doe had a violent criminal past, which Patterson purportedly said was not a problem. But as described herein, *see supra* Part III.B, there is no evidence in the record which creates a genuine dispute of material fact as to these allegations. The record is devoid of any evidence that Patterson knew Doe had firearms on the SWBTS campus until Roe reported this fact to him in August 2015, months after the alleged sexual assaults occurred.

Likewise, there is no evidence that Patterson knew anything about Doe's criminal past prior to Roe's sexual assault report in August 2015. And, to the extent SWBTS's knowledge of Doe's criminal past is attributed to Patterson, Doe's criminal record included no sex offenses or violent offenses, but rather only alcohol and drug-related convictions. Thus, even assuming Patterson was aware of Doe's prior convictions, this information did not suggest that Doe was violent or a sexual predator. Nor is there any evidence that Patterson was aware of Roe's concern that Doe was stalking her.

For these reasons, summary judgment in favor of Patterson is proper, as there is no basis upon which to impose a duty on him under the Texas multifactor test. Without any knowledge of Doe's allegedly violent propensities, his unwanted pursuit

of Roe, or of his possession of firearms on campus, Roe's alleged assaults at the hands of Doe were necessarily unforeseeable to Patterson.

Roe's suggestion that Patterson was timely apprised of reports from two students indicating that those students were concerned with Roe's wellbeing does not change the Court's analysis. To begin, Roe has not challenged Patterson's contention that these statements were made after Roe's alleged assaults, so they would not have provided any notice to Patterson in advance of Doe's alleged victimization of Roe. Further, the only evidence on this point is Patterson's own testimony, which describes generalized concerns that Roe might need assistance and a "hint" that Roe may have violated SWBTS's ethical code. *See supra* Part III.B.ii.d. Roe does not herself identify who these two students are, nor does Roe make any arguments or point to any evidence indicating that these students said anything to Patterson that contradicts Patterson's deposition testimony.

Therefore, even accepting Patterson's testimony as framed by Roe, (Dkt. #285 at 19), it is clear that Roe's alleged assaults remained unforeseeable to Patterson. Even assuming the students' statements preceded the alleged sexual assaults, it can hardly be said that a violent sexual assault by Doe against Roe "might reasonably have been anticipated" on the strength of two unnamed students' reports to Patterson concerning Roe's general wellbeing, particularly when the reports do not reference Doe, or for that matter any issue of sexual harassment, much less sexual assault. *See Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d at 478 (declining to find the sexual assault of children as being foreseeable to the defendant where the evidence

presented was only "remotely related" to the "course of events" that led to the assaults, such that "no reasonable mind could anticipate the result"). To hold otherwise would impose potentially limitless liability on university officials for any injury to a student where generalized, vague reports had been made concerning the student's wellbeing. Such a regime would also result in the imposition of a wholly impractical and unworkable burden on such officials to investigate all similar reports and to take any number of unspecified actions to protect students from unknown harms.

The Texas multifactor test does not support the imposition of a duty on Patterson under these circumstances. Accordingly, the Court will grant Patterson's summary-judgment motion and dismiss with prejudice Roe's negligence claim against him.

### ii. Gross Negligence

"Gross negligence" is statutorily defined under Texas law as an act or omission:

(A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM. CODE § 41.001(11)(A)-(B). Under the first, objective element, an "extreme risk" is a likelihood of serious injury to the plaintiff, not a remote possibility of injury or even a high probability of minor harm. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998). Under the subjective element, "actual awareness means that the defendant knew about the peril, but its acts or omissions

demonstrated that it did not care." *Id.* Both elements of gross negligence must be proven by clear and convincing evidence, *Diamond Shamrock Refin. Co. v. Hall*, 168 S.W.3d 164, 169–70 (Tex. 2005), and may be proven by circumstantial evidence. *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014) (per curiam).

"Evidence of simple negligence is not enough to prove either the objective or subjective elements of gross negligence." *Mobil Oil Corp.*, 968 S.W.2d at 921. Thus, a fortiori, for the same reasons Roe has failed to offer proof creating a genuine issue of material fact as to her negligence claim against Patterson, she has also failed to do so as to her gross negligence claim against him. This claim will also be dismissed with prejudice.

