UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| JANE ROE | § | |
| | § | |
| v. | § | CIVIL NO. 4:19-CV-179-SDJ |
| | § | |
| LEIGHTON   PAIGE   PATTERSON, | § | |
| ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant Leighton Paige Patterson's Motion for Partial Summary Judgment on Defamation, (Dkt. #241), and Defendant Southwestern Baptist Theological Seminary's Motion for Partial Summary Judgment Regarding Plaintiff's Defamation Claim, (Dkt. #259). Also before the Court is Defendant Southwestern Baptist Theological Seminary's Objections to Plaintiff's Defamation Summary Judgment Evidence and Motion to Strike. (Dkt. #317).

The Court, having reviewed the motions, the relevant briefing, the applicable law, and the parties' arguments presented at hearing, **OVERRULES as moot** Defendant Southwestern Baptist Theological Seminary's Objections to Plaintiff's Defamation Summary Judgment Evidence and Motion to Strike, (Dkt. #317), **GRANTS** Defendant Leighton Paige Patterson's Motion for Partial Summary Judgment on Defamation, (Dkt. #241), and **GRANTS** Southwestern Baptist Theological Seminary's Motion for Partial Summary Judgment Regarding Plaintiff's Defamation Claim, (Dkt. #259).

1

# I. Background

Defendants Leighton Paige Patterson and Southwestern Baptist Theological Seminary ("SWBTS") seek the dismissal of Plaintiff Jane Roe's defamation claims against them. Roe's defamation claims arise from statements related to Roe's allegations of sexual assault at the hands of John Doe while both were students at SWBTS in 2014–2015. Although discussed more fully in the Court's prior orders, *see, e.g.*, *Roe v. Patterson*, No. 4:19-CV-179-SDJ, 2023 WL 2632803, at *1, 3–4 (E.D. Tex. Mar. 25, 2023), the Court provides a brief description of Roe's sexual assault allegations that underlie her defamation claims. Roe enrolled as an undergraduate student at SWBTS in the fall of 2014 after being drawn to the school because of its commitment to conservative Christian beliefs. (Dkt. #223 at 10 ¶ 44). She alleges that, after her arrival on campus as a student and a student-employee, she became the victim of repeated stalking, physical abuse, sexual abuse, and threats of violence towards herself and her family perpetrated by Doe, a seminary student and student-employee at SWBTS. (Dkt. #223 at 11–16 ¶¶ 47–75). Roe reported the sexual assaults to Patterson and SWBTS in August 2015, months after the assaults had allegedly occurred. At that time, Patterson and SWBTS notified the Fort Worth Police Department and Roe was interviewed by law enforcement. Roe declined to pursue charges against Doe.

Roe's defamation claims fall into two broad categories, allegations that Patterson directly defamed her and allegations that both Defendants are legally responsible for alleged defamatory statements made by others. As to the latter category, Roe contends that both Defendants are liable for certain alleged defamatory

statements made in 2018, at the time that Patterson was terminated as president of SWBTS. As will be explained, certain of these complained-of publications touched on Patterson's handling of Roe's sexual assault allegations.

Patterson's termination followed two SWBTS Board of Trustees meetings in late May 2018. The Board initially determined that Patterson would be appointed to a lifetime emeritus position at SWBTS, including compensation and benefits. But the Board then changed course within roughly one week, such that Patterson ultimately did not receive the lifetime emeritus position. The Board meetings followed a series of media reports alleging that Patterson had committed various misdeeds while at SWBTS and his former institution, Southeastern Baptist Theological Seminary ("SEBTS"), as well as a petition signed by thousands of Southern Baptist women criticizing Patterson for his past conduct.

During this time, various supporters of Patterson publicly defended his leadership at SWBTS. As relevant here, some of that support came by way of blog posts, attorney press releases, and a letter originally shared with the SWBTS Board of Trustees. Roe asserts that statements made in some of these publications supporting Patterson, and specifically referencing Patterson's handling of Roe's sexual assault allegations, defamed her. Although Roe acknowledges that none of these complained-of defamatory statements were published by Patterson himself, Roe maintains that the offending statements were part of publications that were prepared at the direction of or were ratified by Patterson and agents of SWBTS, such that both Patterson and SWBTS are liable for the allegedly defamatory content.

3

## II. LEGAL STANDARD

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). If the moving party presents a motion for summary judgment that is properly supported by evidence, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).

The nonmoving party "must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). To defeat a motion for summary judgment, the nonmovant must present "significant probative evidence demonstrating the existence of a triable issue of fact." *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (citations omitted). Thus, "mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden." *Pickett v. IceCold2, LLC*, No. 4:17-CV-666, 2019 WL 1063369, at *2 (E.D. Tex. Mar. 6, 2019).

Further, as noted in the Court's local rules, in ruling on motions for summary judgment, the Court "will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy,

except to the extent that such facts are controverted in the responsive brief filed in opposition to the motion, as supported by proper summary judgment evidence." Local Rule CV-56(c).

### III. DISCUSSION

Sitting in diversity, the Court will apply the substantive law of Texas, the forum state. *Wisznia Co. v. Gen. Star Indem. Co.*, 759 F.3d 446, 448 (5th Cir. 2014). Federal courts look first to decisions of the Texas Supreme Court to resolve issues of Texas state law. *Hux v. S. Methodist Univ.*, 819 F.3d 776, 780 (5th Cir. 2016). If the Texas Supreme Court has not ruled on the issue, the federal court makes an "Erie guess," predicting what the Texas Supreme Court would do if faced with the same facts presented in the case. *Id.* Generally, state intermediate appellate courts' decisions are the strongest indicator of what a state supreme court would do. *Id.* at 780–81. Therefore, the Court will look to Texas Supreme Court and intermediate appellate court decisions to construe Texas law applicable to Roe's claims.

### A. Texas Defamation and Agency Law

#### i. General Principles

Under Texas law, to prevail on a defamation claim, a plaintiff must establish that: "(1) the defendant published a false statement; (2) that defamed the plaintiff; (3) with the requisite degree of fault regarding the truth of the statement (negligence if the plaintiff is a private individual); and (4) damages (unless the statement constitutes defamation per se)." *D Mag. Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017) (citing *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015)).

In any defamation case, a threshold legal question is whether the challenged publication is defamation per se or defamation per quod. *See In re Lipsky*, 460 S.W.3d at 596 (observing that "whether a statement qualifies as defamation per se is generally a question of law"). A statement is considered defamation per se if, on its face, it falls within one of the following four categories: (1) it falsely charges a person with the commission of a crime, *see, e.g.*, *Leyendecker & Assocs. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984); (2) it falsely imputes that a person has a loathsome disease, *see, e.g.*, *Memon v. Shaikh*, 401 S.W.3d 407, 421 (Tex. App.—Houston [14th Dist.] 2013, no pet.); (3) it falsely imputes sexual misconduct, *see, e.g.*, *id.*; or (4) it injures a person in their office, profession, or occupation, *see, e.g.*, *Bedford v. Spassoff*, 520 S.W.3d 901, 905 (Tex. 2017). Damages are presumed if the publication is defamation per se. *In re Lipsky*, 460 S.W.3d at 596.

If a challenged publication is determined to be defamation per quod, however, damages must be proven as an element of the claim. "[I]n order to sustain a jury award of mental anguish damages in the defamation context, there must be not only evidence of compensable mental anguish but also evidence justifying the amount awarded." *Exxon Mobil Corp. v. Hines*, 252 S.W.3d 496, 505 (Tex. App.–Houston [14th Dist.] 2008, pet. denied). "Similarly, to sustain an award of injury to reputation or character, there must be competent evidence of 'actual injury' to the interest involved." *Id.*

Regardless of whether the asserted defamation is per se or per quod, determining which side bears the burden of proof—either plaintiff to show falsity or

defendant to show truth—depends on the extent to which the First Amendment is implicated. Where the speech challenged as defamatory involves a matter of public concern, the common law presumption of falsity no longer applies, such that the burden is shifted to the plaintiff to show falsity. *See Van Der Linden v. Khan*, 535 S.W.3d 179, 198–99 (Tex. App.–Fort Worth 2017, pet. denied) ("Now, when a case implicates a constitutional issue—i.e., when a case involves a public official, a media defendant, or a matter of public concern, or any combination thereof—the burden is upon the plaintiff to prove falsity, not upon the defendant to prove truth.").[1] "Whether a publication involves a matter of public concern is a question of law." *Klentzman v. Brady*, 456 S.W.3d 239, 257 (Tex. App.–Houston [1st Dist.] 2014), *aff'd*, 515 S.W.3d 878 (Tex. 2017). The Supreme Court has defined "matters of public concern" as encompassing "any matter of political, social, or other concern to the community," including those matters that are "[the] subject of legitimate news interest; that is, [the] subject of general interest and of value and concern to the public." *Snyder v.*

---

[1] Roe cites *Cummins v. Bat World Sanctuary* for the proposition that "neither the United States Supreme Court nor the Supreme Court of Texas has required a private plaintiff to prove the falsity of defamatory statements in suits against *nonmedia* defendants, even when the statements are on matters of public concern," with *Cummins* concluding that the statements challenged as defamatory in that case were presumed false, as the suit was between a private plaintiff and a non-media defendant. No. 02-12-00285-CV, 2015 WL 1641144, at *10 (Tex. App.–Fort Worth Apr. 9, 2015, pet. denied). However, the Court notes that both *Cummins* and *Van Der Linden* are decisions of the Fort Worth Court of Appeals, with *Van Der Linden* being a more recent, published opinion, and with *Cummins* being designated a memorandum opinion pursuant to Texas Rule of Appellate Procedure 47.4. *See also* MICHOL O'CONNOR, O'CONNOR'S TEXAS CAUSES OF ACTION, Chap. 8–A § 2.4 (2023) (observing that *Van Der Linden* requires "any plaintiff to prove falsity in any case against any defendant as long as the case involves a matter of public concern").

