# EXHIBIT C

```
1                    UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
2                         SHERMAN DIVISION

3   JANE ROE                    )(
                                )(
4   VS.                         )(   CIVIL NO.:
                                )(   4:19-CV-00179-SDJ
5   LEIGHTON PAIGE PATTERSON,   )(
    IN HIS INDIVIDUAL CAPACITY;)(
6   SOUTHWESTERN BAPTIST        )(
    THEOLOGICAL SEMINARY        )(
7

8   ********************************************************

9            ORAL AND VIDEOTAPED DEPOSITION OF

10                      KEVIN UECKERT

11                      March 3, 2022

12  ********************************************************

13                   *** CONFIDENTIAL ***

14

15            ORAL AND VIDEOTAPED DEPOSITION OF

16  KEVIN UECKERT, produced as a witness at the instance

17  of the Plaintiff, and duly sworn, was taken in the

18  above-styled and numbered cause on the 3rd day of

19  March 2022, from 10:09 a.m. to 4:04 p.m., before

20  KIKI FARR, CSR, in and for the State of Texas,

21  reported by oral stenograph, at the First Baptist

22  Church of Georgetown, 1333 West University Avenue,

23  Georgetown, Texas, pursuant to the Federal Rules of

24  Civil Procedure and the provisions stated on the

25  record or attached hereto.
```



```
 1                          APPEARANCES

 2   FOR THE PLAINTIFF:

 3           SHEILA P. HADDOCK
             THE ZALKIN LAW FIRM, P.C.
 4           10590 West Ocean Air Drive, Suite 125
             San Diego, California  92130
 5           sheila@zalkin.com
             (858)259-3011
 6
     FOR THE SOUTHWEST BAPTIST THEOLOGICAL SEMINARY:
 7
             DAVID M. MACDONALD
 8           MACDONALD DEVIN, P.C.
             3800 Renaissance Tower
 9           1201 Elm Street
             Dallas, Texas  75270
10           dmacdonald@macdonalddevin.com
             (214)744-3300
11
     FOR THE LEIGHTON PAIGE PATTERSON:
12
             JIM GRAU
13           GRAU LAW GROUP
             1445 Ross Avenue, Suite 4700
14           Dallas, Texas  75202
             jgrau@graulawgroup.com
15           (214)521-4145

16   ALSO PRESENT:

17           COLE HILL, Videographer

18           █████Jane Roe█████, Plaintiff  (Appeared
             Remotely)
19
             MICHAEL ANDERSON, Southwestern Baptist
20           Theological Seminary  (Appeared Remotely)

21           SHAWNEE CUMMINGS, Assistant to Ms. Haddock
             (Appeared Remotely)
22

23

24

25
```



KEVIN UECKERT  Confidential                                    March 03, 2022
Jane Roe vs Leighton Paige Patterson & SWBTS                            44

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18      Q.    So your testimony is the first time that you

19   ever heard there was an issue with      Jane Roe

20   and sexual assault was in 2018?

21      A.    As far as I can remember, yes.

22      Q.    And tell me what you remember about when you

23   did learn about it?  How did you learn about it?