### D. SWBTS's Negligence and Gross Negligence Motion

Roe asserts four different theories of negligence liability against SWBTS: **(1)** that SWBTS is vicariously liable for the actions of Patterson; **(2)** that SWBTS owed a duty to Roe under the Texas multifactor test; **(3)** that SWBTS is liable for its failure to train or supervise Patterson; and **(4)** that SWBTS is liable for failing to supervise Doe as a student-plumber.

Given the Court's conclusions concerning Patterson's negligence liability, *see supra* Part III.C, Roe's derivative claims against SWBTS, both that SWBTS was vicariously liable under the Texas multifactor test and that SWBTS is liable for its failure to train or supervise Patterson, necessarily fail. *See, e.g., Endeavor Energy Res., L.P. v. Cuevas*, 593 S.W.3d 307, 311 (Tex. 2019) (noting that "a negligent-hiring claim requires negligence by two separate parties: the employer's negligence in hiring

27

the employee and the employee's subsequent negligent act or omission"); *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 130 (Tex. 2018) (noting that respondeat superior liability is "liability for one person's fault [that] may be imputed to another who is himself entirely without fault solely because of the relationship between them").

This leaves Roe with two remaining negligence theories against SWBTS, which the Court will consider in turn.

### i. The Texas multifactor test applied to SWBTS—Foreseeability and duty

Here, the competent evidence supporting Roe's negligence claim against SWBTS under the Texas multifactor test shows that SWBTS knew that (1) Doe had been involved in several alcohol and one drug-related criminal offenses, and (2) Doe was the subject of a "suspicious student" report. In addition, through SWBTS professor and campus physician Dr. Richard Knight, and for the purpose of summary judgment, the Court has concluded that SWBTS was on notice of Roe's concern that she was being stalked by Doe and that Doe had been leaving notes on Roe's windshield. These facts, even when taken together and viewed in the light most favorable to Roe, do not support the imposition of a duty on SWBTS.

*First*, SWBTS's knowledge of Doe's prior criminal convictions, as revealed in his initial application to the school and his January 2015 criminal background report, included no violent crime of any kind and no sexual offenses. Doe's criminal history

was limited to alcohol and drug-related offenses.[5] (Dkt. #292 at 28). Texas case law is clear that such attenuated relationships between complained-of harms and prior bad acts cannot, as a matter of law, serve as the foundation of a foreseeability finding. *See, e.g.*, *Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d at 478 (holding that "prior DWI convictions did not indicate criminal conduct in any way akin to sexual assault of young boys").[6] Nothing in Doe's background as revealed through either his initial application to SWBTS or his January 2015 criminal background search in any way makes his alleged sexual assaults of Roe foreseeable.

*Second*, the "suspicious student" report provides no information that would allow a factfinder to conclude that SWBTS was on notice that Doe presented a danger to fellow students. As the Court has explained, *see supra* Part III.B.ii.g, the two-paragraph report involves an encounter between Doe and SWBTS campus police officers that was resolved without incident. Although the report notes that Doe

---

[5] The Court notes that, because SWBTS's criminal background check on Doe occurred in January 2015, after the date of Roe's first alleged rape in October 2014, it cannot bear on the foreseeability analysis related to that specific allegation. *See Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d at 478 (noting that an injury is foreseeable "if its general character might reasonably have been *anticipated*" (emphasis added) (cleaned up)).