More fundamentally, however, nothing in this case turns on which party bears the burden of proof regarding the truth or falsity of the challenged statements.

*Phelps*, 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (quotations omitted).

If a challenged publication involves a matter of public concern, the plaintiff must point to evidence that would allow a factfinder to conclude that the challenged statements are false—"that is, that the gist of the statements was not substantially true." *KBMT Operating Co. v. Toledo*, 492 S.W.3d 710, 711 (Tex. 2016). To determine the gist of an allegedly defamatory publication, courts are instructed to "construe the publication as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *D Mag.*, 529 S.W.3d at 434 (quotations omitted). "It is well settled that the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002) (quotations omitted). And whether a publication is "defamatory," even if assumed to be false, is a matter of law for the Court. *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987) ("The threshold question then, which is a question of law, is whether [the challenged] statements are reasonably capable of a defamatory meaning.").

### ii. Vicarious **Defamation** Liability

To the extent Roe seeks to hold Patterson or SWBTS liable for statements they did not publish themselves, but that were allegedly published by others at their direction, Roe must point to evidence that could allow a factfinder to conclude that the statements were made in the context of a principal-agent or employer-employee

relationship.[2] *See, e.g.*, *Texam Oil Corp. v. Poynor*, 436 S.W.2d 129, 130 (Tex. 1968) ("An action is sustainable against a corporation for defamation by its agent, if such defamation is referable to the duty owing by the agent to the corporation, and was made while in the discharge of that duty. Neither express authorization nor subsequent ratification is necessary to establish liability." (cleaned up)).[3] However, even where an employment relationship exists, if the agent acts "outside the scope of her authority," the employer will be liable only where it "authorize[d], condone[d], or ratif[ied]" the defamatory statements. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 647 (Tex. 1995).

Further, in the specific context of the attorney-client relationship, courts across the country have reached different outcomes as to when liability may be imposed on a client premised on defamatory statements made by his attorney. *Compare Demopolis v. Peoples Nat. Bank of Wash.*, 796 P.2d 426, 433–34 (Wash. Ct. App. 1990)

---

[2] Texas law also recognizes that the acts of "vice principals" are considered to be the acts of the corporate entity itself. "A vice-principal represents the corporation in its corporate capacity, and includes persons who have authority to employ, direct, and discharge servants of the master, and those to whom a master has confided the management of the whole or a department or division of his business." *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999). As the Texas Supreme Court has explained, the acts of vice principals are "the acts of the corporation itself, and corporate liability in this situation is direct rather than vicarious." *Chrysler Ins. Co. v. Greenspoint Dodge of Hous., Inc.*, 297 S.W.3d 248, 253 (Tex. 2009) (citing *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997)).

To the extent this doctrine is implicated by any issue in this case, Roe has forfeited any such arguments by failing to raise them. *See, e.g., United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (observing that "forfeiture is the failure to make the timely assertion of a right").

[3] *See also Rodriquez v. Sarabyn*, 129 F.3d 760, 769 (5th Cir. 1997) ("For an employer to be liable for defamation by its employee in Texas, the defamatory statement must be (1) referable to a duty owed by the employee to the employer and (2) made while the employee is in the process of discharging that duty.").

(observing that Washington state case law "seemingly limits a client's liability for his or her attorney's defamatory communications to situations in which the attorney acted within the scope of employment, and with the client's knowledge and consent"),[4] *with United Farm Bureau Mut. Ins. Co. v. Groen*, 486 N.E.2d 571, 574 (Ind. Ct. App. 1985) ("Because of the close identity of an attorney with the client he represents, we hold that neither the absence of a master-servant relationship nor the characterization of the attorney as an independent contractor is a bar to liability of the client for the torts of the attorney acting within the scope of his authority.").[5] "Although the question of agency is generally one of fact, the question of whether a principal-agent relationship exists under established facts is a question of law for the

---

[4] *See also Plant v. Tr. Co. of Columbus*, 310 S.E.2d 745, 746–47 (Ga. Ct. App. 1983) ("We think the unique attorney-client relationship should not be analyzed merely with reference to ordinary agency law. . . . We will not presume a direction or authority or permission to commit a tortious or illegal act inheres in the usual attorney-client relationship."); *Green Acres Tr. v. London*, 688 P.2d 658, 665 (Ariz. Ct. App. 1983), *aff'd in relevant part,* 688 P.2d 617 (Ariz. 1984) (noting that appellees "would be vicariously liable for the allegedly defamatory statements of their attorneys only if such statements were actually or apparently authorized by them"); *Williams v. Burns*, 463 F.Supp. 1278, 1284–85 (D. Colo. 1979) (applying Colorado law and concluding that "an attorney at law who has been retained as outside counsel to render legal services on matters specified by a client is [not] an employee or agent of that client within the meaning of Respondeat superior," observing that "[c]lients are not insurers of actions taken by attorneys, despite the fact that such actions are taken on the clients [sic] behalf" and further noting that the "only basis upon which [the client] could conceivably be liable for the alleged defamatory statements made by [the client's attorney] is if it either authorized or subsequently ratified [the attorney's] tortious actions").

[5] *See also Depp v. Heard*, No. CL-2019-2911, 2021 WL 6550462, at *4 (Va. Cir. Ct. Jan. 4, 2021) (finding counterclaims to be "actionable defamation claim[s]" even where at-issue statements were made "through [plaintiff's] attorney"); *Doyle v. Shlensky*, 458 N.E.2d 1120, 1131 (Ill. Ct. App. 1983) ("The attorney-client relationship is one of agent-principal . . . governed by principles of agency law . . . and the general rule is that the client is bound by the acts and omissions of his lawyer-agent in the prosecution of a remedy." (cleaned up)).

court." *Ross v. Tex. One P'ship*, 796 S.W.2d 206, 209–10 (Tex. App.–Dallas 1990, writ denied).

The parties have not cited, and the Court is unaware of, any Texas precedent directly addressing a client's potential liability for defamation based on their attorney's allegedly defamatory statements. However, Texas courts have examined the nature and scope of the attorney-client relationship in various other contexts, sometimes holding the relationship to be that of an independent contractor, sometimes not. *Compare State Farm Mut. Auto. Ins. Co. v. Traver*, 980 S.W.2d 625, 627 (Tex. 1998) ("A defense attorney, as an independent contractor, has discretion regarding the day-to-day details of conducting the defense, and is not subject to the client's control regarding those details." (citing RESTATEMENT (SECOND) OF AGENCY § 385, cmt. a.")),[6] *with Gavenda v. Strata Energy, Inc.*, 705 S.W.2d 690, 693 (Tex. 1986) ("The attorney-client relationship is an agency relationship. The attorney's acts and omissions within the scope of his or her employment are regarded as the client's acts; the attorney's negligence is attributed to the client.").[7]

---

[6] *See also Hennigan v. Hennigan,* 666 S.W.2d 322, 324–25 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e) ("We find that an attorney engaged in private practice is an independent contractor and does not receive current wages. Thus, his fees for legal services rendered may be garnished.").

[7] *See also Sw. Bell Tel. Co. v. Wilson*, 768 S.W.2d 755, 759 (Tex. App.–Corpus Christi 1988, writ denied) ("In order to hold [defendant] liable for the intentional torts of its attorneys, it was incumbent upon [plaintiff] to prove that [defendant's attorney] was an agent or employee of [defendant] when the alleged tortious acts were committed . . . [and] that the act or acts subjecting [defendant] to liability were within the scope of the agent's employment.").

Of course, an independent contractor can also be an agent. *See, e.g., Quigley v. Rosenthal*, 327 F.3d 1044, 1064 n.10 (10th Cir. 2003) (noting that "attorneys are independent contractors as well as agents, and that, accordingly, they exercise exclusive control of the manner of performing their legal work, being responsible to the client only for the result" (cleaned up)). And the Texas Supreme Court has made clear that an attorney can herself be liable for defamation, even where the attorney does no more than advance defamatory statements related to contemplated litigation. *Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 53 (Tex. 2021) (declining to apply, in a defamation action, either the "judicial-proceedings privilege" or "attorney immunity" to press releases and social media posts made by a defendant attorney in connection with contemplated litigation).[8]

**B. Summary Judgment Evidence**

Roe asserts that the following four publications, attributable to either Patterson, SWBTS, or both, were defamatory: (1) a blog post published by Sharayah Colter on May 31, 2018, entitled "The Untold Truth," (Dkt. #288-17); (2) a press release from Patterson's former attorney Shelby Sharpe on June 4, 2018, referred to by the parties as the Sharpe "Release of Facts," (Dkt. #288-28); (3) a CNN article quoting Shelby Sharpe published June 12, 2018; and (4) a letter from SWBTS-donor Gary Loveless submitted to the SWBTS Executive committee on June 29, 2018, (Dkt. #288-37).

---

[8] To be clear, such liability can exist only for out-of-court statements, as otherwise, the "judicial-proceedings privilege" stands as an "absolute privilege" covering any statements made by counsel within the context of judicial proceedings. *Id.* at 46.

Separately, in her summary-judgment responses but not her complaint, Roe also asserts two additional bases for defamation liability against both Defendants: **(1)** that Patterson defamed Roe sometime in 2016 through communications with SWBTS professor Patricia Ennis; and **(2)** that Patterson, either individually or by way of his attorney Sharpe, defamed Roe in a May 22, 2018, meeting with the SWBTS Board of Trustees. (Dkt. #288 at 11–12); (Dkt. #295 at 23–25). Before turning to the merits of Defendants' summary-judgment motions, the Court will outline each of the allegedly defamatory publications.[9]

### i. "The Untold Truth"

"The Untold Truth" was a blog post published on May 31, 2018, which was authored by Sharayah Colter, in conjunction with Candi Finch, written in defense of Patterson following his ouster from SWBTS. (Dkt. #241 at 3 n.9); (Dkt. #288-17). Ms. Colter and Dr. Finch had connections to Patterson and SWBTS. Sharayah Colter is the wife of Scott Colter, who was Patterson's Chief of Staff during Patterson's employment with SWBTS. (Dkt. #288 at 14–15). Candi Finch was an SWBTS adjunct professor and administrative assistant to Dorothy Patterson, Patterson's wife. (Dkt. #259 at 27 n.6).