24      A.    I received correspondence from  Jane Roe

25   Jane Roe  s lawyer at that time.
```



```
 1        Q.    Is that correspondence that you produced to
 2   us?
 3        A.    No.
 4        Q.    Why not?
 5        A.    I don't have it.
 6        Q.    Where is it?
 7        A.    Michael Anderson at the time was the lawyer
 8   that was involved.  He may have it.
 9        Q.    Okay.  So was it something you received in
10   the mail?
11        A.    I don't remember.
12        Q.    What do you recall about whatever
13   communication -- whatever form it was?  What were you
14   advised of?
15        A.    The lawyer -- lawyer communicated that we
16   should have awareness of this information because he
17   believed it was relevant to our current situation.
18        Q.    And what was the current situation?
19        A.    The seminary dealing with Dr. Patterson's
20   tenure as president.
21        Q.    Okay.  And I believe you said that was in
22   the 2018 time frame so when in 2018?
23        A.    It would have been May.  April or May most
24   likely.
25        Q.    What was -- was there something going on in
```



1   April or May of 2018 that you believe prompted

2   **Jane Roe** 's attorney to forward that information

3   to you believing it was important for you to know?

4        A.    Yes.

5        Q.    What was going on in April and May of 2018?

6        A.    There were a couple of releases in social

7   media that brought into question Dr. Patterson's

8   perspective on a couple items from -- from over a

9   decade before.

10       Q.    What was the perspective that was being

11  called into question?

12       A.    Abuse -- physical abuse and objectifying a

13  woman.  Those were the two things.

14       Q.    And how -- how was the board or how -- how

15  were you as -- you're chair at this time and the

16  annual -- or the spring meeting -- did -- did this

17  bubble up prior to the spring meeting or explain to me

18  because it sounds like this happened sort of in the

19  April/May time period --

20       A.    Okay.

21       Q.    -- and so that's only two months so can you

22  tell me -- can you pinpoint when -- which came first?

23  Did the spring meeting come first or did this?

24             MR. MACDONALD:  I'm going to object to

25  the form of the question.  I mean, it's confusing to



1   me.  I'm not sure.  I'd ask if you could reask it, but

2   I'm going to make my objection.  If you can answer, do

3   the best you can.

4        A.   April 2018 was the board meeting.

5        Q.   Uh-huh.

6        A.   None of what I described happened prior or

7   during the board meeting.

8        Q.   Okay.  So following -- when -- when in April

9   was the board meeting?

10       A.   I don't know.

11       Q.   What -- let me back up for just a minute.

12   What do you recall -- when did -- did you receive the

13   letter from        **Jane Roe**        's attorney after the

14   meeting?

15       A.   Yes.

16       Q.   Was Dr. Patterson's continued employment as

17   president a topic of discussion at the April meeting?

18       A.   No.

19       Q.   So that had not come up as an issue --

20       A.   No.

21       Q.   -- during or prior to the April meeting?

22       A.   No.

23       Q.   I'm going to give you what we're going to

24   mark as Exhibit No. 9.

25                MR. MACDONALD:  Thank you.

KEVIN UECKERT  Confidential                                    March 03, 2022
Jane Roe vs Leighton Paige Patterson & SWBTS                         48

```
 1        Q.    Dr. Ueckert, this is a May 7th, 2018 Fort
 2   Worth Star-Telegram article by Sarah Smith that refers
 3   to -- or the headline is Over 1700 sign open letter
 4   denouncing Southern Baptist leader after comments on
 5   women.  I'm going to give you a minute to look at
 6   that.
 7                     Does this article reflect the events
 8   that you were referring to that started to bubble up
 9   that were questioning some of Dr. Patterson's comments
10   from the past?
11        A.    Okay.  I've looked -- I've looked through
12   that.
13        Q.    Does this article reflect the -- the events
14   that you were referring to earlier that called into
15   question some of Dr. Patterson's past?
16        A.    Yes.
17        Q.    And you do recall this -- the open letter?
18        A.    Yes.
19        Q.    And do you recall when you first became
20   aware of the open letter?
21        A.    No.
22        Q.    On Page 3 of the article, it indicates that
23   this is May 7th -- do you recall talking to Sarah
24   Smith the reporter about this article or at this time?
25        A.    I don't remember.
```



1    Q.    On Page 3, it indicates the seminary is

2   planning a meeting of the trustees on May 22nd, quote,

3   in light of recent events, end quote, according to a

4   release on its website.  The release alleges that

5   Patterson himself called the meeting.  Is that

6   correct?  Is that your recollection?

7    A.    Which part?

8    Q.    Is that a true statement that the seminary

9   called a special meeting or the trustees called a

10  special meeting on May 22nd in light of recent events

11  and that it was Patterson who called the meeting.

12   A.    So it states here the seminary is planning a

13  meeting and Patterson called the meeting.  That is not

14  a true statement.

15   Q.    Okay.  Explain to me what is -- what is true

16  about that.

17   A.    The seminary is planning a meeting and the

18  chairman called the meeting --

19   Q.    Okay.

20   A.    -- is a true statement.

21   Q.    Okay.  And did you call the meeting at

22  Dr. Patterson's request?

23   A.    Yes.

24

25



1

2

3

4

5

6

7

8

9

10

11

12       Q.   What was your understanding of the reason he

13   wanted to call a special meeting?

14       A.   He wanted the full board to meet.

15       Q.   I understand that.  What -- did you have an

16   understanding of why?

17       A.   Because he believed the full board needed to

18   be involved in the current circumstance.

19

20

21

22

23

24

25