[6] *See also Frith v. Fairview Baptist Church*, No. 05-01-01605-CV, 2002 WL 1565664, at *1, *4 (Tex. App.—Dallas July 17, 2002, pet. denied) (declining to conclude that alleged assailant's criminal background "would have put [defendant] on notice that he might sexually assault a child," even where said criminal background included felony convictions for burglary of a building and possession of a controlled substance, as well as misdemeanor convictions for public intoxication, possession of marijuana, unlawful carrying of a weapon, and evading arrest or detention); *Fields v. Moore*, 953 S.W.2d 523, 524–25 (Tex. App.–Texarkana 1997, no pet.) (declining to find as foreseeable an individual's "propensity to commit violent assaultive crimes" even where defendant knew of said individual's "history of drug- and alcohol-related offenses," as said individual "had no history of violent offenses or sex offenses").

behaved in an "erratic" manner at some point in the interaction, and while it is not clear why Doe requested that he be permitted to speak to then-Police Chief John Nichols, nothing in the report suggests that Doe was violent or threatened any violence. Moreover, the officers later brought Doe to meet with Dean Nichols and then "cleared the scene." And there was no apparent follow-up or any discipline of Doe following this event. In sum, nothing in the report indicates that Doe acted in a manner that SWBTS personnel perceived as violent or dangerous.

Finally, SWBTS's knowledge of Roe's mother's stalking concerns also does not create a genuine issue of material fact that SWBTS owed Roe a duty under the multifactor test. To begin, the Court notes the unusual nature of the stalking allegation against Doe. The allegation did not come from Roe, by way of formal complaint or otherwise. Indeed, it is undisputed that Roe never told anyone at SWBTS of her concerns about Doe. Roe did not even go so far as to speak with Dr. Knight or his wife directly, even though the Knights were family friends of Roe and her mother, and even though Roe was a student in a class taught by Dr. Knight. Instead, Roe's mother relayed this concern to Lennie Knight. Lennie Knight, in turn, is not an SWBTS employee, but she made her husband, Dr. Richard Knight, aware of the information from Roe's mother. Dr. Knight was a professor at SWBTS and the campus physician, and therefore part of the SWBTS administration. Given Dr. Knight's position at SWBTS, the Court has concluded that, for purposes of summary judgment, SWBTS—through Dr. Knight—was aware of the alleged stalking concern.

But context matters, and it is notable that, at the point in time when Roe's mother's concerns were relayed to Dr. Knight through his wife, Roe was a student in a class taught by Dr. Knight, yet she never raised any issue with Dr. Knight, in spite of the many opportunities she had to do so. (Dkt. #292-1 at 5 ¶ 22); (Dkt. #292-15 at 5). On this evidence, even assuming that Dr. Knight had been made aware through his wife that Roe's mother had contacted her and voiced concerns that Doe was "stalking" Roe, given the full context of Dr. Knight's experience with Roe being in his class for a full semester and the unusual nature of the way in which Roe's alleged concerns were communicated to him, the notion that either Dr. Knight specifically or SWBTS more generally should have foreseen violent sexual assaults of Roe is untenable.[7] *See Leatherwood v. M.B.Z., Inc.* No. 04-99-00292-CV, 2000 WL 682569, at *3 (Tex. App.–San Antonio May 17, 2000, pet. denied) (holding that it was not foreseeable to an employer that its employee would sexually assault a three-year old

---

[7] The Court's conclusion in this regard is unaffected by the possibility that had SWBTS followed up with Roe concerning her mother's stalking allegations, Roe may have produced to SWBTS the notes written by Doe that he left on Roe's windshield. The Court has reviewed the notes and found that none contain any threats of violence or otherwise suggest that Roe was in danger of a potential sexual assault at the hands of Doe. To be sure, the record shows that Doe left a number of notes on Roe's windshield, which reflect a rollercoaster of Doe's emotions at the time. However, the notes primarily detail Doe's sadness at Roe's failure to reciprocate his romantic interest in her, and their content does not demonstrate any language that is intimidating or threatening. Given the nature and content of the notes, the Court fails to see how SWBTS could have reasonably anticipated that, absent intervention, Doe's violent rapes might occur. To hold otherwise would be to charge universities with liability for any harms resulting from every awkward or unreciprocated courtship that goes on between its students. "Foreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury." *Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d at 478. Even had SWBTS been apprised of the contents of the notes Roe has entered into the record, this would not render Roe's alleged rapes foreseeable.

child on its premises even where there was evidence the employee had been accused by three adult women "of sexually harassing them by offering them beer, inappropriately touching them, and giving them gifts of money or cigarettes," all while on the employer's property, as there was no evidence the employee "ever acted inappropriately toward a child" or "ever threatened anyone or was violent in any way").