---

[9] Both Defendants have asserted various objections to Roe's proffered summary-judgment evidence. *See* (Dkt. #301) (Defendant Leighton Paige Patterson's Reply in Support of Motion for Partial Summary Judgment on Defamation); (Dkt. #317) (Defendant Southwestern Baptist Theological Seminary's Objections to Plaintiff's Defamation Summary Judgment Evidence and Motion to Strike). However, none of the complained-of evidence alters the analysis of the summary-judgment issues before the Court. Therefore, Defendants' objections will be overruled as moot.

Roe claims that the following statement from "The Untold Truth" blog post, which concerns Roe's allegation that she was sexually assaulted by Doe, was defamatory: "The accused man admitted to having sexual relations with the woman, but said it was consensual. The man also produced evidence to the police to that effect." (Dkt. #288 at 15–16); *see also* (Dkt. #223 at 23 ¶ 113).

### ii. The Sharpe "Release of Facts"

Roe's allegation that she was defamed by the Sharpe "Release of Facts" concerns a June 4, 2018, press release made by Patterson's former attorney, Shelby Sharpe, "to set the facts straight" concerning alleged "wide-spread misrepresentation and misinformation regarding Dr. Patterson." (Dkt. #288-28 at 2). Roe specifically points to the following statement from that press release as defamatory: "The student in question had given several different accounts of her story to authorities, school administration, and her family. Dr. Patterson was seeking to understand what actually occurred among the many contradictory statements." (Dkt. #223 at 24 ¶ 114); (Dkt. #288-28 at 3).

### iii. The CNN Article

In her complaint, Roe identifies a June 12, 2018, CNN article as containing defamatory statements also made by Shelby Sharpe. However, Roe has not produced the article to the Court, and at the hearing on Defendants' summary-judgment motions, Roe disclaimed her reliance on the article, stating that she did not "consider it one of the three major publications."

### iv. The Loveless Letter

Similar to "The Untold Truth" and the Sharpe "Release of Facts," the Gary Loveless donor letter (the "Loveless Letter") was a publication made in support of Patterson following Patterson's termination from SWBTS. Loveless submitted the letter to the SWBTS Executive Committee of the Board of Trustees on June 29, 2018, "to express [the signatories'] utter disdain for [SWBTS's] actions" in terminating Patterson. (Dkt. #280-37). Roe contends that she was defamed by the following statements in the Loveless Letter concerning her 2015 sexual assault allegations against Doe:

> In contrast, the facts regarding the 2015 Southwestern event referenced by Mr. Ueckert in his June 1 statement are well known. It is our understanding that you knew full well that the female student's allegations of rape were false, that she had engaged in consensual sexual activities on more than one occasion and those acts had taken place in public buildings at the Seminary, and that campus security were shown the nude pictures she texted to the male student. It is further our understanding that she begged Dr. Patterson not to call the police but he insisted he would and did so within six minutes of hearing her allegation.
>
> ***
>
> The full Board understood and accepted Dr. Patterson's explanation of the phrase "breaking her down"[10] [sic] that appeared in that email as being a statement of his desire to meet with her (without police present, but clearly, as was always his practice, with other Seminary personnel present) and attempt to help her recant her false allegations of rape before she continued with such false statements to the police. While the actual sentence for a criminal conviction of making a false statement to

---

[10] The "break her down" email related to a message Patterson sent then-SWBTS Chief of Police John Nichols on September 28, 2015, and was based on Patterson's apparent mistrust of the truthfulness of Roe's allegations.

15

the police may vary from jurisdiction to jurisdiction, the criminal offense itself remains a permanent mark on an individual's record.

(Dkt. #288 at 10); *see also* (Dkt. #223 at 24–25 ¶ 116); (Dkt. #295 at 12–13).

### v. Patterson's May 2016 Statements to Patricia Ennis

In response to each of Defendants' motions for summary judgment on Roe's defamation claims, Roe asserts that she was defamed by Patterson directly, sometime in May 2016, through the following statements he allegedly made to SWBTS professor Patricia Ennis as revealed through Ennis's deposition testimony:

> Q. Did [Patterson] tell you anything about [John Doe's] response to [Jane Roe's] allegations?
>
> A. Yes. He said that he showed – [Doe] showed him pictures that were compromised pictures of [Roe].
>
> Q. And Dr. Patterson told you that he saw those pictures?
>
> A. He did not say that he had seen them. He said that [Doe] said that he had pictures.
>
> ***
>
> Q. Did [Patterson] tell you that [Roe] had told him that [Doe] took photographs of her during one of the sexual assaults?
>
> A. He told me that he had pictures, that [Doe] had pictures. He did not say where and how he had gotten the pictures.
>
> Q. Did [Patterson] imply that they were – that the relationship was a consensual sexual relationship and that [Roe] had voluntarily sent [Doe] the photographs?
>
> A. Yes.
>
> Q. So [Patterson] didn't tell you that [Roe] had told him that [Doe] took the photographs . . . during one of the sexual assaults?
>
> A. No.
>
> Q. Patterson did not tell you that?

A. No.

(Dkt. #288-69 at 116–17); *see also* (Dkt. #288 at 11–12); (Dkt. #295 at 23–24).

### vi. The May 22, 2018, Meeting

Finally, and again in response to each of Defendants' motions for summary judgment on Roe's defamation claims, Roe asserts that she was defamed by either Patterson directly or through his attorney Shelby Sharpe at a May 22, 2018, meeting between Patterson and the SWBTS Board of Trustees, as revealed through a one-page document entitled "Questions and Responses to Chairman Ueckert's Questions," which document Roe alleges reflected "Patterson's notes for responding to the Board of Trustees." (Dkt. #295 at 24); *see also* (Dkt. #288 at 12). Roe argues that the combination of the one-page "Questions and Responses" document, coupled with the following deposition testimony of former SWBTS Chairman of the Board of Trustees Kevin Ueckert, establishes that either Patterson or Sharpe defamed her:

Q. Do you recall [Roe's allegations] being discussed?

A. Yes.

Q. How did it come up?

A. Shelby Sharpe.

Q. What did Shelby Sharpe say?

A. He said that he had all the information related to this incident and verifiable proof that there was no wrong done on the side of the seminary.

\*\*\*

Q. Did [Patterson or Sharpe] respond to the question of do we have documentation of this investigation [concerning Roe's allegations]?

A. Yes.

Q. What was the explanation for: Do we have documentation of this investigation?

A. Shelby had with him all the documentation, reportedly. I don't know. But he said I've got all the documentation and he had a stack of papers.

Q. Did he share with the trustees the stack of papers?

A. No. We did not ask, and he did not offer.

Q. What else did he say?

A. I recall him saying something about pictures.

Q. What did he say about pictures?

A. That they – that there was something about pictures that was also a part of the reason they believed that the allegations were not factual.

Q. Did he say that he had pictures?

A. I can't remember.

(Dkt. #288-12 at 4, 7); *see also* (Dkt. #288 at 12); (Dkt. #295 at 24–25).

## C. Patterson's Defamation Motion

At the outset, the Court notes that the parties do not dispute that Roe is a private citizen, and that therefore, she only need show that any allegedly defamatory statements were made negligently, not with actual malice. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998) ("Private plaintiffs must prove that the defendant was at least negligent.").

Patterson challenges Roe's defamation claims both procedurally and substantively. Procedurally, Patterson argues that Roe's claims are barred by the legal doctrine of "like immunity." Substantively, Patterson asserts that he has no direct liability for the publications, as he did not "aid or assist" in preparing or publishing the statements, and that he has no vicarious liability for the publications,

as he lacked control of the individuals who published the statements. The Court will consider each argument in turn.

### i. Like-Immunity, Respondeat Superior, and The Relation-Back Doctrine

Attacking all of Roe's defamation claims that are rooted in theories of vicarious liability as being untimely asserted, Patterson argues that the rule of "like immunity" "recognizes that a person who may be liable based on the conduct of another is entitled to assert the same defenses to liability as the individual who allegedly committed the tortious conduct." (Dkt. #241 at 12). Patterson notes that "the limitations period for Plaintiff's claims against Dr. Patterson's purported employees/agents has long passed," and argues that because Roe would not have been able to assert defamation claims against those directly responsible for publishing the allegedly defamatory content when she filed her amended complaint on March 23, 2022, (Dkt. #223), Roe should likewise be barred from asserting such defamation claims against him by way of an amended complaint. (Dkt. #241 at 12–13).

As a legal term of art, "like immunity" appears first to have been coined in *New Orleans & N.E.R. Co. v. Jones*, which observed that "if the party who actually causes the injury is free from all civil and criminal liability therefor, his employer must also be entitled to like immunity." 142 U.S. 18, 24, 12 S.Ct. 109, 35 L.Ed. 919 (1891). In this regard, "like immunity" operates as a corollary of the familiar rule of respondeat superior. *See, e.g., Cameron Compress Co. v. Kubecka*, 283 S.W. 285, 287 (Tex. App.–Austin 1926, writ ref'd) ("The rule of 'like immunity' is based upon the rule in respondeat superior, which declares the act of the servant to be the act of the master,

19

and that which excuses or justifies the one will in like manner excuse or justify the other."). However, any application of "like immunity" in this case, premised on the expiration of a limitations period, is superseded by the well-settled rule of the relation-back doctrine.