```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17      Q.    Okay.   What -- what time did the meeting of

18   the full board begin that day?

19      A.    I believe 9 a.m.

20      Q.    Well, if you go back to Page 1 in the first

21   paragraphs, the first two paragraphs, it indicates

22   that you're telling him that the executive committee

23   will have breakfast at 8:30 and see him at 9:30 a.m.

24      A.    Hmm.

25      Q.    Does that change your recollection of when
```

1   the meeting of the full board began?

2        A.   Then I -- what I remember it may have been

3   10.  It was sometime that morning.

4        Q.   Okay.  Where was the full meeting -- where

5   did it occur?

6        A.   In the Riley Center.

7        Q.   And is that on the Southwestern's campus?

8        A.   Yes.

9        Q.   How many of the 40-member board attended?

10        A.   100 percent.  There may -- there may have

11   been one person that had a conflict, but nearly 100

12   percent.

13        Q.   And did they all attend in person?

14        A.   No.

15        Q.   How did -- the ones that did not attend in

16   person, how were they attending?

17        A.   Videoconference.

18

19

20

21

22

23

24

25



```
 1
 2
 3      Q.   Okay.  Was there a period of time where
 4   Mr. Sharp represented the seminary?
 5      A.   I believe so.
 6      Q.   And at some point he represented
 7   Dr. Patterson and not the seminary?
 8      A.   Yes.
 9      Q.   And when is your understanding of when that
10   change happened?
11      A.   I don't -- I don't remember the timing of
12   that change.  I know that in that meeting that was the
13   case.
14      Q.   Okay.  And was that your decision?  Did you
15   as chairman of the board of trustees, did you make the
16   decision to change counsel?
17      A.   No.  No.  Let me go back.
18      Q.   Okay.
19            MR. MACDONALD:  Let her finish the
20   answer [sic].
21            THE WITNESS:  Sorry.
22      Q.   Did you need to correct something?
23      A.   Yes.
24           Okay.
25      A.   At that time, Shelby Sharpe was still acting
```



1   in both roles --

2        Q.   Okay.

3        A.   -- because Dr. Patterson was still the

4   president and nothing had changed in terms of

5   employment.  But for that board meeting, Michael

6   Anderson was hired to assist the board meeting so that

7   it occurred in a way that was legally appropriate.



```
 1

 2

 3

 4

 5

 6

 7

 8        Q.    Just help me understand how that meeting

 9   unfolded.   My understanding that it was at

10   Dr. Patterson's request because he wanted the full

11   board to hear his side of the story so how did the

12   meeting begin?

13        A.    The meeting began with me calling the

14   meeting to order, making general introductions, and

15   then I called the board into executive session and

16   dismissed everyone in the room who was not a trustee.

17        Q.    Okay.

18        A.    And then in executive session, we discussed

19   the items germane to the -- the purpose of the meeting

20   as I saw --

21        Q.    And what was --

22        A.    -- the purpose of the meeting.

23        Q.    What was the purpose of the meeting as you

24   saw it?