In performing the foreseeability analysis, "[t]he key is whether the behavior at issue is so similar in character *and* severity to what came before as to be foreseeable, or is so extraordinarily unlike prior conduct that it could not reasonably have been anticipated." *Bos v. Smith*, 556 S.W.3d 293, 305 (Tex. 2018) (cleaned up) (emphasis added). With this guidance from the Texas Supreme Court, the Court holds that Roe's injuries at the hands of Doe were not foreseeable to SWBTS, even considering altogether the totality of Doe's past criminal conduct, the "suspicious student" report, and Roe's mother's allegations of stalking.

In addition to the lack of foreseeability present here, the imposition of a duty on SWBTS based on the facts of this case faces other obstacles. Before imposing a duty, the Texas multifactor test requires courts to consider "the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Phillips*, 801 S.W.2d at 525; *see also Humble Sand & Gravel, Inc.*, 146 S.W.3d at 182 (same). The Court previously detailed these considerations in connection with Roe's argument that Patterson should be charged with a duty because he had received reports from two students expressing concerns about Roe's

wellbeing, *see supra* Part III.C.i, and all the same considerations apply here. SWBTS is an academic institution with thousands of students and limited administrative resources. On the record developed in this case, recognizing the duty Roe suggests should be imposed on SWBTS would have significant consequences. With no evidence that a student has committed any sexual or violent offense, violated a school policy, or threatened a student or school employee, SWBTS would nonetheless be charged with investigating any and every situation where a student is subject to an unwanted romantic pursuit for any period of time, even where the alleged victim made no report to the school, so long as any school official was aware of the interaction. SWBTS's failure to do so could result in potential liability. Because such a regime would impose an unreasonable and unworkable burden on the school, it does not pass muster under the Texas multifactor test.[8]

Furthermore, the duty analysis instructs courts to consider "whether one party would generally have superior knowledge of the risk." *Elephant Ins. Co.*, 644 S.W.3d at 145 (quotations omitted). Here, again assuming that the alleged sexual assaults took place, there is no question that Roe herself had appreciably more knowledge of

---

[8] It bears noting that even beyond the fact that the record in this case is devoid of any evidence showing that SWBTS should have been aware that Doe posed a grave threat to Roe during the relevant time period, the only evidence of record supports the opposite conclusion, with multiple SWBTS officials testifying to their impressions that Roe and Doe were in a relationship together, given those officials observations of Roe and Doe during their time together at SWBTS.

To be clear, the Court is not resolving any factual disputes about *why* Roe and Doe were seen on campus together—the parties have sharply divided views on that point. *Compare* (Dkt. #239 at 4) *with* (Dkt. #285 at 17 n.2). But it is not disputed that the two were seen on campus together, and, at least to some observers, appeared to be in a relationship.

the risks that Doe posed to her than did SWBTS. Roe claims to have known that Doe had "mental health issues," that he claimed to be "suicidal," and that he had "an extensive criminal history." (Dkt. #292-1 at 4–5 ¶¶ 18–19). Roe had full awareness of the contents of all of Doe's notes, and of all the other manifestations of Doe's allegedly unwanted romantic pursuit. Yet, prior to the first alleged assault, none of that prevented Roe from speaking to Doe for extended periods of time by phone, accepting flowers from Doe, and after doing so also voluntarily attending Doe's October 2014 party, where Roe alleges she was first assaulted. And by no later than that first assault, Roe became aware that Doe possessed firearms, yet she never apprised the school of this at any time before August 2015.

For all of these reasons, the Court holds that SWBTS did not owe a duty to Roe under Texas's multifactor test, and Roe's negligence claims against SWBTS therefore must fail.