In diversity cases, federal law governs whether an amended complaint relates back to a timely filed original complaint. *Johansen v. E.I. Du Pont De Nemours & Co.*, 810 F.2d 1377, 1380 (5th Cir. 1987). Specifically, Federal Rule of Civil Procedure 15(c) provides the framework governing the analysis. As relevant here, Rule 15(c)(1)(B) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when: the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out–or attempted to be set out–in the original pleading." The Fifth Circuit has explained that, under Rule 15(c)(1)(B), "[n]ewly asserted claims relate back if they are premised on the same or similar allegations as those in the original filing," or in other words, if such claims are "tied to a common core of operative facts." *United States v. Alaniz*, 5 F.4th 632, 636 (5th Cir. 2021) (cleaned up).

Here, there is little doubt that Roe's operative Third Amended Complaint relates back to her timely filed complaint. Indeed, as the Court noted in its Memorandum Opinion and Order dated March 7, 2022, "the gravamen of Roe's [timely filed intentional infliction of emotional distress] claim—that Patterson 'published or caused to be published false statements' about Roe—amounts to a straightforward defamation claim." *Roe v. Patterson*, No. 4:19-CV-179-SDJ, 2022 WL

672692, at *10 (E.D. Tex. Mar. 7, 2022). And in her operative complaint, Roe changed nothing aside from removing her intentional-infliction-of-emotional-distress and public-disclosure-of-private-facts claims, which had been dismissed, and inserting the instant defamation claims. *Compare* (Dkt. #8), *with* (Dkt. #223). Under similar circumstances, at least one court has allowed an amendment under Rule 15(c)(1)(B) where new vicarious liability claims had been asserted. *See Miller v. Warren Hosp. IPA*, No. CV-15-7496, 2016 WL 3509305, at *4 (D.N.J. June 27, 2016) (finding as not time-barred a Rule 15(c)(1)(B) amendment adding a new claim for vicarious liability that related back to the original complaint).

Accordingly, the Court holds that Roe's defamation claims against Patterson are not barred under the doctrine of like-immunity, and that these claims properly relate back to her original complaint.

### ii. Patterson's Alleged Defamation Liability—Direct

As noted *supra* Part III.B, in her responses to both Defendants' motions for summary judgment on her defamation claims, Roe alleges that Patterson defamed her directly in two ways: (1) that Patterson defamed Roe sometime in May 2016 through communications with SWBTS professor Patricia Ennis; and (2) that Patterson, either individually or by way of his attorney Sharpe, defamed Roe in a May 22, 2018, meeting with the SWBTS Board of Trustees. (Dkt. #288 at 11–12); (Dkt. #295 at 23–25).

Although Roe did not assert either of the above claims in her live complaint, neither Patterson nor SWBTS objected to these claims on that ground, and instead

both Defendants have challenged the substantive validity of these new claims. Therefore, the Court will address each on the merits. FED. R. CIV. P. 15(b)(2) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."); *see also United States v. Shanbaum*, 10 F.3d 305, 312–13 (5th Cir. 1994) ("Whether an issue has been tried with the implied consent of the parties depends upon whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity to respond.").

### a. Patterson's May 2016 Statements to Patricia Ennis

Roe argues that Patterson defamed her as evidenced through the deposition testimony of SWBTS professor Patricia Ennis in the following three ways: (1) Patterson told Ennis that Doe showed him nude photos of Roe; (2) Patterson implied that Roe and Doe were in a consensual relationship, and that Roe had sent nude photos to Doe voluntarily; and (3) Patterson failed to tell Ennis that Roe had told him that Doe had taken nude photographs of Roe during one of the alleged rapes. (Dkt. #288 at 12).[11]

---

[11] The Court notes that while these statements may well be time-barred, given that they relate to things Patterson allegedly said to Ennis sometime during May 2016, as Patterson has not raised a limitations defense with respect to this claim and shown that there is no genuine dispute of material fact as to when Roe's defamation claim began to accrue, the Court cannot hold that these claims are time-barred. *See, e.g., Deaver v. Desai*, 483 S.W.3d 668, 674–75 (Tex. App. Houston [14th Dist.] 2015, no pet.) ("However, the discovery rule applies to an action for defamation if the defamatory statement is inherently undiscoverable

Even assuming that these alleged statements from Patterson are not time-barred, the Court concludes that the cited portions of Patricia Ennis's deposition testimony do not permit any actionable defamatory inferences. Concerning Roe's first point, that Patterson told Ennis that Doe showed him nude photos of Roe, this misstates Ennis's deposition testimony. In fact, Ennis made clear that Patterson did not say he had seen the referenced photos of Roe, but rather that Doe said that he (Doe) had such photos. *See* (Dkt. #288-69 at 9) ("Q: And Dr. Patterson told you that he saw [nude photos of Roe]? A: He did not say that he had seen them. He said that [Doe] said that he had pictures.").

Roe's second and third points relate to Ennis's testimony that Patterson "implied" that Roe and Doe were in a consensual relationship, and that this implication was further supported by the fact that Patterson did not tell Ennis that Roe told him (Patterson) that Doe took pictures of Roe during one of the alleged assaults. Ennis's testimony, however, falls well short of supporting a viable defamation claim against Patterson.

To begin, Ennis's testimony is insufficient to permit a factfinder to ascertain that Patterson actually made any specific defamatory statements about Roe to Ennis. *See, e.g.*, *Ameen v. Merck & Co.*, 226 F.App'x 363, 370 (5th Cir. 2007) ("To recover on [a defamation] claim, the plaintiff must identify the alleged defamatory statement and the speaker" (citing *Abbott v. Pollock*, 946 S.W.2d 513, 520 (Tex. App.–

---

or not a matter of public knowledge. When the discovery rule applies, the limitations period begins to run when the claimant discovers, or through the exercise of reasonable care should have discovered, the existence of the defamatory statement.").

Austin 1997, pet. denied))); *Davis v. Prosperity Bank*, 383 S.W.3d 795, 804 (Tex. App.–Houston [14th Dist.] 2012, no pet.) (affirming grant of summary judgment in favor of defendant where plaintiffs failed to identify "any specific statements they claim[ed] to be defamatory" (citing *Bell v. Bennett*, No. 02-10-00481-CV, 2012 WL 858603, at *9, 11 (Tex. App.–Fort Worth Mar. 15, 2012, no pet.))); *cf. Rogers v. Soleil Chartered Bank*, No. 02-19-00124-CV, 2019 WL 4686303, at *8–9 (Tex. App.–Fort Worth Sept. 26, 2019, no pet.) (holding, in the context of motion to dismiss filed pursuant to the Texas Citizens Participation Act on a libel-based defamation claim, that "traditional Texas pleading rules require the [plaintiff] to be specific about what statement was false," as without such allegations, the court is left only with "opinions and conclusions as to the libelous matter" (quoting *Kahn v. Beicker Eng'g, Inc.*, No. 04-94-00823-CV, 1995 WL 612402, at *2 (Tex. App.–San Antonio Oct. 18, 1995, pet. denied))).[12]

And the legal concept of "defamation by implication" is of no help to Roe, as "defamation by implication" is "simply a subtype of textual defamation [i.e., defamation per se], which is itself one way that a publisher can communicate a defamatory meaning." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 629 (Tex. 2018). The requirement remains that Roe must identify a specific statement

---

[12] *See also Atchison v. SpawMaxwell Co.*, No. 01-06-00488-CV, 2007 WL 1500328, at *5 (Tex. App.–Houston [1st Dist.] May 24, 2007, no pet.) (affirming trial court's grant of summary judgment to defendant concerning plaintiff's slander claim, where plaintiff's affidavits failed to identify "any specific statement that he contends is defamatory, who specifically made the statement, and to whom (other than [to plaintiff]) such a statement was made").

that she believes *implies* a defamatory meaning, and Ennis's conclusory interpretation of an unidentified statement Patterson allegedly made to her sometime in May 2016 does not satisfy this requirement. Without identifying any specific statement that Patterson made to her, Ennis's opinion that, sometime in May 2016, Patterson implied that Roe and Doe were in a consensual sexual relationship, does not give rise to an actionable defamation claim against Patterson.

### b. The May 22, 2018, Meeting

Concerning certain statements that were made at a May 22, 2018, meeting between Patterson and the SWBTS Board of Trustees, Roe initially argued that the evidence showed that Patterson himself made defamatory statements. (Dkt. #288 at 11–12); (Dkt. #295 at 23–25). In reply, both Defendants argued that the evidence showed that it was Sharpe who made any such statements, and not Patterson. (Dkt. #301 at 3); (Dkt. #313 at 4). Conceding the point in her surreply, Roe renewed her principal-agent vicarious liability arguments as it relates to these statements. (Dkt. #307 at 3).

Regardless of who made the allegedly defamatory statements in connection with the May 22, 2018, meeting, the Court concludes that there is no evidence that would allow a factfinder to conclude that either Patterson or Sharpe made any defamatory statements about Roe in connection with that meeting. First, as to the one-page document entitled "Questions and Responses to Chairman Ueckert's Questions," Roe does not allege that this document itself was ever published to the SWBTS Board of Trustees, as Roe characterizes the document as "Patterson's notes

25

for responding to the Board of Trustees." (Dkt. #295 at 24). Absent an allegation and proof that Patterson's notes were published to anyone, they cannot support a defamation claim. For this reason alone, Roe's claim fails as to the notes.

Further, reviewing the contents of the "notes" themselves, the statement Roe takes issue with is nothing more than a question from an unnamed trustee claiming that their "recollection [was] that [Patterson] said that [Roe] had retracted her allegation that she had been raped." (Dkt. #288-16 at 2). On its face, this statement only concerns a "recollection" of what a trustee believes Patterson had previously said about Roe retracting her sexual assault allegations. There is no indication of when, where, how, or in what context Patterson purportedly made the statement "recollected" by the trustee. This part of the "Questions and Answers" document, without more, does not permit the inference that Patterson made such a statement, much less that the statement was published within the relevant, non-time-barred period of time.