25        A.    To determine whether or not Dr. Patterson
```



1   could continue as president of the seminary.

2       Q.   And what were the reasons that you believed

3   made that an issue?

4       A.   Enrollment --

5       Q.   Okay.

6       A.   -- finances, general culture among his

7   cabinet and then leadership -- his ability to continue

8   leading the seminary.

9       Q.   When you say ability is based on what --

10  what factors were impairing or calling into question

11  his ability?

12      A.   It was the factors that I just described

13  that created the reason I felt like for the outcome --

14  unnecessary outcome of the meeting, the finances, the

15  enrollment, and the current circumstances facing the

16  school related to finances and enrollment.

17      Q.   Included in those current circumstances, did

18  you consider the open letter and the matters of

19  Dr. Patterson's comments?

20      A.   Yes.  Yes, that would fall under the

21  category of leadership in the circumstances.

22      Q.   And what was the general culture that caused

23  some concern?

24      A.   Dr. Patterson's cabinet was fractured.

25      Q.   How so?



1      A.   Primarily around investigations into the

2  current financial status of the seminary.

3      Q.   Were there certain cabinet members that were

4  aligned with Dr. Patterson and others were not?

5      A.   No.

6      Q.   So what was -- where did the fractures lie?

7      A.    There was an audit produced internally

8  related to the finances of the seminary and that audit

9  produced internally, created differences of opinion

10  that created some disagreement with the cabinet.

11      Q.   Was the -- one of the items that we talked

12  about was Item No. G., this reporting about an alleged

13  rape on campus --

14      A.   Uh-huh.

15      Q.   -- was that one of the factors that you were

16  including in the consideration, his handling of that

17  matter?

18      A.   Yes.

19      Q.   How -- were each of the subjects that you

20  just mentioned discussed in any particular order?

21      A.   Yes.

22      Q.   What order were they discussed in?

23      A.   The order that as best I can recall was

24  finances, enrollment, leadership, and current

25  circumstances.  Current circumstances would have been



 1  related to the events that we discussed earlier in

 2  reference to that signed letter.

 3       Q.   And would the current circumstances also

 4  have included the handling of the report of rape?

 5       A.   Yes.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



11    Q.    When you received this e-mail along with the

12    information from Jane Roe's lawyer -- and just for the

13    record, this is the "break her down" e-mail where

14    Dr. Patterson sends a message to John Nichols about

15    Nichols' request to meet with Jane Roe along with

16    Dr. Patterson and he says:  Well, we'll see.  I have

17    to break her down and I may need no official types

18    there, but let me see.

19               What did you do when you received this

20    e-mail and the information from Jane Roe's lawyer?

21    A.    Nothing outside of my conversation with

22    Michael Anderson.

23    Q.    Did Dr. Patterson or did Shelby Sharpe on

24    Dr. Patterson's behalf provide an explanation to the

25    trustees of what he meant by this e-mail?



```
 1        A.    Yes.

 2        Q.    What was that explanation?

 3        A.    That he intended to determine whether or not

 4    [Jane Roe] was telling the truth.

 5        Q.    And did he indicate his reasons for

 6    questioning whether she was telling the truth?

 7        A.    No.

 8        Q.    And who -- who gave that explanation?

 9    Dr. Patterson?

10        A.    No.  Shelby Sharpe.

11        Q.    Was there discussion among the trustees

12    about whether that was an appropriate comment for him

13    to -- to make me or action for Dr. Patterson to take

14    to break her down?

15                    MR. GRAU:  Object to the form.

16                    MR. MACDONALD:  You can answer.

17        A.    No discussion was needed.

18        Q.    Okay.  That's not exactly what I asked.  Was

19    there -- there may not have been a discussion needed,

20    but was there a discussion that occurred?

21        A.    No.

22        Q.    And why do you say there was no discussion

23    needed?