### ii. Roe's negligent supervision claim

Separately, Roe advances a negligent supervision claim against SWBTS concerning Doe's employment as a student-employee plumber. The Texas Supreme Court has not "ruled definitively on the existence, elements, and scope of torts such as negligent . . . supervision of an employee by an employer." *Pagayon*, 536 S.W.3d at 505 (quoting *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 n.27 (Tex. 2010)). Concerning Roe's negligent supervision claims, the Court previously held that this legal duty existed as a general matter, and that within the scope of this duty was the obligation of the employer "to implement safeguards to protect students from

34

foreseeable criminal activities." *Roe*, 2022 WL 672692, at *8. However, on the facts presented here, Roe has failed to show either that SWBTS breached any such duty, or even assuming a breach, that Doe's employment was a proximate cause to her injuries.

Concerning breach, it must first be noted that, as Doe was not an SWBTS student-employee in October 2014, the date of Roe's first alleged rape, her negligent supervision claim applies only to the April 2015 assaults. But even there, Roe's claim is constrained by all of the Court's findings above, in particular, that there is no admissible evidence in the record establishing that SWBTS knew that Doe had any violent tendencies, or that Doe possessed guns on campus. Moreover, Roe has failed to present any evidence suggesting that Doe ever previously abused the access afforded him to campus buildings by way of being a plumber when he was formerly employed by SWBTS in that capacity.

Concerning the cause-in-fact requirement of proximate cause, the closest Roe comes in this regard is through her allegation that by way of Doe's access to her building as a plumber, he was able to learn the schedules of Roe and her roommates, such that "Doe knew the building was not secure at certain hours and was aware that the large solid wooden front door had no peephole." (Dkt. #292-1 at 8 ¶ 41). Roe further alleges that Doe committed the final April 2015 rape in a women's restroom while wearing his SWBTS uniform. (Dkt. #292-1 at 8–9 ¶ 43). However, at best, these allegations do no more than show that SWBTS "furnish[ed] a condition which made [Roe's] injury possible," which in no way justifies the conclusion that her injury "was

the natural and probable result thereof." *Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d at 477. And the Court fails to see how any of the foregoing foreseeability analysis in the context of the Texas multifactor duty test, *see supra* Part III.D.i., is fundamentally altered by way of Doe's employment as an SWBTS student-plumber in the proximate-cause analysis, given SWBTS's complete lack of knowledge of any of the relevant dangerous predilections that Roe alleges Doe possessed.

For all of these reasons, the Court holds that Roe's negligent supervision claim against SWBTS must fail.

### iii. Gross Negligence

Finally, as noted *supra* Part III.C.ii, gross negligence is a statutorily defined term under Texas law having both an objective component and a subjective component, with the clear and convincing standard of evidence applying to both elements. *Diamond Shamrock Refin. Co.*, 168 S.W.3d at 169–70. And as a failure to prove negligence necessarily requires a failure to prove gross negligence, *Mobil Oil Corp.*, 968 S.W.2d at 921, for the same reasons Roe has failed to offer proof creating a genuine issue of material fact as to her negligence claims against SWBTS, she has also failed to do so as to her gross negligence claim against it. This claim will also be dismissed with prejudice.

\* \* \*

Finally, throughout her briefing on these motions, Roe suggests that the Court should consider evidence of the "atmosphere" or "culture" at SWBTS, under Patterson's leadership. Specifically, Roe argues that women experienced "a toxic

environment at SWBTS under Patterson," and that "women on the campus were treated as petty annoyances at best and evil seductresses hell bent on the destruction of the purely innocent men around them." In Roe's view, this resulted from Patterson's "sweeping authority and unfettered discretion to make decisions regarding admission, employment, and discipline matters." (Dkt. #285 at 8) (quotations omitted).

Roe further points to an instance when Patterson publicly objectified a sixteen-year-old girl, and another instance in which Patterson advised women in abusive relationships to stay "submissive in every way" and "to elevate" to their partners. (Dkt. #285 at 8). And, as is most relevant to the issues in this case, Roe asserts that "women who tried to report sexual harassment and sexual abuse were ignored, dismissed or disciplined themselves," (Dkt. #285 at 8), and that Patterson "was known to be a proponent of guns and during his presidency guns were prevalent on SWBTS' campus." (Dkt. #285 at 9). In this vein, Roe has directed the Court to an email from Patterson to another school official concerning a meeting he planned to have with Roe after she reported Doe's alleged sexual assaults in August 2015. The email suggests that Patterson doubted the veracity of Roe's allegations against Doe, and that he planned to "break her down," i.e., "break [Roe] down," during the meeting. The implicit suggestion of the message is that Patterson would seek to have Roe recant her allegations about Doe's alleged sexual assaults.