As to the deposition testimony of former SWBTS Chairman of the Board of Trustees Kevin Ueckert, nothing in Ueckert's testimony permits the inference that either Patterson or Sharpe said anything defamatory about Roe regarding her allegation that she had been sexually assaulted by Doe. Ueckert testified that Sharpe "said that he had all the information related to this incident and verifiable proof that there was no wrong done on the side of the seminary," although he could not recall what the "verifiable proof" was. (Dkt. #288-12 at 4). And concerning Ueckert's testimony that Sharpe said "something about pictures," and that "there was

26

something about pictures that was also a part of the reason they believed that the allegations were not factual," this testimony falls well short of permitting a factfinder to ascertain that any specific defamatory statements were made about Roe at that meeting. *See supra* Part III.C.ii.a.

* * *

Altogether, the Court concludes that Roe has failed to create a genuine dispute of material fact as to any claim that Patterson directly defamed her. Accordingly, Patterson's motion for summary judgment on these claims will be granted.

### iii. Patterson's Alleged Defamation Liability—Vicarious

Separately, Roe alleges that Patterson is vicariously liable for four distinct publications that she claims are defamatory: (1) Sharayah Colter's "The Untold Truth" blog post, made on May 31, 2018, *see supra* Part III.B.i; (2) a press release from Patterson's former attorney Shelby Sharpe on June 4, 2018, referred to by the parties as the Sharpe "Release of Facts," *see supra* Part III.B.ii; (3) a CNN article quoting Shelby Sharpe published June 12, 2018, *see supra* Part III.B.iii; and (4) a letter from SWBTS-donor Gary Loveless submitted to the SWBTS Executive committee on June 29, 2018, referenced herein as the "Loveless Letter," *see supra* Part III.B.iv.

As noted above *supra* Part III.B.iii, Roe has disclaimed any reliance on the CNN article, both through her statements at the summary-judgment hearing and by failing to produce the article to the Court. Therefore, the Court will grant Patterson's summary-judgment motion as it relates to the CNN article, leaving "The Untold Truth," the Sharpe "Release of Facts," and the Loveless Letter.

The Court concludes as an initial matter that each of the "The Untold Truth," the Sharpe "Release of Facts," and the Loveless Letter (collectively, the "Three Publications") relates to a matter "of public concern," such that the burden is on Roe to point to facts showing the falsity of any allegedly defamatory statements contained in those publications. To begin, as Roe notes in her complaint, "Paige Patterson was, for decades, one of the most powerful leaders in the history of the Southern Baptist Convention ('SBC'), the nation's largest Protestant denomination." (Dkt. #223 at 9 ¶ 33). Roe further alleged that in "April and May 2018, SWBTS' and Patterson's history and pattern of dismissing, discrediting and demeaning abused women *came under public scrutiny*," as evidenced by media reports and an open letter signed by "thousands of Baptist women . . . calling for Patterson's ouster." (Dkt. #223 at 22 ¶ 107) (emphasis added).

Following this "public scrutiny," Patterson was indeed ousted by SWBTS, with SWBTS Board of Trustees Chairman Kevin Ueckert specifically citing as a reason for Patterson's dismissal the manner in which Patterson handled Roe's allegations of sexual assault, making reference to Patterson's "break her down" email. (Dkt. #288-27 at 2). The Three Publications are each related to the events leading up to Patterson's termination, with Roe's allegations of sexual assault being a central piece of that process. Therefore, the Three Publications are on matters of public concern, and Roe thus bears the burden of proving the falsity of the statements contained therein that she asserts are defamatory.

### a. "The Untold Truth"

Sharayah Colter, in conjunction with Candi Finch, authored "The Untold Truth" blog post, which was written in defense of Patterson following his termination by SWBTS. *See supra* Part III.B.i. Roe contends that Colter and Finch published "The Untold Truth" as agents of Patterson, such that Patterson is vicariously liable for the following allegedly defamatory statement contained in the blog post: "The accused man admitted to having sexual relations with the woman, but said it was consensual. The man also produced evidence to the police to that effect." (Dkt. #223 at 23 ¶ 113); (Dkt. #288 at 15–16). Regardless of who is legally responsible for "The Untold Truth," the Court concludes that nothing in this article is defamatory, as the gist of the publication concerns certain of Patterson's actions in leadership positions throughout the course of his life, and does not lend itself to any defamatory reading as it relates to Roe.

The gist of a publication is determined by construing the publication "as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it," *D Mag.*, 529 S.W.3d at 434 (quotations omitted), and "depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Bentley*, 94 S.W.3d at 579 (quotations omitted). At the outset, the Court notes that "The Untold Truth" is decidedly *not* about Roe—it is about Patterson and the many allegations that had been leveled against him surrounding the time he was terminated. The Dallas Court of Appeals's opinion in *Wheeler v. New Times, Inc.* is instructive on this point, as there, the plaintiff,

29

Wheeler, complained that a published article contained "numerous factual misrepresentations and false implications" about him that, when taken together, portrayed Wheeler as "a powerful white slumlord who manipulated the Dallas code enforcement system and exploited its racially discriminatory policies to obtain preferential treatment." 49 S.W.3d 471, 474 (Tex. App.–Dallas 2001, no pet.). The court held otherwise, concluding that "the article in this case does not expressly criticize Wheeler," and instead was "critical of Dallas's urban rehabilitation efforts," with "[t]he majority of the article [being] directed toward the City's improper demolition of certain properties." *Id.* at 474–75.

The publication at issue in *Wheeler* is analogous to "The Untold Truth," which was a defense of Patterson that never explicitly accused Roe of anything. Instead, the closest "The Untold Truth" comes to even *implying* anything about Roe is its statement that *Doe* characterized his relationship with Roe as consensual, and that *Doe* provided evidence to that effect to the police. But it is undisputed that Doe did indeed characterize his interactions with Roe as consensual, so the parties agree that this statement in the blog post is accurate. *See* (Dkt. #295 at 30–32). And as to the statement that Doe provided evidence to the police supporting his contention that he and Roe were in a consensual relationship, even if incorrect, that statement is not defamatory of Roe. An incorrect statement that Doe produced evidence to the police that he was in a consensual relationship with Roe does not constitute an affirmative statement from the author that *Roe* was lying about her sexual assault allegations, or that *Roe* had given a false statement to the police, or that *Roe* had voluntarily sent

nude photographs to Doe.[13] Instead, it is clear that "The Untold Truth" was concerned with detailing Roe's allegations only to the extent that those allegations implicated Patterson, such that no defamatory implication running to Roe can reasonably be derived from the post.

As a matter of law, the Court concludes that "The Untold Truth" is not reasonably capable of a defamatory meaning against Roe. Therefore, the Court will grant Patterson's summary-judgment defamation motion as it pertains to "The Untold Truth."

**b. The Sharpe "Release of Facts"**

The so-called Sharpe "Release of Facts" refers to a June 4, 2018, press release made by Patterson's former attorney, Shelby Sharpe, "to set the facts straight" concerning alleged "wide-spread misrepresentation and misinformation regarding Dr. Patterson." *See supra* Part III.B.ii. Roe contends that the following statement from that press release defamed her: "The student in question had given several different accounts of her story to authorities, school administration, and her family.

---

[13] While not explicitly argued by Roe, the Court appreciates the Texas Supreme Court's distinction between defamation through "gist" and "implication" as it relates to situations where only a portion of a publication is challenged. *Dall. Morning News, Inc.*, 554 S.W.3d at 629 ("'Implication,' on the other hand, refers to the inferential, illative, suggestive, or deductive meanings that may emerge from a publication or broadcast's discrete parts. Implication includes necessary logical entailments as well as meanings that are merely suggested. Thus, in the sentence 'John took some candy,' implication includes both the *logical entailment* that John took at least one piece of candy as well as the *suggestion* that John did not take every piece of candy. 'Defamation by implication,' as a subtype of textual defamation, covers both 'gist' and 'implication.'"). This distinction does not help Roe concerning "The Untold Truth," however, as there is no "logical entailment" or "suggestion" in "The Untold Truth" that is defamatory to Roe, at least not from the perspective of an ordinary person.

Dr. Patterson was seeking to understand what actually occurred among the many contradictory statements." (Dkt. #288-28 at 3); *see also* (Dkt. #223 at 24 ¶ 114).

Patterson argues that he had no direct involvement in the Sharpe "Release of Facts," precluding direct liability, and that he did not have a principal-agent relationship with Sharpe sufficient for the imposition of vicarious liability. In response, Roe argues that "[e]mail correspondence between Sharpe, Scott [Colter], [Candi] Finch, Sharayah [Colter], and Patterson's son-in-law" reflect that all were collectively involved in drafting and proofreading the "Release of Facts," and that given Patterson and Sharpe's long-term professional relationship, Sharpe was acting as Patterson's agent in making the complained-of statement. Notably, Patterson does not argue that the Sharpe "Release of Facts" contains only true statements, or that it does not contain identifying information concerning Roe, although these arguments are advanced by SWBTS. (Dkt. #259 at 15–16, 20–21).

The Court concludes that there is evidence in the record sufficient to permit a reasonable juror to conclude that Sharpe was acting as Patterson's agent when he published the "Release of Facts"—namely, that Sharpe was Patterson's personal attorney at the time of publication. However, this does not end the inquiry. The Court must next consider whether this press release contains identifying information concerning Roe, and whether it contains any defamatory statements. For the following reasons, the Court holds that a factfinder could conclude that the Sharpe "Release of Facts" contains defamatory statements that sufficiently identify Roe, such that Patterson could be liable for defamation.