24        A.    Shelby Sharpe explained what was said, why

25    it was said, and conveyed it was not a good thing to
```



1   say.  At that point there was no discussion needed.

2        Q.   When you say he conveyed it was not a good

3   thing to say, what does that mean?

4        A.   Was not wise choice of words to convey what

5   Dr. Patterson meant by what he said.

6        Q.   Did -- so you're -- I -- I'm confused.  So

7   was that sufficient to the board?  Is that a

8   sufficient explanation?

9        A.   Yes.  Because this was not a primary aspect

10  of the board meeting.  It was a very minor point of

11  the board meeting.  It received almost no attention in

12  the board meeting.

13       Q.   And was --

14       A.   The real issue in the board meeting related

15  to this particular situation was whether or not it had

16  been reported to the police, which it had.  This

17  e-mail was discussed to clarify the meaning behind

18  something that could be misunderstood.  When the

19  explanation was given, our primary concern being

20  whether or not it was handled legally appropriately

21  was sufficed and so there was no more discussion

22  related to this e-mail.

23       Q.   Okay.  Let me -- me back up because now I

24  understand you say that the primary discussion was

25  around whether it was reported to the police?



```
 1        A.    Correct.

 2        Q.    So, again, I think I understood you to

 3   say that Shelby Sharpe is the one that brought the

 4   whole thing up, correct?

 5        A.    Yes.

 6        Q.    And -- and why did he bring it up?

 7        A.    Well, it was mentioned in the previous

 8   e-mail of Dr. Patterson as a concern of the executive

 9   committee.  And so Dr. Patterson stated in his e-mail

10   that he intended to address those topics in the

11   meeting so his cabinet and representatives were

12   prepared to address many, not all of the topics listed

13   and so they initiated that discussion.

14        Q.    Okay.  So Shelby Sharpe initiated the

15   discussion.  And so I'm going to ask again about the

16   specific parts of the -- the Item G.

17        A.    Uh-huh.

18        Q.    My recollection and I understand that's

19   not -- you're saying that's not you, but that

20   Dr. Patterson said the young woman had retracted her

21   allegation that she had been raped.  Did Shelby Sharpe

22   or Dr. Patterson say anything about the statement that

23   she had retracted her allegation that she had been

24   raped?

25        A.    I don't remember.
```



1      Q.   Did they respond to the question of do we

2  have documentation of this investigation?

3      A.   Yes.

4      Q.   What was the explanation for:  Do we have

5  documentation of this investigation?

6      A.   Shelby had with him all the documentation,

7  reportedly.  I don't know.  But he said I've got all

8  the documentation and he had a stack of papers.

9      Q.   Did he share with the trustees the stack of

10  papers?

11      A.   No.  We did not ask, and he did not offer.

12      Q.   What else did he say?

13      A.   I recall him saying something about

14  pictures.

15      Q.   What did he say about pictures?

16      A.   That they -- that there was something about

17  pictures that was also a part of the reason they

18  believed that the allegations were not factual.

19      Q.   Did he say that he had pictures?

20      A.   I can't remember.

21      Q.   Did you understand that the pictures were

22  among the stack of documents that he had?

23      A.   No.

24      Q.   What else did he say?

25      A.   That's all I can remember.



1    Q.   Well, you said that it was confirmed that it
2    was reported to the police.  So what did he say about
3    the police?
4    A.   He said that the police were notified
5    immediately.  That's all I can remember he said about
6    that.  It was a very brief presentation.
7              MR. MACDONALD:  Sheila, at 12:30, we'll
8    have been going a little over an hour and fifteen
9    minutes.  It might be a good time to take a lunch
10   break.
11             MS. HADDOCK:  Okay.  Well, I want to
12   get through this right now, I think.
13   Q.   At what point in the day do you recall the
14   discussion about   **Jane Roe**   occurring?
15   A.   It would have been late in the meeting.
16   Q.   Well, it's my understanding that the -- the
17   meeting went well into the night into the early
18   morning hours of the next day.  So do you have an idea
19   of when during that time frame?
20   A.   Probably after supper.  I don't know.
21   Q.   Did Dr. Patterson say anything during this
22   time about the rape?
23   A.   I don't remember him saying anything during
24   the meeting about that.
25   Q.   Did Mr. Sharpe indicate that Dr. Patterson



1   did, if fact, meet with **Jane Roe**?

2       A.   Yes.

3       Q.   And what did he say about the meeting?

4       A.   I don't remember him going into detail.

5       Q.   Was he able to determine that she was lying

6   as he attempted to?

7       A.   He did not reference the specific outcome to

8   the meeting noted in this e-mail --

9       Q.   Was it --

10      A.   -- that I can recall.

11      Q.   Was it your impression that -- that the

12  ultimate outcome was that **Jane Roe** was lying?

13      A.   No.  We -- we did not focus on whether or

14  not -- as a -- as a board whether or not **Jane Roe**

15  was lying.  The issue in front of the board was

16  whether or not the allegations were handled legally

17  appropriately.

18      Q.   And the consensus of -- was what?

19      A.   The board released a statement that it

20  believed that in the matters of sexual abuse all those

21  issues were handled appropriately.

22      Q.   Appropriately or legally?

23      A.   Legally.

24           Were they handled appropriately?

25      A.   I do believe they were handled