It is apparent that Roe views the cited evidence of the "culture" at SWBTS, and of certain instances of Patterson's behavior, including his email about "breaking

down" Roe, as powerful evidence supporting her negligence claims against Defendants. The Defendants object to the admissibility of much of the "culture" evidence relied upon by Roe.

In considering Roe's "culture" argument, the Court must begin with what has already been decided, namely that all of the other record evidence in this case does not support her negligence claims, and particularly does not support the notion that it was foreseeable to SWBTS or Patterson that John Doe would violently and repeatedly sexually assault Jane Roe. The question then becomes, even considering all the evidence cited by Roe about the "atmosphere" at SWBTS, regardless of admissibility, does such evidence somehow create a genuine issue of material fact? The Court concludes it does not.

To begin, Roe's conclusory assertions that women experienced "a toxic environment at SWBTS under Patterson," and that "women on the campus were treated as petty annoyances at best and evil seductresses hell bent on the destruction of the purely innocent men around them," are not evidence that the Court can consider in evaluating summary judgment. Instead, they are opinions about how women experienced their time as students at SWBTS. While they may reflect Roe's opinion and perhaps the opinion of some other female students, they remain just that—opinions, not evidence.

Likewise, Roe's assertion that Patterson was "a proponent of guns," and that guns were "prevalent" on SWBTS's campus, also does not alter the analysis in this case. SWBTS's policy prohibiting firearms on campus absent permission is

undisputed, and there is no evidence that Doe had permission to violate the policy. To the contrary, the record establishes that Doe was expelled when SWBTS learned he had firearms. And Roe's assertion that "women who tried to report sexual harassment and sexual abuse were ignored, dismissed or disciplined themselves" is a gross distortion of the evidence before the Court. The proposition that SWBTS has a history of condoning sexual assault or sexual harassment of female students has not been proven by Roe and is not supported by the record in this case.[9]

Finally, the "break her down" email that Roe has repeatedly cited does not demonstrate that Doe's alleged sexual assaults of Roe were foreseeable to Patterson or SWBTS. The email was sent after the assaults occurred, after Roe had reported them to Patterson and SWBTS, and after Roe herself decided not to pursue criminal charges against Doe. Thus, the email is irrelevant to the question of what information Defendants were aware of prior to Roe's alleged victimization. Patterson's approach to further communications with Roe may well have been misguided and inappropriate, but his post-hoc actions based on an apparent mistrust of the truthfulness of Roe's allegations cannot create a genuine issue of material fact on the key questions of foreseeability and duty at the heart of this case.

---

[9] The cited instances of Patterson objectifying a sixteen-year-old girl and condoning domestic violence are reprehensible, if true, but they bear no direct relevance to the issues in this case, whether it was foreseeable to Defendants that Doe would sexually assault Roe. Similarly, SWBTS's alleged discriminatory treatment of female students concerning the application of the school's ethical or disciplinary codes, even if true, does not support the foreseeability finding sought by Roe in this case.

Altogether, the Court will grant both Patterson's and SWBTS's negligence summary judgment motions in full.

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED** that the parties' objections to the negligence summary judgment evidence, (Dkt. #296, #315), are **GRANTED in part**. Specifically, with the exception of objections that have been expressly granted by this memorandum opinion and order, all other objections are **DENIED as moot**.

It is further **ORDERED** that Defendants' negligence summary judgment motions, (Dkt. #239, #257), are **GRANTED**. It is further **ORDERED** that all of Plaintiff Jane Roe's negligence and gross negligence claims against Defendants Patterson and SWBTS are **DISMISSED with prejudice**.

**So ORDERED and SIGNED this 25th day of March, 2023.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE

40