32

To prevail on her defamation claim in connection with the Sharpe "Release of Facts," Roe must "produce evidence that the disputed publications were 'of and concerning'" her. *Cox Texas Newspapers, L.P. v. Penick*, 219 S.W.3d 425, 433 (Tex. App.–Austin 2007, pet. denied) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 288, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). "Even if the plaintiff is not expressly named, the plaintiff may satisfy his burden on the 'of and concerning' element by offering proof that persons acquainted with the plaintiff would understand the publication to refer to him." *Id*. Here, based on the record presented, the Court concludes that Roe has met her burden with respect to the "of and concerning" element. In particular, Roe notes that a relatively large number of individuals were familiar with her allegations, including "the 35-plus students employed as security officers" who had access to a memo prepared by then-SWBTS Chief of Police John Nichols, which memo detailed Roe's allegations using Roe's full name and included a photograph, as well as members of the SWBTS Board of Trustees who were all made aware of the "break her down" email which contained Roe's full name. (Dkt. #295 at 18). Based on these facts, it seems clear "that persons acquainted with [Roe] would understand" the Sharpe "Release of Facts" to refer to her.

Finally, "[a] defamatory statement is one that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 417 (Tex. 2020) (cleaned up). The statement at issue meets this standard, as it suggests that Roe told differing and inconsistent

33

stories regarding her alleged sexual assaults by Doe, and that therefore she was untruthful. Under the circumstances, a reasonable juror could conclude that the statement could damage Roe's reputation or otherwise negatively impact her estimation in the community.

However, the Court concludes that any allegedly defamatory statements contained in the Sharpe "Release of Facts" are defamation per quod, and that therefore, Roe must show damages. *See In re Lipsky*, 460 S.W.3d at 596 (observing that "whether a statement qualifies as defamation per se is generally a question of law"). As described *supra* Part III.A.i, a statement is considered defamation per se if, on its face, it falls within one of the following four categories: (1) it falsely charges a person with the commission of a crime; (2) it falsely imputes that a person has a loathsome disease; (3) it falsely imputes sexual misconduct; or (4) it injures a person in their office, profession, or occupation. Sharpe's statement does not meet the definition of defamation per se under Texas law.

To begin, Sharpe does not accuse Roe of a crime. At most, Sharpe's statement suggests that Roe was untruthful about her sexual assault allegations in general, not that Roe had committed the specific crime of making a false statement to the police. In this regard, it is notable that Sharpe's release does not identify *any* statements made by Roe that he deemed to be false, much less a statement to the police that was alleged to be false.

Similarly, the type of false allegations of "sexual misconduct" that amount to defamation per se under Texas law implicate such things as accusing someone of

34

being a "pedophile," *Montano v. Cronan*, No. 09-20-00232-CV, 2021 WL 2963801, at *6 (Tex. App.–Beaumont July 15, 2021, no pet.), or being put on a published list entitled "Names of All Clergy with a Credible Allegation of Sexual Abuse of a Minor," *Diocese of Lubbock v. Guerrero*, 591 S.W.3d 244, 252 (Tex. App.–Amarillo 2019), *vacated on other grounds*, 624 S.W.3d 563 (Tex. 2021), or otherwise being accused of sexually molesting a minor, *Miranda v. Byles*, 390 S.W.3d 543, 552 (Tex. App.–Houston [1st Dist.] 2012, pet. denied). At worst, Sharpe's statement suggests that Roe may have acknowledged at some point that she had a consensual sexual relationship with Doe. This does not constitute the type of "sexual misconduct" sufficient to trigger defamation per se liability under Texas law. *See also Villasenor v. Villasenor*, 911 S.W.2d 411, 418 (Tex. App.–San Antonio 1995, no pet.) ("Adultery is not a crime; therefore, there can be no slander per se based upon a noncriminal offense.").

Lastly, Sharpe's statement cannot be construed to impute that Roe has a loathsome disease, *see id.* ("[T]o be actionable on the loathsome disease basis, the allegedly slanderous words must claim a present infection. Possible exposure to human immunodeficiency virus (HIV) does not necessarily raise the inference that one is infected with AIDS." (citation omitted)), or to suggest that she is unfit to continue on in her occupation, *see Hancock v. Variyam*, 400 S.W.3d 59, 67 (Tex. 2013) ("The statements that Variyam lacked veracity and dealt in half truths in the context they were made are not defamatory *per se* because they do not injure Variyam in his profession as a physician."). There are no allegations in the record that Roe has

suffered from any disease, much less a "loathsome disease" as described in Texas precedent on defamation. Likewise, because Roe has not even argued what her "profession" is, *a fortiori* she has not shown that Sharpe's statement somehow injured her in connection with her profession.[14]

As to damages, "in order to sustain a jury award of mental anguish damages in the defamation context, there must be not only evidence of compensable mental anguish but also evidence justifying the amount awarded." *Exxon Mobil Corp.*, 252 S.W.3d at 505 (citation omitted). "Similarly, to sustain an award of injury to reputation or character, there must be competent evidence of 'actual injury' to the interest involved." *Id.*

Roe has failed specifically to show how the alleged defamation in the Sharpe "Release of Facts" damaged her. In response to SWBTS's argument that there is no evidence in the record showing that Roe has sustained any damages from any of the allegedly defamatory publications, Roe points to the deposition testimony of Patricia Ennis and her own declaration. As noted *supra* Part III.B.vi, the cited portions of Ennis's testimony relate to things "Patterson told [Ennis] in May of 2016," and not to the Sharpe "Release of Facts." Therefore, this testimony cannot support a damages finding relevant to the Sharpe "Release of Facts." And Roe's declaration fares no

---

[14] The Court recognizes that in her declaration, Roe states that while she was a student at SWBTS, her "dream" was to publish Christian books, and that Roe appears to suggest that this goal was frustrated by the fact that the Loveless Letter was sent directly to the president of a Christian publishing outfit. (Dkt. #288-1 at 18 ¶ 103). However, these conclusory allegations, directed only to the Loveless Letter, fail to show how anything in the Sharpe "Release of Facts" damaged her occupational fitness.

better, as the cited portions of her declaration discuss only alleged injury associated with the Loveless Letter and make no mention of the Sharpe "Release of Facts," or for that matter any of the other allegedly defamatory statements.[15]

Altogether, the Court will grant Patterson's summary-judgment motion in connection with the Sharpe "Release of Facts," as there is no evidence in the record supporting the conclusion that Roe has experienced any damages resulting from the Sharpe "Release of Facts."

### c. The Loveless Letter

The Gary Loveless donor letter was a document submitted to the SWBTS Executive Committee of the Board of Trustees to express the signatories' displeasure at the termination of Patterson as SWBTS president. *See supra* Part III.B.iv. Loveless testified that he and Susan Oliver were responsible for the preparation of the letter. (Dkt. #259-21 at 2).

It is undisputed that neither Loveless nor Oliver were, at any time, employees of SWBTS or Patterson. Roe argues that Patterson was nonetheless involved in the Loveless Letter through Scott Colter, which she contends is demonstrated by a series of emails and text messages between Colter and various SWBTS donors that were connected with the Loveless Letter. (Dkt. #288 at 17–18).

---

[15] The Court notes that, while Patterson has not argued that Roe has failed to show damages with respect to the Sharpe "Release of Facts," because Roe cannot show how she has been damaged by this press release with respect to SWBTS, it necessarily follows that she cannot show any such damages with respect to Patterson.

"An agency relationship cannot be presumed to exist," and although "the question of agency is generally one of fact, the question of whether a principal-agent relationship exists under established facts is a question of law for the court." *Ross*, 796 S.W.2d at 209–10 (cleaned up). During the relevant time period surrounding the preparation and publication of the Loveless Letter, it is undisputed that Scott Colter no longer worked for Patterson in any official capacity, and that there was no formal agreement between the two until sometime later, when Colter left SWBTS and joined Patterson at Patterson's Sandy Creek Foundation. In support of her claim that Colter "continued to act as Patterson's chief of staff and personal assistant even after Patterson's termination," Roe points to the following passage of Colter's deposition testimony:

> Q: And the question about Shelby Sharpe's press release. At this point, you're still working for Dr. Patterson, even though you're not working for Southwestern in the capacity of Chief of Staff, you're still essentially serving the same role for him, aren't you?

> A: Correct.

(Dkt. #288-9 at 38). And at the summary-judgment hearing, Roe argued that even though Colter was not an employee of Patterson during this time, he had "dual agency" with both Patterson and SWBTS, his formal employer.

In the dual-employment context, the Texas Supreme Court has instructed that courts should not "focus on the legal question of who had the contractual right to control the [employee's] work," but instead should examine "the factual question of who exercised the right to control as a practical matter in the course of the [employee's] daily work." *Waste Mgmt. of Tex., Inc. v. Stevenson*, 622 S.W.3d 273, 279

(Tex. 2021). Here, however, Roe has not pointed to *any* facts in the record suggesting that Colter was simultaneously an agent of Patterson while also an employee of SWBTS following Patterson's termination as president, much less evidence sufficient to permit the inference that Patterson "as a practical matter" "exercised the right to control" Colter's conduct.[16] Accordingly, the Court concludes that during the relevant period surrounding the preparation and publication of the Loveless Letter, Colter was not an agent of Patterson.[17]

---

[16] The Court recognizes the close relationship that exists between Colter and Patterson. As Roe explains, Colter met Patterson while he was a student at SWBTS, (Dkt. #288 at 15), and following Colter's departure from SWBTS, he immediately began work again with Patterson. And it is clear from the emails and text messages that Roe has entered into the record that Colter was very disappointed by SWBTS's termination of Patterson, as were many others. That Colter was undoubtedly involved in helping shape a pro-Patterson narrative following Patterson's ouster from SWBTS in no way establishes a legal agency relationship between Colter and Patterson. And indeed, aside from making inferences relating to Patterson and Colter's close relationship with one another, Roe points to no evidence in the record showing that Patterson was actively controlling Colter's conduct in any way during the relevant period.