```
 1   appropriately.  I do not believe the wording in this

 2   e-mail was wise or appropriate.

 3       Q.   Do you think it was wise or appropriate that

 4   Dr. Patterson was -- intended to meet with a young

 5   woman who reported being raped at gunpoint to break

 6   her down to determine whether she was lying?

 7                  MR. GRAU:  Object --

 8                  MR. MACDONALD:  Object to form.

 9                  MR. GRAU:  -- to form.

10                  MR. MACDONALD:  It's a

11   mischaracterization of the statement and the evidence.

12       Q.   You understood -- do you understand what the

13   allegations were?

14       A.   You -- you can remind me.

15       Q.   Do you understand -- you said that you had

16   just -- you said that you had already received at this

17   point the e-mail --

18       A.   Yes.

19       Q.   -- and the letter from Jane Roe's attorney.

20       A.   Yes.

21       Q.   Did he explain to you what the allegations

22   of rape were?

23       A.   Not in detail.  I think his motivation was

24   to get this situation back in front of the school so

25   he did not go into detail.
```



1

2

3

4

5

6        Q.   -- correctly?  Okay.  All right.  What is

7    the next thing that you believe is factually

8    inaccurate?

9        A.   Accusation No. 2:  Patterson did not handle

10   appropriately an alleged case of sexual assault

11   against a Southwestern student.

12                 And the way she states this deals with

13   the issue of the police being involved, and this issue

14   specifically related to not handling appropriately was

15   not a part of the reason why Paige Patterson was

16   terminated.  So that is not true.

17       Q.   Okay.  Let me ask you this:  Underneath that

18   accusation --

19       A.   Uh-huh.

20       Q.   -- there is paragraph that begins:  Truth --

21       A.   Yeah.

22       Q.   Plaintiff immediate -- plaintiff --

23   Patterson immediately called police in response to a

24   female student claiming she had been raped.

25                 Is that accurate?



1    A.   Yes.

2    Q.   The accused man admitting to having sexual

3  relationships -- relations with the woman, but said it

4  was consensual.

5          Is that something that was reported to

6  the board in the May 22nd meeting?

7    A.   No.

8    Q.   The next --

9    A.   The consensual part, yes.  The accused man

10  and all those details, no.

11    Q.   So during the May 22nd meeting, nothing was

12  mentioned about anyone admitting to having sexual

13  relations, but you said it was discussed that it was

14  consensual.  How -- how was it phrased then?

15    A.   No.  I just said that the man was not

16  discussed.

17    Q.   Okay.  So what did -- did Mr. Sharpe say?

18    A.   I mentioned earlier that he gave a brief

19  report.

20    Q.   I understand.  And part of the -- this whole

21  case turns on the details --

22    A.   Yeah.

23    Q.   -- okay?  The confidential details --

24    A.   Sure.

25    Q.   -- that have been referred to.  So it's



1   really important for me -- you are the person who was

2   there and so you're the only person that I can get