[17] Even assuming arguendo that Colter was in fact Patterson's agent throughout the period relevant to the drafting and publication of the Loveless Letter, Roe's defamation claim against Patterson would still fail. This is because Roe does not argue, and nothing in the record supports, that Colter had anything to do specifically with creating the contested portion of the Loveless Letter that Roe objects to as defamatory. *Cf. Trentecosta v. Beck*, 703 So.2d 552, 558 (La. 1997) (applying Louisiana law and observing that "[d]efamation is an individual tort, which, as a general rule, does not give rise to solidary liability"). As has been stated throughout this order, Roe must identify "the alleged defamatory statement *and the speaker*." *Ameen*, 226 F.App'x at 370 (emphasis added); *see also supra* Part III.C.ii.a. If countenanced, Roe's theory of liability against Patterson, premised on Colter's vague and ambiguous involvement in the Loveless Letter, would necessarily entail a breathtaking expansion of the tort of defamation.

Moreover, Roe's arguments concerning Colter's purported involvement in the Loveless Letter appear more akin to her ratification arguments advanced in connection with Patterson's ostensible approval of the Loveless Letter, which are considered *infra* Part III.C.iii.c. However, Roe has not attempted to argue, much less come forward with evidence in support of, the proposition that either of the authors of the Loveless Letter, Gary Loveless or Susan Oliver, were *Colter's* agents, a necessary precondition before liability could be imposed for ratification of tortious conduct.

Therefore, Roe's attempt to connect Patterson with the Loveless Letter hinges on her assertion that Patterson subsequently ratified the Loveless Letter as his own publication. (Dkt. #288 at 19–21). Under Texas law, "[r]atification is the adoption by a person, with knowledge of all material facts, of a prior act that did not then legally bind that person and which that person had a right to repudiate." *Lopez v. Rosewood Real Estate Equities*, No. 05-97-00215-CV, 1999 WL 562709, at *4 (Tex. App.–Dallas Aug. 3, 1999, no pet.) (not designated for publication).

Roe points to two pieces of evidence purporting to show that Patterson "ratified" the Loveless Letter. First, Roe argues that an email that Patterson sent to Loveless and Oliver, wherein Patterson stated to both recipients that "I want you to know that the letter was sensational," that no one "could have written it better than the two of you," and that the letter "is essentially unanswerable," evinces Patterson's ratification of the letter. (Dkt. #288-40 at 2). Second, Roe points to an October 24, 2018, podcast that Patterson appeared on, where, in response to the podcast host's comment that "a number of donors . . . came to [Patterson's] defense . . . [and] said that the committee committed bylaw infractions and violated trustee confidentiality," Patterson stated that "there was no doubt in [his] mind that they were correct in what they alleged. From [his] perspective, they were right on every point." (Dkt. #288-2 at 24).

Roe's allegations do not create a genuine dispute of material fact on the issue of ratification. First, concerning Patterson's personal email to Loveless and Oliver, Roe has provided no support for the proposition that a private email sent only to the

publishers of an allegedly defamatory statement is sufficient for the sender of the email to have "given effect" to the defamatory statement "as if originally authorized by him." Although there is limited Texas precedent on ratification of defamatory statements, Texas courts have made clear that it is possible for defamatory statements to be ratified by another. *See, e.g., Waddill v. Phi Gamma Delta Fraternity Lambda Tau Chapter Tex. Tech Univ.*, 114 S.W.3d 136, 143 n.5 (Tex. App.–Austin 2003, no pet.); *Lopez*, 1999 WL 562709, at *4; *Gonzales v. Am. Postal Workers Union, AFL-CIO*, 948 S.W.2d 794, 798 (Tex. App.–San Antonio 1997, pet. denied). As aptly explained by a sister court in this district:

> Ratification, like many other agency concepts, is positioned somewhat awkwardly between [principles] of tort and contract law. For instance, it is well established that a principal may ratify a *contract* by essentially doing nothing. Knowing acceptance of the benefit of a transaction ratifies the act of entering into the transaction. In tort, however, it is unhelpful to ask whether a principal "accepted the benefit" of an employee's tortious conduct. . . . Rather, in tort the inquiry seems to tend toward "approval" of the tortious conduct.

*Smith v. Michels Corp.*, No. 2:13-CV-185-JRG, 2014 WL 708416, at *2 (E.D. Tex. Feb. 24, 2014) (cleaned up). *Smith* went on to note that, in the context of employer ratification of tortious conduct, "a Texas appellate court has approved a definition of ratification that includes 'the adoption, confirmation, or failure to repudiate prior unlawful acts which were not legally binding at the time when the defendant had the right and knowledge of the facts necessary to repudiate such conduct.'" *Id.* (cleaned up) (quoting *Hinote v. Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO, Local 4-23*, 777 S.W.2d 134, 141 (Tex. App.–Houston [14th Dist.] 1989, pet. denied)).

However, the Court is not aware of any precedent, arising outside the context of a principal-agent relationship, imposing defamation liability by applying the concept of "ratification" of tortious conduct. To the contrary, at least one Texas case suggests that no such liability can exist outside the principal-agent context. *See Mulvey v. Mobil Producing Tex. & N. Mex. Inc.*, 147 S.W.3d 594, 606 (Tex. App.–Corpus Christi-Edinburg 2004, pet. denied) ("Mulvey asserts that appellees face liability for their 'authorization and ratification' of the acts of the operators. However, 'authorization and ratification' are elements used to determine if an agent-principal relationship exists, and are otherwise not used to establish vicarious liability of two parties outside of an agency relationship.") (citing *Texam Oil Corp.*, 436 S.W.2d at 130 and RESTATEMENT (SECOND) OF AGENCY § 82).[18] This restriction on the scope of defamation liability makes sense, as the alternative would implicate potentially limitless liability as to *anyone* who endorsed an allegedly defamatory statement. Accordingly, the Court holds as a matter of law that, as neither Gary Loveless, Susan Oliver, nor Scott Colter were agents of Patterson during the preparation and publication of the Loveless Letter, Patterson is incapable of "ratifying" that letter through subsequent acts such that he may be held liable for any defamation

---

[18] *But see Disney Enters., Inc. v. Esprit Fin., Inc.*, 981 S.W.2d 25, 31 (Tex. App.–San Antonio 1998, pet. dism'd w.o.j.) ("While most cases will fall within the context of an agency relationship, such a relationship is not necessary to cause the ratification to be effective.").

contained therein. And the podcast, even assuming it is admissible, is equally unhelpful to Roe, as it fails to show ratification for all the preceding reasons.[19]

Altogether, the Court will grant Patterson's summary-judgment defamation motion as it pertains to the Loveless Letter.

## D. SWBTS's Defamation Motion

Similar to Patterson, SWBTS asserts both procedural and substantive challenges to Roe's defamation claims. As before, the Court will first address SWBTS's argument that Roe's defamation claims are time-barred. The Court will then address in turn each of the publications Roe alleges to be defamatory and traceable to SWBTS.

### i. The Relation-Back Doctrine

In its motion for summary judgment, SWBTS argues that "[b]ecause Plaintiff did not amend her Complaint to add her defamation cause of action until March 23, 2022, any publications or statements made prior to March 23, 2021" are barred under Texas's one-year statute of limitations applicable to defamation claims. (Dkt. #259 at 11). This implies SWBTS's belief that Roe's defamation claims do not "relate back" to her timely filed complaint. *See also* (Dkt. #313 at 2) (SWBTS reply arguing that Roe has "failed" to meet her burden on the relation-back doctrine). However, for all

_____

[19] To be clear, the Court is not holding that Patterson could *never* be liable for the Loveless Letter. For example, if Patterson were to republish the Loveless Letter as if it were his own statement, defamation liability could attach. *See Milo v. Martin*, 311 S.W.3d 210, 214 (Tex. App.–Beaumont 2010, no pet.) ("Under Texas law, a person who repeats a defamatory statement made initially by another can be held responsible for republishing the libelous statement."). However, Roe has declined to raise any "republishing" based liability theories with respect to the Loveless Letter, and accordingly, any such arguments are forfeited.

the reasons the Court has explained herein, *see supra* Part III.C.i, Roe's live complaint, asserting defamation claims, relates back to her original complaint. Accordingly, as with Patterson, the Court holds that Roe's defamation claims against SWBTS properly relate back to her original complaint.

### ii. SWBTS's Alleged Defamation Liability

Roe asserts that each of the allegedly defamatory publications described *supra* Part III.B apply equally to SWBTS as they do to Patterson. Therefore, the Court will consider each in turn.

### a. "The Untold Truth"

The Court has already described the facts surrounding "The Untold Truth" blog post. *See supra* Part III.C.iii.a. As relevant to Roe's defamation allegations against SWBTS, it is undisputed that "The Untold Truth" was written by Sharayah Colter and Candi Finch, (Dkt. #259 at 15), and that Finch was employed as a professor by SWBTS during the relevant period surrounding the preparation and publication of "The Untold Truth." Roe also argues that SWBTS employee Scott Colter was involved in the preparation of this article, as purportedly shown through email correspondence between Scott, Sharayah, and Finch, which Roe contends further exposes SWBTS to defamation liability.