3   this information from and it's very important that you

4   tell me.  What -- did Mr. Sharpe say it was a

5   consensual relationship?  Did he -- what -- what did

6   he say?

7              MR. GRAU:  Object to the form.

8       A.   They said they reported it to the police as

9   they should have, and the police did not find any

10  reason to move the case forward.  There was not enough

11  evidence and so the evidence leaned on the side of it

12  being a consensual relationship.

13      Q.   And that's what you said they said.  Who's

14  they?

15      A.   Shelby.  The only person that spoke to that

16  was Shelby Sharpe --

17      Q.   Okay.

18      A.   -- to my recollection.

19      Q.   Okay.  So Shelby Sharpe said it was reported

20  to the police; the police didn't find any reason to

21  move forward?

22      A.   There was no evidence from the police

23  investigation that they needed to handle this as an

24  actual rape.

25      Q.   Did he say that photographs were provided to



1   the police?

2        A.   He said something about photos.  I don't

3   know whether those photos were provided to the police

4   or in some other way.

5        Q.   What did he say about photos?

6        A.   That there were photos that corroborated

7   consensual relationship.

8        Q.   Did he describe what the photos were?

9        A.   I don't remember.

10       Q.   Did he indicate that he had the photos in

11  his possession?

12       A.   No.

13       Q.   The next sentence is:  The man also produced

14  evidence to the police to that effect.

15            Did Shelby Sharpe tell the board that

16  the man produced evidence to the police to that

17  effect?

18       A.   I don't remember.  The photos are the only

19  thing that I can definitely remember as it relates to

20  any evidence produced.  But he had a stack of papers

21  that referenced the case, but none of that was made

22  available or talked about in detail.

23       Q.   The next sentence is:  Southwestern's chief

24  of police can confirm the Fort Worth Police Department

25  was called and responded.



```
 1                    Did you ever -- I think you already
 2    answered this, but did -- did John Nichols, the chief
 3    of police, ever provide any information to the board?
 4         A.    No.
 5         Q.    Or to you?
 6         A.    No.
 7         Q.    Whether or not in the context of the
 8    meeting?
 9         A.    No.
10         Q.    At any time?
11         A.    No.
12         Q.    Then:  Patterson expelled the male student
13    accused of rape.
14                    Was that discussed in the meeting?
15         A.    I don't remember.
16         Q.    However, because the female student refused
17    to press charges, Patterson had done all he could do
18    by calling the police, expelling the student, and
19    encouraging the woman multiple times to press charges.
20                    Was that information provided to the
21    board?
22         A.    I do not remember.  Honestly, I do not
23    remember.  It just wasn't talked about for that long
24    so I can't remember the details of a shorter
25    conversation.
```



```
 1      Q.   But this would be inconsistent with what you
 2   recall them saying that the police investigated it and
 3   found no reason to move forward.  That's different
 4   than saying that she refused to press charges, isn't
 5   it?
 6                MR. MACDONALD:  Object to form.  It's
 7   argumentative.  Object to form.
 8      Q.   Is this -- are the statements in that
 9   paragraph that we just looked at consistent with what
10   you recall being said at the meeting?
11      A.   Yeah.  I don't remember it being stated at
12   the meeting that she refused to press charges.  I
13   don't remember that.
14
15
16
17
18
19
20
21
22
23
24
25
```



KEVIN UECKERT  Confidential                                    March 03, 2022
Jane Roe vs Leighton Paige Patterson & SWBTS                          184

1

2

3

4

5

6

7

8

9

10

11

12          Q.   If the evidence in this case would show that

13   Dr. Patterson, along with the chief of police for the

14   university, the seminary, met with the Plaintiff and

15   family members when the story about what happened to

16   her was revealed, if the evidence in the case is that

17   Dr. Patterson and the chief police immediately

18   contacted the police to report the assault, in your

19   mind, is that the appropriate behavior and conduct on

20   their part?

21          A.   Yes.

22          Q.   In other words, isn't that what they should

23   have done?

24          A.   Yes.

25          Q.   Is that the report that you got at the



1  | May 22, 2018 meeting?

2  |      A.    Yes.

3  |      Q.    And when you testified earlier that you felt

4  | that the conduct of Dr. Patterson in handling the

5  | report of the assault was appropriate, is that what

6  | you were referring to?

7  |      A.    Yes.



1                       CHANGES AND SIGNATURE

2    PAGE        LINE        CHANGE                REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____



1              I, KEVIN UECKERT, have read the
   foregoing deposition and hereby affix my signature
2  that same is true and correct, except as noted above.

3

4                    _____
                        KEVIN UECKERT
5

6  THE STATE OF TEXAS    )

7  COUNTY OF WILLIAMSON )

8              Before me, _____,
   on this day personally appeared KEVIN UECKERT, known
9  to me (or proved to me under oath or through
   _____) (description of identity card
10 or other document) to be the person whose name is
   subscribed to the foregoing instrument and
11 acknowledged to me that they executed the same for the
   purposes and consideration therein expressed.

12

13             Given under my hand and seal of office
   this _____ day of _____, 2022.

14

15

16

17

18                  _____
                       Notary Public in and for the State of Texas
19

20

21

22

23

24

25



```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF TEXAS
 2                          SHERMAN DIVISION

 3    JANE ROE                    )(
                                  )(
 4    VS.                         )(   CIVIL NO.:
                                  )(    4:19-CV-00179-SDJ
 5    LEIGHTON PAIGE PATTERSON,   )(
      IN HIS INDIVIDUAL CAPACITY;)(
 6    SOUTHWESTERN BAPTIST        )(
      THEOLOGICAL SEMINARY        )(

 7                     REPORTER'S CERTIFICATION
 8              ORAL AND VIDEOTAPED DEPOSITION OF
                            KEVIN UECKERT
 9                          March 3, 2022

10             I, Kiki Farr, Certified Shorthand Reporter

11    in and for the State of Texas, hereby certify to the

12    following:

13             That the witness, KEVIN UECKERT, was duly

14    sworn by the officer and that the transcript of the

15    oral deposition is a true record of the testimony

16    given by the witness;

17             I further certify that pursuant to FRCP Rule

18    30(f)(1) that the signature of the deponent:

19             __X__ was requested by the deponent or a

20    party before the completion of the deposition and that

21    the signature is to be before any notary public and

22    returned within 30 days from the date of receipt of

23    the transcript if returned, the attached Changes and

24    Signature Page contains any changes and the reasons

25    therefor;
```



KEVIN UECKERT  Confidential                                    March 03, 2022
Jane Roe vs Leighton Paige Patterson & SWBTS

1              _____ was not requested by the deponent or a

2    party before the completion of the deposition.

3              I further certify that I am neither counsel

4    for, related to, nor employed by any of the parties or

5    attorneys in the action in which the proceeding was

6    taken, and further that I am not financially or

7    otherwise interested in the outcome of the action.

8

9              Certified to me by this 16th day of March,

10   2022.

11

12

13

14   _____

15   KIKI PARR, TEXAS CSR 11512
     Expiration Date:  2-28-2023
16   Esquire Deposition Solutions
     1700 Pacific Avenue, Suite 1000
     Dallas, Texas 75204
17   Firm Registration No. 286

18

19

20

21

22

23

24

25