Roe is mistaken. First, as noted *supra* Part III.C.iii.a, nothing in "The Untold Truth" is defamatory towards Roe. However, even assuming arguendo that "The Untold Truth" included defamatory statements against Roe, the Court concludes as a matter of law that it was prepared and published outside the scope of any

44

employment relationship with SWBTS, such that SWBTS cannot be liable for its contents. In this regard, the Texas Supreme Court's decision in *Randall's Food Mkts., Inc. v. Johnson* is instructive. In that case, the plaintiff, Johnson (a manager), sued her former employer, Randall's, for defamation, arguing in part that Randall's was liable for a defamatory petition that was circulated by one of its employees, Ketner (a cosmetician subordinate to Johnson), concerning Johnson's allegedly poor managerial skills and suspected misappropriation of Randall's merchandise. 891 S.W.2d at 643. After first concluding that Ketner, as an employee of Randall's, "was privileged to report this alleged wrongdoing to management," the Texas Supreme Court held that "Ketner stepped outside the boundaries of this privilege by circulating a petition about Johnson to ordinary employees and customers. In so doing, Ketner, as a matter of law, acted independently and outside the scope of her authority as a cosmetician." *Id.* at 647. The *Randall's* court concluded that because "the summary judgment evidence establishe[d] that Randall's did not authorize, condone, or ratify Ketner's circulation of this petition . . . Randall's is not liable for any defamation claims that may have resulted from the petition's circulation." *Id.*

The same reasoning applies here. There is little doubt that "The Untold Truth" is a publication made directly *against* the interests of SWBTS, criticizing the institution for what the authors viewed as SWBTS's improper actions in terminating Patterson. Roe has failed to show how the preparation and publication of "The Untold Truth" was in any way "referable to or in discharge of any duty" that Candi Finch or Scott Colter owed to SWBTS. *Wagner v. Caprock Beef Packers Co.*, 540 S.W.2d 303,

305 (Tex. 1976). Therefore, as this publication was made outside the scope of any duty owed to SWBTS, it falls outside the rule of *Texam Oil Corporation*, such that express authorization or subsequent ratification is necessary for liability to obtain. *Randall's Food Mkts., Inc.*, 891 S.W.2d at 647. And here, Roe points to no evidence showing that SWBTS later "authorize[d], condone[d], or ratif[ied]" "The Untold Truth."

Altogether, the Court will grant SWBTS's summary-judgment defamation motion as it pertains to "The Untold Truth."

### b. The Sharpe "Release of Facts"

The Court has described herein the content and facts surrounding the so-called Sharpe "Release of Facts." *See supra* Part III.C.iii.b. The Court has also explained that there is a genuine dispute of material fact as to whether Sharpe was acting as Patterson's agent when he made the complained-of press release. Roe further claims that SWBTS should also be held liable for any defamatory content contained within the Sharpe "Release of Facts."

The Court has already concluded, however, that there is no evidence in the record suggesting that Roe has suffered any damages as a result of Sharpe's "Release of Facts." For this reason alone, the claim fails. The claim is also untenable as to SWBTS because the "Release of Facts" was not authored or published by any SWBTS employee within the scope of their employment, or by any agent of SWBTS. Nor did SWBTS authorize or ratify the "Release of Facts." In this regard, it is undisputed that (1) on June 4, 2018, the date of the Sharpe's press release, Patterson had already been terminated from SWBTS, and (2) Sharpe was not an attorney for SWBTS.

46

(Dkt. #259-19 at 2–3); (Dkt. #259 at 8). Roe concedes this point, arguing instead that "email correspondence between Sharpe, Scott, Finch, and Sharayah show that Sharpe was not the sole author of the press release." (Dkt. #295 at 28).

However, for all the reasons explained by the Court in regard to "The Untold Truth" blog post, *see supra* Part III.D.ii.a, any involvement Scott Colter or Candi Finch had with respect to the Sharpe "Release of Facts" was plainly outside the scope of their employment with SWBTS, and Roe has otherwise failed to point to evidence showing that SWBTS somehow "authorize[d], condone[d], or ratif[ied]" Sharpe's press release.

Therefore, the Court will grant SWBTS's summary-judgment defamation motion as it pertains to the Sharpe "Release of Facts."

### c. The CNN Article

As previously noted, *see supra* Part III.B.iii and Part III.C.iii, Roe has affirmatively disclaimed any reliance on the CNN article in support of her defamation claims. Therefore, the Court will grant SWBTS's summary-judgment motion in connection with the CNN article.

### d. The Loveless Letter

The content and facts surrounding the Loveless Letter have been described herein. *See supra* Part III.C.iii.c. As relevant to Roe's claims against SWBTS premised on the Loveless Letter, Roe does not dispute that Gary Loveless and Susan Oliver, the authors of the letter, were not at any point in time employees of SWBTS. Roe nonetheless argues that SWBTS may be liable for the content of the letter

because SWBTS employees Scott Colter, Candi Finch, Dean Nichols, and John Nichols were allegedly heavily involved in the preparation of the letter, as evidenced through a series of emails. (Dkt. #295 at 29 (citing Dkt. #295-42–68)); (Dkt. #295 at 31).

SWBTS does not dispute Roe's contentions on this point, but instead argues that there is no genuine, material fact issue indicating that any of these individuals were acting on behalf of SWBTS in regard to the Loveless Letter. (Dkt. #313 at 4). The Court agrees.

For the same reasons applicable to "The Untold Truth," *see supra* Part III.D.ii.a, any involvement of Colter, Finch, Dean Nichols, and John Nichols in connection with the Loveless Letter was decidedly outside the scope of their employment with SWBTS.[20] And as Roe has otherwise failed to point to evidence showing that SWBTS somehow "authorize[d], condone[d], or ratif[ied]" the Loveless Letter, her claims here must fail.

Therefore, the Court will grant SWBTS's summary-judgment defamation motion as it pertains to the Loveless Letter.

---

[20] Throughout the periods relevant in this case, Dean Nichols was the SWBTS Chaplain, and John Nichols was the SWBTS Chief of Police. The Court notes that Roe appears to suggest that both Dean and John Nichols defamed her through their deposition testimony. (Dkt. #295 at 30) ("Dean Nichols and John Nichols [sic] testimony—and the credibility of their testimony—has become critical in this case. The Nichols are the sole source of information related to the alleged nude photographs."). However, the "judicial-proceedings privilege" extends to deposition testimony, such that no defamation liability can arise from such testimony. *Landry's, Inc.*, 631 S.W.3d at 46 ("The judicial-proceedings privilege is an absolute privilege that covers any statement made by the judge, jurors, counsel, parties or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, *depositions*, affidavits and any of the pleadings or other papers in the case." (emphasis added) (quotations omitted)).

### e. Patterson's May 2016 Statements to Patricia Ennis

Roe has also suggested that SWBTS is liable for statements that Patterson allegedly made to Patricia Ennis in May 2016 concerning Roe's allegations of sexual assault. The Court has concluded, however, that Ennis's testimony fails to identify any specific statement that Roe alleges is defamatory, and that Ennis's opinion that Patterson implied that Roe and Doe engaged in a consensual sexual relationship is not an actionable defamation claim. *See supra* Part III.C.ii.a. For the same reason, the Court will grant SWBTS's summary-judgment motion in connection with any allegedly defamatory statements Patterson made to Ennis in May 2016.

### f. The May 22, 2018, Meeting

The Court has already described Roe's claims against Patterson in connection with allegedly defamatory statements made by Sharpe at the May 22, 2018, meeting between Patterson, Sharpe, and the SWBTS Board of Trustees. *See supra* Part III.C.ii.b. As relevant to Roe's claims against SWBTS premised on this meeting, Roe asserts that SWBTS is vicariously liable for Sharpe's allegedly defamatory statements.

Here, in addition to the fact that SWBTS cannot be vicariously liable for alleged statements that the Court has already found fail to give rise to an actionable defamation claim, *see supra* Part III.C.ii.b, there is an additional reason why these claims fail. As a matter of law, even assuming that Sharpe published defamatory statements at the May 22, 2018, meeting, and that these statements were attributable to Patterson and therefore attributable to SWBTS (as Patterson was at

that time still associated with SWBTS), any such defamatory statements were not made within the course and scope of Patterson's employment with SWBTS.

*Minyard Food Stores, Inc. v. Goodman* is instructive. In that case, an employee, Goodman, sought to hold her employer, Minyard, liable for an alleged defamatory statement made by her coworker, Heflin, in connection with a workplace misconduct investigation that Minyard authorized concerning Goodman. 80 S.W.3d 573, 578 (Tex. 2002). It was undisputed that Heflin, a Minyard employee, defamed Goodman through oral and written statements that Heflin had provided to Minyard in response to allegations that Goodman and Heflin were having an affair. Before the case went to the Texas Supreme Court, a Texas intermediate appellate court held that Minyard, as Heflin's employer, shared liability for Heflin's defamatory statements against Goodman, as Minyard had policies that required that employees "participate in workplace misconduct investigations." The lower Texas court reasoned that, because these policies required Heflin to comply with workplace misconduct investigations, Heflin "was acting in the course and scope of his employment" with Minyard when he defamed Goodman, giving rise to Minyard's liability under *Texam Oil Corporation.*

The Texas Supreme Court rejected this view, holding that there was no evidence to support the position that Heflin's defamatory statements to Minyard Food Stores in any way "futher[ed] Minyard's business and accomplish[ed] a purpose of Heflin's job," and concluding that Heflin's defamatory statements were made outside "the course and scope of Heflin's employment with Minyard," such that Minyard was

50

not liable for Heflin's defamatory statements. *Minyard Food Stores, Inc.*, 80 S.W.3d at 579. In reaching this conclusion, the court observed that "[t]here is a critical distinction between defaming someone to one's employer and defaming someone for one's employer." *Id.*

The same reasoning applies here. Roe has not even attempted to explain, much less point to any evidence, supporting the view that Sharpe's allegedly defamatory statements to the SWBTS Board of Trustees were made in furtherance of Patterson's employment with SWBTS.

For these reasons, the Court will grant SWBTS's summary-judgment motion in connection with any allegedly defamatory statements made by either Patterson or Sharpe at the May 22, 2018, meeting.

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED** that Defendant Southwestern Baptist Theological Seminary's Objections to Plaintiff's Defamation Summary Judgment Evidence and Motion to Strike, (Dkt. #317), are **OVERRULED as moot**, that Defendant Leighton Paige Patterson's Motion for Partial Summary Judgment on Defamation, (Dkt. #241), is **GRANTED**, and that Southwestern Baptist Theological Seminary's Motion for Partial Summary Judgment Regarding Plaintiff's Defamation Claim, (Dkt. #259), is **GRANTED**.

It is further **ORDERED** that Plaintiff Jane Roe's defamation claims against Defendant Leighton Paige Patterson and Defendant Southwestern Baptist Theological Seminary are **DISMISSED with prejudice**.

**So ORDERED and SIGNED this 4th day of April, 2023.**

_____

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE