1           UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF TEXAS

3               SHERMAN DIVISION

4    _____
                                    )
5    JANE ROE,                      )
                                    )
6         Plaintiff,                )
                                    )  CIVIL ACTION NO.
7    VS                             )
                                    )  4:19-cv-00179-SDJ
8    LEIGHTON PAIGE PATTERSON,)
     in his individual             )
9    capacity; SOUTHWESTERN        )
     BAPTIST THEOLOGICAL           )
10   SEMINARY,                      )
                                    )
11        Defendants.               )
     _____)

12

13

14

15

16

17        ORAL DEPOSITION OF GARY LOVELESS

18               APRIL 19, 2022

19

20

21

22

23

24   REPORTED BY:

25        Lisa J. Brannon, RPR, CRR



1          ORAL DEPOSITION OF GARY LOVELESS, produced

2    as a witness at the instance of the Plaintiff,

3    and duly sworn, was taken in the above-styled and

4    above-numbered cause on the 19th day of April,

5    2022, from 12:31 a.m. to 3:50 p.m., before Lisa

6    J. Brannon, RPR, CRR, reported by machine

7    shorthand via Zoom, pursuant to the Federal Rules

8    of Civil Procedure and the provisions stated on

9    the record.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
1                    A P P E A R A N C E S

2

   APPEARING ON BEHALF OF PLAINTIFF:
3
        Sheila P. Haddock, Esq.
4       THE ZALKIN LAW FIRM, P.C.
        10590 W. Ocean Air Drive, suite 125
5       San Diego, California  92130
        Telephone:  858-259-3011
6       Email:      sheila@zalkin.com

7

   APPEARING ON BEHALF OF THE DEPONENT:
8
        Larry P. Wilson, Esq.
9       THE LANIER LAW FIRM
        10940 West Sam Houston Parkway N.
10      Suite 100
        Houston, Texas  77064
11      Telephone:  713-804-6361
        E-mail:     larry.wilson@lanierlawfirm.com
12

13  APPEARING ON BEHALF OF DEFENDANT, LEIGHTON PAIGE
    PATTERSON:
14
        Jim Grau, Esq.
15      Travis J. Jones, Esq.
        GRAU LAW GROUP, PLLC
16      1445 Ross Avenue, Suite 4700
        Dallas, Texas  75202
17      Telephone:  214-521-4145
        E-mail:     jgrau@graulawgroup.com
18
   APPEARING ON BEHALF OF DEFENDANT, SOUTHWESTERN
19  BAPTIST THEOLOGICAL SEMINARY:

20      David M. Macdonald, Esq.
        Jennifer D. LeBlanc, Esq.
21      MACDONALD DEVIN, P.C.
        3800 Renaissance Tower, 1201 Elm Street
22      Dallas, Texas  75270
        Telephone:  214-744-3300
23      Email:      dmacdonald@macdonalddevin.com

24

25
```



```
 1              A P P E A R A N C E S

 2                   (continued)

 3   ALSO PRESENT:

 4        ███████ Jane Roe ███████  plaintiff
          Christian Owen, exhibit technician
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1
 2
 3
 4
 5
 6           .    (BY MS. HADDOCK)   I'm going to mark
 7   what is going to be Exhibit Number 3, which is
 8   Loveless 8 through 11.  Take a minute and look at
 9   that.  It's a May 14th, 2018 letter from you to
10   Kevin Ueckert with an e-mail transmission to
11   Charles Patrick.
12        A.    (Reviewing exhibit.)
13        Q.    Have you read through that?
14        ".    Yeah, I did.
15        Q.    And what was going on around May 14th,
16   2018 that prompted you to write this letter?
17           .    Well, what was going on was the
18   seminary was, I guess -- with Mr. Ueckert's
19   leadership as chairman of the board was -- I
20   guess had decided that -- that -- that Paige
21   Patterson ought to retire.
22              And so I guess that -- that it was a
23   meeting shortly thereafter, May 22nd, that the
24   full board met and met with Mr. Ueckert, Chairman
25   Ueckert, and also, you know, the other officers
```



1  of the board and, I guess, was talking about his

2  exit package, from what I understood.

3      Q.   And that was -- that's what you

4  understood happened at the May 22nd --

5      A.   Of 2018.  And, see, I'd rode off in '17

6  so I had been gone.

7      .    Right.  So were you -- excuse me.  Were

8  you aware of -- that the May 22nd meeting was

9  planned --

10     .    No.

11     .    -- even before it occurred?

12     A.   No.

13     Q.   When did you learn what had happened at

14  the May 22nd meeting?

15     A.   Well, I don't know.  I guess I -- I was

16  talking to the Behans, and I was talking to other

17  people, and I basically -- I don't know.  Scott

18  Colter and I talked about the -- about the -- a

19  number of times just what was going on with the

20  Pattersons and what had happened and so just

21  those kinds of conversations.

22          I never talked to his wife Sharayah but

23  I read some of her material and so -- and, again,

24  I followed four, five, six -- you know, just

25  various sources of people reporting on it so I --



1   I didn't have probably an accurate rendition but

2   I had a good idea what was happening at that

3   point.

4        Q.   Did you speak with Scott about what had

5   happened in the meeting, what --

6        .    Huh-uh.  I didn't -- I didn't talk with

7   him except that I -- you know, I don't know who I

8   knew this from but that -- but I knew that the

9   Pattersons -- some of their -- I guess their

10  folks was left outside and the Board of Trustees

11  met, and Mr. Ueckert didn't really, in my

12  opinion, based on what I had just read about or

13  heard, have an opportunity to give much rebuttal

14  to what was coming down, but I guess that's the

15  way it works sometimes.

16       .    And you're basing that on information

17  that you got from Scott?

18       A.   No.  I'm basing that on information

19  from just the blogs, just friends, you know.

20       Q.   Okay.

21       A.   And I knew the trustees, Joe was still

22  there, but I don't know.  It was just -- it was

23  just -- once I found out what was happening, then

24  I kind of gathered the information.

25       .    Did you speak to any of the trustees



```
 1   that were -- that were there?
 2        A.   I spoke to a couple of trustees, I
 3   think.  I can't remember now who it was.  But
 4   they lived in -- maybe in Fort Worth or
 5   something.  I can't recall.
 6             But, you know, you couldn't -- at that
 7   particular time with the people that I knew on --
 8   you know, trustees, and the people I knew that --
 9   the Pattersons and all, it's a big deal.  And
10   then, you know, we got every journal wanting to
11   write about it in town.
12        Q.   When did you learn that
13   Dr. Patterson -- well, my understanding is in the
14   May 22nd meeting he was moved to president
15   emeritus.  Is that right?
16        .    Right, right.
17
18
19
20
21
22
23
24
25
```



```
 1

 2

 3

 4

 5

 6

 7

 8        .    So the actual exhibit is May 31st.

 9             When did you first become aware that a

10   student had alleged that she was sexually

11   assaulted at Southwestern in 2015?

12        A.   I gotta think about that because I

13   don't really know.  I became aware of it I guess

14   just through -- I don't know whether it was -- it

15   was the Mayhams, the Goughs, you know, or

16   different people that live in Fort Worth that

17   maybe I found out through.  That's -- that's the

18   only answer I have as to when I found out about

19   it.  Obviously it was about the time of the -- of

20   the -- I guess of the -- of the crime.

21        Q.   In 2015?

22        ^.   Yeah, in 2015.

23        .    And when you say obviously it was about

24   that time, what makes you say that it --

25        A.   Well, I don't know, just the chatter
```



```
 1   that I heard that -- that it was a -- someone was
 2   making allegations.  And so I was still a
 3   trustee, of course, at that time, so, you know, I
 4   was there, and there was a scuttlebutt.  It
 5   wasn't totally out in the open but people were
 6   talking about it, and these kinds of things from
 7   Sharayah was -- which was her attempt to clear
 8   things up about the matter, you know, one of
 9   those, and there was other documents or blogs or
10   something, but I don't -- I don't really know
11   what they found out or something but it was in
12   the time frame.
13       Q.   And what -- what -- in 2015 what did
14   you hear about the circumstances of --
15       A.   Well, there was allegations of an
16   assault, was what I heard, just a general thing,
17   and that it was being investigated.  I didn't
18   know much.
19       _.   Did you speak with Dr. Patterson about
20   it at that time?
21       A.   Well, you know, I don't think I did,
22   but he may have given -- we have a -- you know, a
23   board meeting -- at our board meetings, the first
24   thing is to recap what's been going on, so it's
25   possible that he spoke of it at that meeting.
```



 1  I'm not sure.  Maybe -- he may not have, but I --

 2  that would be where I would've most likely heard

 3  it, but that would be where all the trustees were

 4  in there.

 5      Q.   Did you ever see any documents related

 6  to the allegations of sexual assault?  And right

 7  now I'm talking about in the time frame near the

 8  events in 2015.

 9      A.   Any documents?  No, no.

10      Q.   Do you have an understanding of what

11  the facts were?  Did you recall hearing that the

12  investigation revealed that it was not a sexual

13  assault but, rather, was a consensual

14  relationship?

15      A.   So -- so a moment ago I asked you can I

16  explain the context so that my answer would make

17  more sense to you.  Can I go ahead?

18         .   Please.

19         .   Okay.  So -- so in two-thousand and --

20  the May 14th letter that Stephanie and I wrote,

21  and that was -- that was sent out to all the

22  other folks, but that was my way of letting the

23  corporate governance folks know that there wasn't

24  much corporate governance.  Certainly, in my

25  opinion, an investigation needed to happen.  And



```
 1   that -- that -- that May 14th letter just
 2   addressed those issues.  There was no alleging --
 3   you know, allegations of -- of a crime in -- in
 4   that letter.  It was about the trustees' action,
 5   which is what I was about.  Do you see what I'm
 6   saying?
 7           And then on -- on June the 12th I wrote
 8   a letter.  This is after my -- for a guy that'd
 9   never written a letter in his life, these kinds
10   of things, I was getting pretty prolific.  So I
11   wrote a letter, which was a May 12th -- pardon me
12   -- a June 12th letter.  It would later become the
13   June 29th letter when Susan Oliver got involved.
14       Q.   Okay.  I'm looking for the June 12th
15   letter.  I thought if I --
16        .   You need that letter because I'll make
17   a point about it in a moment.  It would be in
18   those documents and it's also in ours.
19       _.   Here we go.  Or I actually just have
20   one copy of it, though.
21       A.   That's all right.  I don't have to have
22   the letter.
23        .   Okay.  It's Loveless 004 and 5.  Let
24   me -- let me show this to you and make it -- mark
25   it as an exhibit.  I want to make sure that
```



```
 1   that's what you're talking about.

 2        A.   Yeah.  So the May 14th letter had been

 3   sent out.  I wrote this letter here.  And this

 4   letter was pretty short and sweet.  And you can

 5   see that it wasn't written by an attorney if you

 6   compared it to the June 29th letter and so --

 7             MR. GRAU:  Mark that please.

 8             (Exhibit Number 5 marked.)

 9        A.   That was -- that was my letter.  May

10   14th was my letter when we -- when --

11        Q.   (BY MS. HADDOCK)  Okay.  May 14th was

12   your letter, and June 12th, that was your --

13        A.   This is my letter, yes.  This is a --

14   mine was in my wife's things.  I was getting

15   ready to carry on with my thoughts.

16        .    Now, was that a -- just a draft, or is

17   it --

18        .    Just a -- just a --

19             THE COURT REPORTER:  Okay.  Wait, wait,

20        guys, waits.  There's beginning to be an

21        awful lot of overlap.  Please speak one at a

22        time.

23        .    (BY MS. HADDOCK)  Let me ask you a

24   question.  Was that letter ever sent, the June --

25        A.   No, no, it was never sent.
```



1          .    Okay.

2          A.    Because Susan -- if you've read the

3    June 29th letter and saw the number of drafts and

4    different things, that became a legal letter more

5    than anything else.

6               And so the way that worked was that

7    Susan would -- would -- was drafting the letter.

8    It was going to be sent out under her name.

9    Again, she'd made a major gift to the seminary,

10   she was known by the seminary, so she was going

11   to be the signature on that letter.

12              And as we went along from June 12th to

13   June 29th, especially along somewhere around June

14   25th, what happened was that -- that Susan

15   decided that she was -- preferred that I

16   basically sign the letter instead of her, which

17   was a shock to me because we had had a number of

18   conversations about some of the things that were

19   in the June 29th letter that I knew nothing

20   about, and that's the nude pictures, and that's

21   the crime, and that's the sex on campus.  I knew

22   nothing about any of that, and I told her that,

23   and that we needed to take that out of her

24   letter, but -- and she vacillated but assured me

25   that she -- she had reason to believe that that

1   was all true.

2           And I said, well -- I had -- you know,

3   really, we had, as I said, three or four

4   conversations about -- about that part of the

5   letter, and, you know, I had gotten to know

6   Susan, you know.  I had no reason to doubt her.

7   She seemed very reputable.  She's a retired

8   judge.  She's worked in probate, wills, and that

9   part of the business.  She had been a long-time

10  supporter of the Pattersons.  I had no reason not

11  to believe her.  But she said, when I asked her

12  about it, you just have to trust me.  Well, I'm

13  not too good at that, but after a while, after

14  all it was her letter, so I -- I was just to be

15  on the bottom.

16          But then on -- somewhere around the

17  25th she switched it over, it's going to be my

18  letter, so I had already crossed that path, and,

19  in retrospect, I maybe was a bit naive about that

20  point, because that language went in the letter.

21  I'm not saying it's true or not true.  I'm just

22  saying I don't know anything about it.

23

24

25



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19              Did you have conversations with

20      Mr. Sharpe about what happened in the May 22nd

21      board meeting?

22              No.

23

24

25



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17          .    Did you -- were you speaking with

18   Dr. Patterson during this time?

19          .    Not about this, I was not.  I don't

20   remember if I was talking to Dr. Patterson at

21   all, but certainly not about this.  Because, you

22   know, I could've had daily -- this is dated June

23   20th, 2018, and I probably rolled off the board

24   -- because I rolled off the board in '17, didn't

25   I, so, you know, I wouldn't have been talking



```
 1    with Dr. Patterson on a daily basis, nor anyone

 2    else on a daily basis except for Susan.  I was

 3    trying to run three companies.  It's a little

 4    hard to do that with this crew.

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20           (Exhibit Number 10 marked.)

21        Q.   (BY MS. HADDOCK)  All right.  Exhibit

22    Number 10 is going to be Loveless 278 to 287.

23                          This is Macdonald.

24       Sheila, what's the date of that, please?

25           MS. HADDOCK:  Just a minute.  It's
```



1       Friday, June 22nd, 2018.
2                       ().  It's an email from
3   Karen Beard with a copy to Gary Loveless to Mr.
4   -- to Fred Gough saying, "Gary Loveless asked me
5   to forward this draft to you to read and
6   consider.  He's hoping to make a few changes and
7   that you will sign it together.  Call him to
8   discuss when you get a chance."
9           Please look at that and tell me if you
10  recall seeing that.  Or did you send that to
11  Mr. -- do you remember sending that to Mr. Gough?
12      A.   Yeah.  Top of the first page?
13      Q.   Well, it's all connected.  It appears
14  that -- this is the way it was produced to us,
15  and so the letter is the draft, the June 20th --
16      .   Yeah.
17      .   -- draft that Susan Oliver sent you.
18  So I guess let me ask you this.  Do you remember
19  sending this first draft to Mr. Gough?
20      A.   Well, I think that it was sent out to
21  the people.  I know Susan was supposed to get
22  some input from the people and so we did do that.
23  I didn't talk with people about it that I recall
24  anyway.
25      .   Okay.  That was going to be my next



1   question, is did he respond to you?

2        A.    Not that I recall.  I mean, not that I

3   can recollect.  Linda, she was kind of always

4   responding and stuff with Susan, typically,

5   instead of me, thank goodness.

6        .    Okay.

7        .    But I can look over the others.

8        .    Well, I think this one is just you

9   sending -- Karen Beard is sending it on your

10  behalf to Mr. Gough.

11       A.    Right.  I think that was -- she'd go

12  through me on that one because I'm friends of his

13  and she didn't know him.

14       Q.    Okay.

15       ⁻.    That was the only thing I can get.

16       .    I want to take a look at this first

17  draft.  If you turn with me to page 280 is where

18  the draft starts.  And on the first page there's

19  a discussion about -- well, let me ask you this

20  question this way.

21           Do you know at this point, June 20th,

22  when you received this first draft from

23  Ms. Oliver, did you have an understanding of

24  where she got this information that she has

25  included in this first draft?



1          .    Well, you know, I look at it in
2    context of the whole letter.  You know, some of
3    that I would -- I would -- May 30th meeting and
4    about having parties, I mean I understood the
5    concept, but as far as maybe the part -- is that
6    later in the letter?
7          .    When she's -- let's go to page 282
8    where it begins, paragraph -- first full
9    paragraph begins, "The facts regarding the 2015
10   Southwestern event referenced by Reverend Ueckert
11   are well known.  You knew full well that the
12   female student's allegations of rape were false."
13   Do you know where she got that information?
14        A.   I do not.  I asked her -- I asked her
15   that question, as I mentioned a moment ago.  I
16   asked her, where do you -- where do have that?
17   Don't put it in the letter.  You know, I don't
18   feel -- I don't feel comfortable.  I don't know
19   any of that stuff.  I don't know if it's true or
20   not true.  But, again, we had built a
21   relationship, I trusted her, she's contributed,
22   and it was her letter by that time.
23        .    So I'm confused.  You built a
24   relationship with her since when?
25        A.   I built the relationship in -- in --



GARY LOVELESS                                          April 19, 2022
Jane Roe vs Leighton Paige Patterson & SWBTS                    60

```
 1    the -- after the May letter and all the hoopla
 2    about Dr. Patterson in the context of knowing her
 3    background, knowing she had been a long-time
 4    friend of theirs.  I don't mean deep personal
 5    relationship.  But -- but, again, it was her
 6    letter.  And -- and I could -- at the time I was
 7    thinking about if we left it in, I wouldn't sign
 8    it.  But -- but she said -- she asked me to trust
 9    her, and that she had knowledge of this, and so
10    anyway I, you know, said it made sense, but, you
11    know, maybe, you know, I was naive about that.
12            I just -- we took it out and she put it
13    in.  We took it out and she put it in.  I mean,
14    in terms of points, she was going to do that.
15    She would say, you know, I'm going to -- I don't
16    know about that because that's a little bit
17    strong.  And I said, well, why did you put it in
18    there at all if you -- you know?  She said, I
19    have information that says that these things
20    happened, and you're going to have to trust me on
21    than because I can't divulge -- that's how that
22    happened.
23       .    She said she couldn't divulge the
24    source to you?
25       A.    Yes.
```



```
 1              .   If Ms. Oliver testified in this case
 2    that she was not the principal author of this
 3    letter, would that be an untrue statement?
 4         A.   Not only would it be untrue, she -- she
 5    would -- I would hope with -- she'd have to burn
 6    all of her paperwork then, because she says
 7    in one of the -- I think we need to change you to
 8    the author, from my letter to your letter.  And
 9    so -- and I don't think a reading of the letter
10    it says that -- that -- you know, this is
11    something that an attorney would write, not that
12    I wrote.  I own up to my letters.
13         Q.   Okay.  I want to go through this and
14    make sure if there's any of this that you have
15    information that you know is true, okay?
16              So you said you don't know -- you don't
17    have any information whether the allegations were
18    false.  "You knew full well that she engaged in
19    consensual sexual activities on at least three
20    separate occasions and in three separate public
21    buildings with the male student involved."  Do
22    you have any information as to whether that
23    statement is true?
24         A.   No.  It could be true.  It could be
25    false.  I don't have any information.
```



```
 1          .    "You knew full well that she had texted
 2     nude pictures of herself to the male student."
 3          .    No information.
 4          Q.    "You knew full well that she begged
 5     Dr. Patterson not to call the police but he
 6     insisted that he would and he did."  Do you have
 7     any information about that statement?
 8          .    No.
 9          .    "You knew full well that
10     Dr. Patterson's breaking-her-down statement in
11     his email to the chief of campus security was
12     taken completely out of context in the Reverend
13     Ueckert statement."  Do you have any information
14     relating to that statement?
15          A.    That -- that -- that happens to agree
16     with my rendition of that -- of that statement,
17     but I don't know anything about that.
18          .    "Had the email been released in its
19     entirety, the truth of Dr. Patterson's statement
20     would've been known that he wanted to help her
21     recant her allegations of rape before she made a
22     similar false statement to the police, which
23     would have resulted in a criminal felony
24     conviction on her record for the remainder of her
25     life."  Do you have any information about that
```



1    statement?

2          A.    No.

3          Q.    Have you seen the email in its

4    entirety, the break-her-down email?

5          .    No.

6          .    Has anyone described the email to you?

7          .    No.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11              (Exhibit Number 24 marked.)

12       Q.    (BY MS. HADDOCK)   Okay.  Let's go to

13   Exhibit Number 24, bright and early at 7:29 a.m.

14   On the following day, June 28, Loveless 244.

15   It's an email from Ms. Oliver to Gary Loveless,

16   Linda Behan, Dale Behan, Scott Colter, with the

17   subject of "Early morning thoughts."

18              In the second paragraph she begins,

19   "Earlier I thought I understood the fact to be

20   that while the 2015 Southwestern event had been

21   discussed on May 22nd, the email containing the

22   break-her-down language was discovered afterwards

23   in the same way that the Southeastern info was as

24   they assert discovered after May 22nd.  That

25   explains why in my former draft I stated our
```



1   arguments in the alternative, "If you didn't
2   know" and "If you knew."  After talking with
3   Scott last night and realizing the full board
4   knew everything on May 22nd, subsequent actions
5   of the executive committee take on a whole new
6   meaning."
7            Do you recall this?
8        .   Well, generally I recall it.  I'm sure
9   she sent it to me, but I think -- I think that
10  very little came out of the executive committee,
11  that I recall, I mean in terms of what was talked
12  about in terms of, well, wait a minute, what
13  changed between, you know, the eight days.
14           And so if you're in the executive
15  committee and you see new relevant information
16  and it's so crystal clear and so truthful that
17  you don't have to do anything else, then, you
18  know, that would be one thing.  If it's none of
19  those things, that's another thing.
20           So I think she's -- as I recall, she
21  kind of had an aha-ah moment, she has a lot of
22  those, but this was a bigger "aha" than normal,
23  that they didn't -- the full board didn't ever
24  see all the -- why did they let Dr. Patterson go,
25  you see.  That was what was being thrown out



```
 1    here.
 2              And she figured out that that executive
 3    committee just said -- because the Megan Lively
 4    thing had been going on a long time, and when
 5    Dr. Patterson said Dr. Moseley handled that, then
 6    in Susan's mind she -- she thought, wait a
 7    minute, if he handled it and they did -- even if
 8    it -- if he didn't handle it, then an
 9    investigation of that event would be -- would be
10    what was needed, so she was going to change some
11    of her letter up a little bit.
12         Q.   And that was --
13         A.   That was whatever the changes were.
14         Q.   Okay.  Well, I understood this to be
15    that she's focusing now on the 2015 event.
16         .    Uh-huh.  Well, I don't think so.  I
17    mean, I don't -- maybe you're right.  But I think
18    it was -- it says here that while the 2015 event
19    had been discussed on May 22nd, the event
20    containing the break-her-down language was that
21    the Southeast information was as they assert,
22    discovered after May 22nd, so that's what
23    confused me on that.
24
25
```



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14              (Exhibit Number 29 marked.)
15      Q.   (BY MS. HADDOCK)   Let's go on to
16  Exhibit Number 29, and that is going to be
17  Loveless 49 to 56, which is the final letter that
18  went out.   It's an email cover, dated June 29th,
19  2018, at 3:16 p.m.   If you want to kind of thumb
20  through that.   Does that look like that's t
21  final letter?
22      ^.   Yeah, this is the one.
23
24
25
```



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15         Q.    All right.   Now, Scott Colter's role in

16    this in the providing of information, you shared

17    with us in your answers to questions already that

18    some of the information that Scott Colter

19    provided, as far as you know, at least to you,

20    were things like the email address, information

21    like that, or the timing of -- or due notice

22    requirements --

23         A.    Right.

24          .    -- things that he would have

25    knowledge --



1         .    Procedural things for the board.

2         .    And isn't that the extent of the

3    information that we've seen here in the exam so

4    far today from you that he provided?

5         .    Yeah, from me, from me, that's the

6    extent of it, pretty much.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1
 2
 3
 4
 5
 6         .    During that period of time did you ever
 7    talk to Dr. Patterson about the letter?
 8         .    No.
 9         .    And during that time frame do you have
10    any memory that Dr. Patterson ever contacted you
11    and said, I want you to write a letter on my
12    behalf?
13         ".   He never did that.
14         Q.   Did Scott Colter, during that time
15    frame, come to you and say, Dr. Patterson wants
16    you to write a letter on his behalf?
17         .    He did not.
18
19
20
21
22         Q.   You were -- you were asked about the
23    time frame of when you might have heard about
24    some of the activity, the sexual assaults, and I
25    heard some things in 2015, and I heard some
```



1  things in 2018, and so I want to ask you some

2  very specific questions about that, okay?

3       A.    Uh-huh.

4       Q.    And I'll represent to you that

5  Dr. Patterson has said that, as it relates to the

6  events of 2015, he has not shared that

7  information with anyone.

8       A.    He hasn't shared it with me.

9       Q.    And that's what I wanted to ask you.

10  If that's Dr. Patterson's testimony, do you have

11  any reason to believe that that's not true?

12       A.    He has not done that.

13       Q.    And to clarify any confusion that might

14  be in this record, is it your testimony that

15  Dr. Patterson has not shared with you any of the

16  incidents involving the 2015 allegations of

17  sexual assault on campus?

18       A.    Not to me, no.

19

20

21

22

23

24

25



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16          .    Okay.   And to your knowledge did Scott
17  Colter ever disclose any information to you about
18  this alleged sexual assault in 2015?
19          .    Not to me he did not.
20          Q.   To your knowledge, did Mr. Scott Colter
21  disclose any of the alleged facts and
22  circumstances surrounding the alleged sexual
23  assault in 2015 to anyone, to your knowledge?
24      A.   Not to my knowledge.
25



1                    CHANGES AND SIGNATURE

2    WITNESS NAME:  GARY LOVELESS

3    DATE TAKEN:  APRIL 19, 2022

4    PAGE   LINE   CORRECTION                    REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____



1        I, GARY LOVELESS, have read the foregoing
deposition and hereby affix my signature that
2    same is true and correct, except as noted above.

3                 _____
                  GARY LOVELESS
4
     THE STATE OF TEXAS          )
5    COUNTY OF _____)

6        Before me, _____, on this day
personally appeared GARY LOVELESS, known to me
7    (or proved to me under oath or through
_____) (description of identity card or
8    other document) to be the person whose name is
subscribed to the foregoing instrument and
9    acknowledged to me that they executed the same
for the purposes and consideration therein
10   expressed.

11       Given under my hand and seal of office this
_____ day of _____, 2022.
12
     _____
13
     NOTARY PUBLIC IN AND FOR
14   THE STATE OF TEXAS

15

16

17

18

19

20

21

22

23

24

25



```
 1              REPORTER'S CERTIFICATE
 2          I, Lisa J. Brannon, RPR, CRR, and
 3   Notary Public, do hereby certify that prior to
 4   the commencement of the examination, GARY
 5   LOVELESS was duly sworn by me to testify to the
 6   truth, the whole truth, and nothing but the
 7   truth.
 8          I do further certify that the foregoing
 9   is a verbatim transcript of the testimony as
10   taken stenographically by and before me at the
11   time, place, and on the date hereinbefore set
12   forth, to the best of my ability.
13          I further certify that the signature of
14   the deponent:
15          _X_ was requested by the deponent or a
16   party before the completion of the deposition and
17   that the signature is to be before any notary
18   public and returned within 30 days from date of
19   receipt of the transcript.  If returned, the
20   attached Changes and Signature Page contains any
21   changes and the reasons therefore;
22          ___ was not requested by the deponent
23   or a party before the completion of the
24   deposition.
25          I do further certify that I am neither
```



1  a relative nor employee nor attorney nor counsel

2  of any of the parties to this action, and that I

3  am neither a relative nor employee of such

4  attorney or counsel, and that I am not

5  financially interested in the action.

6          Certified to by me this 6th day of May,

7  2022.

8

9  _____

10  Lisa J. Brannon, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



HIGHLY CONFIDENTIAL

**EXHIBIT**

**5**

June 12, 2018

The Board of Trustees
Southwestern Baptist Theological Seminary

Dear Trustees,

I have watched, over these past weeks since my last correspondence, events unravel that concern me beyond what can be expressed herein. I have been inundated with phone calls, texts and emails from SWBTS employees, trustees, donors and friends as perplexed as I am at what has transpired and the cruel and calloused manner by which it has been carried out.

The very public "trial" of Dr. Patterson, is a travesty beyond anything I have witnessed in my lifetime. The lack of due process is unfortunately the norm in the modern world and lives are destroyed, not by facts, but innuendo and baseless accusations. A mere suggestion of wrongdoing or mischaracterization of events can level a life. Truth is often a casualty of online proceedings and the innocent can be destroyed before raging tides move on to the next victim. Unfortunately this is the template adopted by your chairman Mr. Ueckert.

Mr. Ueckert has abused his position by intimidating the board he leads and he has broken countless bylaws to achieve an outcome he and a handful of others have clearly orchestrated outside the confines of the full board he is bound to operate within. Why is Mr. Ueckert still Chairman given his blatant disregard of fellow trustees, clear failure to adhere to the by laws and arrogant refusal to allow due process?

Mr. Ueckert was unable to accomplish his goal of firing, without benefits, Dr. Patterson at the May 22nd meeting because of justifiable resistance of the full board. He persisted well into the early hours with very little input from Dr. Patterson or staff. You know that because you were there and you know first hand how Mr. Uekert has shamelessly conducted himself.

In order to accomplish what he had failed to do on May 22nd, Mr. Ueckert using the executive committee met on May 30th to override what the full board had already agreed to do. He conveniently waited until Dr. Patterson was out of the country preventing him from defending himself against what we now know were baseless allegations. Had Mr. Ueckert allowed Dr. Patterson the opportunity to respond he would have learned sooner rather than later that there was no substance to the charges. In fact EVERY allegation raised at that meeting, ultimately the so called justification for Dr. Patterson's firing has VERY publicly been disproven. I know of no proceeding outside of lawless dictatorships where the accused is not allowed to defend himself.

The board has a duty to remove Mr. Ueckert immediately for failure to conduct himself according to the bylaws and for using tactics that are intimidating to trustees and deceptive to say the least. While the damage to Dr. Patterson's reputation can not be undone, the board should force Mr. Ueckert to issue a public apology for how he has unethically

LOVELESS 000004

handled these matters and hatefully treated an employee of the seminary with complete disregard and without due process or a remnant of common courtesy. The toxic environment created by Mr. Ueckert unfortunately prevents whole restoration of the Pattersons but the board should at the very least honor what it agreed to do at the May 22nd meeting giving the Pattersons what is right and just.

Failure of the full board to do any less, given the facts not fiction in this case, will require further action I earnestly do not wish to take, but certainly will to insure the hard earned reputation and integrity of an institution I have invested greatly.

It saddens me beyond words that it has come to this, but poor leadership by the chairman of your board has created a mess that must be dealt with. Mr. Ueckert's need to hire a PR firm and attorney to buffer himself under the guise he is protecting SWBTS has not gone unnoticed. There is an up swelling of large donors that are quite concerned with further investment in an institution that would conduct its business in such an illegal and ungodly way, absolutely contrary to the institution we have known under Dr. Patterson's leadership. I am aware of correspondence from the current interim president that leads me to believe he is unconcerned with donor concerns about past and future gifts. I assure you, however, there are agencies in this state that will not be so dismissive. The interim president's condescending response that donors are giving to Southwestern not the Pattersons shows his failure to recognize the intrinsic relationship between donor giving and the donor's faith in strong like-minded leadership. I'm afraid this failure and flippant attitude will gravely affect the future of SWBTS.

Each of you have a duty to protect the mission of SWBTS, its funding and most importantly its students from Mr. Ueckert's reckless undermining, hidden agendas, unethical actions and downright rude behavior. The board of trustees is the only one that can most effectively right the wrongs perpetrated by Mr. Ueckert and must remove him to insure a path forward out of the stench he has left in his wake.

Sincerely,


Gary W. Loveless

LOVELESS 000005

CONFIDENTIAL

## Karen Beard

| | |
|---|---|
| **From:** | Karen Beard |
| **Sent:** | Friday, June 22, 2018 10:57 AM |
| **To:** | fredegoughtx@gmail.com |
| **Cc:** | Gary W. Loveless |
| **Subject:** | FW: This letter is only a first draft!! |
| **Attachments:** | Board - swbts #2.doc; ATT00001.htm |

**EXHIBIT**

**10**

Mr. Gough,

Gary Loveless asked me to forward this DRAFT to you to read and consider.  He's hoping to make a few changes and that you all will sign it together.

Call him to discuss when you get a chance.

Gary's private line is (713) 266-3741 and his cell phone is (713) 816-5315.

**Karen Beard**
Assistant to Gary W. Loveless
Square Mile Energy, L.L.C.
5847 San Felipe, Suite 2900
Houston, TX 77057-3188
713-266-3639 fax
713-302-8532 cell
713-953-3442 direct

**From:** Linda Behan [mailto:LBehan@behangroup.com]
**Sent:** Wednesday, June 20, 2018 3:36 PM
**To:** Stephanie Loveless &Gary Loveless; Gary Loveless
**Subject:** Fwd: This letter is only a first draft!!

FYI please do not send out just for you all to read for your info

Linda Behan
Exe. VP Lindale Pipeline
6125 Airport Freeway, Ste. 200A
Haltom City, Texas. 76117
Email- lbehan@behangroup.com
Col. 1:27-  'Christ in me, my hope of glory!'

Begin forwarded message:

> **From:** susansusango@aol.com
> **Date:** June 20, 2018 at 1:42:49 PM CDT
> **To:** dbehan@behangroup.com, lbehan@behangroup.com

1

LOVELESS000278

CONFIDENTIAL

**Cc:** <scott.colter@birchman.org>, <mhughes@abilene.com>
**Subject: This letter is only a first draft!!**

Dear Dale and Linda,

I have just finished my first draft .. and it is only draft!  I am really tired and I just need some feedback before I go any further.  Thank you.

I have a friend who is an excellent writer -.one of the best I have ever known.  I want to see if he might look over this and help me smooth out the many rough edges I know you will notice.  But before I even give it to him, I need to know if you want a letter as strong as this to be circulated, or do you want me to tone it down some.  I declare, though, that if I don't send something out this strong I don't know how I will contain myself!

I do think that the first two paragraphs need some help, but as I go into the details the letter seems to write itself.

I spoke with Shelby this morning and he explained some of the steps he is pursuing.  He and I both readily acknowledged that his hands need to stay completely away from this letter.  He and I did agree that the more influential names that are signers  .. the greater the impact.  I sincerely think that a letter from the larger financial supporters, combined with the actions he is taking, could have some serious impact at this time.

In truth, I just feel so helpless and I dearly want to do something.

I thank all of you from the bottom of my heart for talking with me and for sharing information regarding how the Pattersons are doing.  Please continue to give them my love and assure them of my prayers for them .. and for you.

Love, Susan

LOVELESS000279

**DRAFT**

June 20, 2018

Rev. Kevin M. Ueckert and Members of the
Executive Committee of the Board of Trustees,
Southwestern Baptist Theological Seminary
Fort Worth, Texas

Dear Mr. Ueckert and Executive Committee Trustees:

Please allow this letter to express our utter disdain for your actions on May 30, 2018 regarding Dr. and Mrs. Patterson.

The illegitimate manner in which that meeting was called and conducted, the ensuing vague and inexplicit statement by the Board of Trustees on May 30, 2018, followed by Kevin Ueckert's personal statement defaming Dr. Patterson on June 1, all point to an unacceptable display of power which is an anathema to the civil and Biblical principles embraced by a moral and honorable people.

The full meeting of the Board of Trustees held on May 22, 2018 determined the professional fate of Dr. Patterson and his relationship with Southwestern Seminary. Proper notice was afforded Dr. Patterson, as he initiated that meeting himself, nonetheless the protocol followed that day was anything but proper. During that long 13-hour session, Dr. Patterson was allowed very limited access to the information provided the Trustees, along with even more limited opportunities to participate in discussions with the Board. Further neither he nor his attorney knew in advance the possibility that such extreme action against him might take place. In fact, prior to that meeting the information disseminated from members of the Trustee Board itself, was that any vote to remove Dr. Patterson was neither anticipated, nor would it be appropriate. If all your actions toward Dr. & Mrs. Patterson had been limited to the events of that day alone, your actions would still have been unwarranted and unacceptable; however, you proceeded further.

LOVELESS000280

Your actions toward Dr. & Mrs. Patterson on May the 30th are as objectionable in their substance as they are legally indefensible in the manner in which they took place. You were well aware at that time that Dr. and Mrs. Patterson were in Germany, preaching at an engagement that had been scheduled months earlier. This fact, apparently for your purposes, presented you with a convenient opportunity to hastily assemble (without full compliance with your By-laws) and take the harshest actions imaginable against Dr. Patterson, without any notice whatsoever. Interestingly, even if a last-minute invitation had been afforded Dr. Patterson, it would have been impossible for him to make even an emergency return to the Seminary.

In legal terms, you conducted an *ex parte* hearing. Such "one-side only" hearings are allowed in our Civil (never in Criminal matters) Courtrooms only when there exists such imminent harm to the petitioner and time is of such an essence, that immediate action must be taken to avoid immediate and irreputable harm. Such was not the case on May the 30th. Rather, the more logical argument is that you assembled and took the action you did regarding Dr. Patterson just because you believed that you could. You are not bound by the same professional standards and ethics that govern attorneys and our Court proceedings. In truth, you are actually bound by higher Biblical standards of honesty and fairness as set forth in Leviticus 19:35-37, sadly your actions attest to the fact that you chose to abandon God's directive that day.

You are already aware of the legal problems associated with your failure to give timely Notice for the May 30th meeting, as required by your By-laws. You are also aware that you failed to give proper Notice regarding the substance of the matters you clearly intended to address. We raise those factors simply to acknowledge the on-going legal significance of such failures.

The May 30, 2018 Statement by the Executive Committee Board refers only to "new information" and "details presented" as justification for the ruthless action taken against Dr. Patterson. To summarily dismiss any individual in as high a position of leadership as that held by Dr. Patterson with a statement so pathetically simplistic as the one released on May the 30th, demonstrates a callus level of disrespect first and foremost towards Dr. Patterson while simultaneously demeaning the institution of Southwestern Seminary itself.

Rev. Kevin Ueckert issued a personal statement on June 1, 2018, in an attempt as he stated, to address a number of questions he received regarding the Executive Committee's actions two days earlier. First, he referred to an incident that allegedly took place in 2003 when Dr. Patterson was President of Southeastern Seminary. However, rather than reveal and explain what such "new information" involved that appeared to have been pivotal to the Executive Committee's actions, Rev. Ueckert states, "this information contradicts a statement previously provided by Dr. Patterson." To this very day, no one outside of the few members of the Executive Committee knows anything whatsoever about the information to which Mr. Ueckert was referring. All anyone knows is that Rev. Ueckert acknowledged the receipt of information which he then unilaterally deemed to have contradicted an earlier statement by Dr. Patterson. And thus with Mr.

Ueckert's statement he was implying the obvious, that Dr. Patterson had earlier lied to the Board of Trustees at its May 22nd meeting. It is doubtful that the true facts of what did or did not occur in 2003 at Southeastern Seminary will ever be known. Countless facts are now available presenting *prima facie* evidence of contradictory statements made by the alleged victim. That is not however, a justification for the Southwestern Board of Trustees' failure to undertake an appropriate and exhaustive investigation to determine the truth of the events that allegedly occurred more than 15 years ago, before it or the Executive Committee acted as they did.

The facts regarding the 2015 Southwestern event referenced by Rev. Ueckert are well known. You knew full well that the female student's allegations of rape were false. You knew full well that she had engaged in consensual sexual activities on at least three separate occasions, and in three separate public buildings with the male student involved. You knew full well that she had texted nude pictures of herself to that male student. You knew full well that she begged Dr. Patterson to not call the police, but he insisted that he would and he did. You knew full well that Dr. Patterson's "breaking her down" statement in his email to the Chief of Campus Security was taken completely out of context in Rev. Ueckert's statement. Had that email been released in its entirety, the truth of Dr. Patterson's statement would have been known -- that he wanted to help her recant her allegations of rape before she made a similar false statement to the police, which would have resulted in a criminal felony conviction on her record for the remainder of her life.

There are only two possible responses to the information set forth in the above paragraph. First, if you reply that you did not know those facts, then your actions toward Dr. Patterson demonstrate a clear and unacceptable rush to judgement, deserving an immediate retraction and an apology. Second, if you did know those facts – and this is far, far more troubling – then it was with premeditation and malice aforethought that you intentionally acted to mislead your public and defame the honorable name of Dr. Patterson. Neither response rises to the level of the legal responsibilities you accepted when you became a Trustee. The legal definition of a trustee is that one acts as a fiduciary on behalf of the individual or institution they serve. This is not an ecclesiastical term with ecclesiastical responsibilities. It is a legal term with legal responsibilities. Your legal obligations to thoroughly investigate and thereafter truthfully present the results of your investigations were woefully, and we submit irresponsibility, ignored on May 22 and May 30, and in the June 1 communicative.

Moreover, Rev. Ueckert, then follows his out-of-context reference to Dr. Patterson's email to the Chief of Campus Security, with his personal statement: "The attitude expressed by Dr. Patterson in that email is antithetical to the core values of our faith and to SWBTS." Rev. Ueckert's statement can only be described as being defamatory on its face. An immediate revocation and apology for that statement is the beginning of the remedial steps which this entire situation merits.

It is our understanding that you are well aware of the true facts surrounding the acquisition and dissemination of the documents referred to by Rev. Ueckert toward the middle of his June 1 statement. For that reason, we know you are already well aware of

LOVELESS000282

the false and misleading manner in which he chose to address those documents. We elect not to discuss the problematic nature of his statements regarding those documents in this letter, other than to note that the actions by the wife of Dr. Patterson's chief of staff in sharing information as she did were neither inappropriate nor unethical, as Rev. Ueckert wrongly asserted.

We conclude by stating the obvious, we wholeheartedly love, support and admire Dr. and Mrs. Patterson. They continue to have our absolute and unwavering support. Your treatment of them is a travesty that must not go unaddressed. We acknowledge that had Dr. Patterson committed an act of moral indiscretion or engaged in illegal financial transactions, then there would have been justification for his removal. In truth, he has done absolutely nothing wrong to merit his dismissal.

We acknowledge that we have been greatly blessed financially by our wonderful God, in ways far beyond anything we could begin to deserve. It has been because of Dr. Patterson's unwavering commitment to proclaiming the entire truth of God's Holy Word in his preaching, teaching and the building up of Southwestern Seminary, that we have enthusiastically given large financial gifts to the Seminary. We have always had complete confidence that under Dr. Patterson's wise stewardship, our financial gifts were Kingdom gifts to the Glory of our Lord and Savior, Jesus Christ.

We are deeply troubled not just by your unacceptable actions toward Dr. & Mrs. Patterson, but by the inexcusable, and we maintain illegal, manner by which you chose to remove Dr. Patterson as President of Southwestern Baptist Seminary. We are saddened beyond words at the defamatory statements made against Dr. and Ms. Patterson. We anticipate that Southwestern Seminary will face grave and perilous consequences both by the Southern Accreditation of Colleges and Schools Board and by the Texas Attorney General's office, as a result of your actions. Please know that it is not out of spite or anger that we say that until the serious wrongs against both Dr. and Mrs. Patterson are righted, we will be unable to continue our support of the Seminary. You can also well understand how impossible it would be for us to ask our friends and colleagues to financially support the Seminary in light of your recent actions. We ask that you retract the false, misleading, and defamatory statements made against Dr. and Mrs. Patterson, apologize for those statements, and restore Dr. and Mrs. Patterson to the proper financial position they held prior to your actions on May 30, 2018.

We appreciate your immediate attention to this letter.

Signed…..

CC:   All Members of the Board to Trustees

LOVELESS000283

CONFIDENTIAL

### Susan G. Oliver
### Attorney at Law

302 St. Paul Drive
Lynchburg, VA 24503
(434) 832-1332 (office)
(434) 942-3870 (cell)
susansusango@aol.com

**CONFIDENTIAL**
**THIS LETTER IS FOR VIEWING BY THE SWBTS TRUSTEES ONLY**

May 16, 2018

Reverend Kevin M. Ueckert
Chairman of the Board of Trustees and all Trustees
of Southwestern Baptist Theological Seminary
Fort Worth, Texas

Dear Reverend Ueckert:

Please allow this correspondence to convey to you and your fellow Trustees my absolute and unwavering support for Dr. Paige Patterson in his position as President of Southwestern Baptist Theological Seminary. I have known and admired Dr. & Mrs. Patterson personally for more than 25 years.

First, please let me say to you and your fellow Trustees how very grateful I am to all of you for your service. It is my sincere belief that SWBTS is the finest of all theological seminaries in the nation, not just amongst the Baptist seminaries, committed to teaching the entire Truth of God's Word. This is an important time in Seminary's history and in the history of our Southern Baptist Convention.

My appreciation for Dr. Patterson's presence and leadership has led to my financial commitment to the Seminary. Within the last year and a half, I have personally signed checks to the Seminary totaling $1,046,000. It was my million-dollar gift that allowed for the complete restoration of Reynolds Auditorium. There is a plaque beside the pictures of Dr. & Mrs. Reynolds acknowledging my anonymous gift. I believe these days to be of such critical importance in the life of the Seminary, that it is imperative for me to share the information of my gifts as I continue to speak of my utmost support for Dr. Patterson and his exemplary leadership. Simply put, had Dr. Patterson not been at the helm of Southwestern Seminary my gifts would have gone elsewhere.

CONFIDENTIAL

Reverend Kevin M. Ueckert
May 16, 2018
Page 2

My friendship with Dr. & Mrs. Patterson began in 1993, when he was President at Southeastern Seminary and I was living in Raleigh and working with the North Carolina Family Policy Council. I had the privilege of forming that state-wide public policy organization associated with Focus on the Family and served as its initial Executive Director. I was invited to speak at the Seminary's chapel service. I wasn't asked to speak a few words, to be followed by a male speaker. I was the primary speaker that morning. And to this day, after speaking to many groups of several thousand and before many judges, my legs have never shaken except in that one instance. I knew the statue of the man sitting behind me on the stage and I knew the honor I was given. My personal experience is merely one of countless similar examples of Dr. Patterson's lifetime commitment to respect, encourage, and support women serving in leadership positions.

I am a fairly new member of the Seminary's Board of Visitors and I decided to audit two on-line two classes this past semester. I chose Dr. Patterson's class on Matthew and Dr. Dickinson's class on Christian Apologetics. Dr. Patterson teaches at an academic level equal to my professors at the University of Virginia School of Law. He hires professors highly credentialed in their respective academic fields. I respectfully submit that the reason the Seminary is able to attract the academically accomplished professors that it does is because Dr. Patterson himself sets the highest bar possible in his pursuit of academic excellence.

I want to address his commentary on Revelation. It took me more than 9 months to read this book. The years of research, writing, editing and prayer that Dr. Patterson dedicated to this treatise are simply impossible for me to process. It was not, however, the academic prose that served as the basis for this book having such a profound impact on my life. The written evidence of Dr. Patterson's heart for the lost and unsaved people of our world, his graphic description of the torture unsaved people will experience without the protection of Jesus' blood, caused me to read about three pages at a time and then stop and pray for my lost family members and friends. Dr. Patterson has the moral courage to tell all who will listen that there is a real Heaven and a real Hell, and each of us will spend eternity in one of those places based on the decisions we make in this life.

Dr. Patterson truly weeps for the lost people in this world. Evangelism is his entire life. He has no greater desire than to preach the good news of God's salvation and help lead people to a saving knowledge of God's grace and mercy. This is the message he proclaims every day as the Seminary's President. Please don't miss this point in the midst of all the hoopla of these last couple of weeks. Academic theological knowledge for the sake of such knowledge is meaningless. Our theological knowledge, as Dr. Patterson preaches, must be the motivation to share the gospel at every possible opportunity. Dr. Patterson exemplifies the life of one dedicated to confessing Christ to every person he meets. To lose a spiritual warrior of his statue would be disastrous.

Reverend Kevin M. Ueckert
May 16, 2018
Page 3

I am sickened to the core of my being by all the recent attacks on Dr. Patterson.  I
am sickened by all the lies and vulgarity aimed at Dr. Patterson.  I am sickened by the
self-serving and pious claims of many women in our denomination.  I am sickened by
Satan's infiltration into the minds of so many individuals who should be able to see these
attacks for what they truly are.  Disguised as a movement aimed at purging our
denomination from men who the accusers assert do not adhere to the "Bible's elevated
view of womanhood," these orchestrated attacks, I respectfully submit, are little more
than a power play by a few individuals currently in positions of significant power seeking
to obtain absolute power.  Please do not fail to notice the convenient timing of these
attacks, arriving immediately before the Seminary's graduation service and as our
denomination gathers next month in Dallas. The strategy is brilliant, while at the same
time embarrassingly simple.

Our secular society today refuses to appreciate the God-breathed dignity that
exists in the life of every child of His creation.  If such individual dignity were
appropriately acknowledged, then individuals with opposing views could debate the
merits of their respective positions and conclude as colleagues, even if one individual
were to completely discredit the views of the other.  Today, it is not simply enough to
discredit an opposing viewpoint, our secular society demands that we must literally
destroy the person himself who holds to an opposing belief.  We see this evident in the
world-wide terrorist attacks occurring all too frequently.  I respectfully submit that this is
what is happening to Dr. Patterson.  His steadfast commitment to the Biblical Truth that
Jesus' atoning death was for all mankind and God's free gift of eternal life is available to
anyone who accepts God's forgiveness, stands in direction opposition to views held by
many in our denomination.  In the eyes of Dr. Patterson's opponents, he must be removed
as Seminary President in order to ensure that his beliefs are eliminated.

I do not care if 3100 women sign a letter in opposition to Dr. Patterson.  I do not
care one wit if 31,000 women were to sign the letter.  The Bible teaches clearly in
Numbers 13 and 14 that just because a majority, even a super majority, of individuals
believe something to be true does not make it true.

I have a unique perspective on this issue because I live in Lynchburg and I know
the primary individual attacking Dr. Patterson.  At the forefront of these mean-spirited
attacks is a Liberty University English Professor, Ms. Karen Swallow Prior.  In recent
days she has acknowledged her role as an author of the letter (and petition) to you, Dr.
Ueckert and has assumed the role as spokesperson with her statements in the *Washington
Post*, appearing on NPR, and generating her own social media blogs.

As an attorney, I ask why anyone would be willing to believe her rhetoric (as
many have appeared to do) without first inquiring if she is an individual who speaks
God's Truth in her personal life and in her activities at Liberty.  I encourage you to go to

LOVELESS000286

Reverend Kevin M. Ueckert
May 16, 2018
Page 4

Google and type in "Being Gay at Jerry Falwell's University" and you will find an article
bearing that title. This article appeared in the Atlantic magazine in April of 2013 and is
written by a former student at Liberty. Ms. Prior is mentioned throughout. I have
firsthand knowledge from students who were in college with the author who report of his
excitement upon receiving Ms. Prior's support and encouragement for his new-found
"gay" lifestyle. Ms. Prior's counseling and encouragement was far more extensive than
this article sets forth. Also, if you Google "Pulpit & Pen" you will see an article dated
February 12, 2018, regarding Ms. Prior's views on immigration and the author describes
her as follows: "[She] …is a radical animal rights activist who believes animals go to
Heaven because naming them gives them personhood, says she's more upset over animal
abuse than abortion, says abortion isn't murder and calling it such is unchristlike,
promoted erotic gay literature and has attended gay fundraisers and uses gay-affirming
language. She calls herself a feminist and attacks complementarianism as unbiblical."

Ms. Prior references two short statements totaling about fifteen minutes (which
were explained and apologized for) from decades of Dr. Patterson's sermons as evidence
for her assertion that he is a "leader with an unbiblical view of authority, womanhood and
sexuality [and should not] be allowed to continue in leadership." I respectfully submit
that her statement is as intellectually dishonest as it is evil. I find it alarming that any
credence whatsoever would be afforded a woman whose personal words and professional
actions are an anathema to Biblical Truth.

I will close with my favorite quote from Martin Luther:  If I profess with the
loudest voice and clearest exposition every portion of the truth of God except precisely
that point which the world and the devil are at the moment attacking, I am not confessing
Christ, however boldly I may be professing Christ. Where the battle rages, there the
loyalty of the solider is proved.

Thank you for your consideration of my thoughts. Please feel free to contact me
using the information at the top of this letter. I would be sincerely delighted to talk with
you and any of the Trustees. You will remain in my prayers.

Respectfully,

(Signed)

Susan G. Oliver

HIGHLY CONFIDENTIAL

EXHIBIT

29

**From:** <gloveless@sqmenergy.com>
**Subject: See attached letter to Mr. Ueckert & Executive Committee**
**Date:** June 29, 2018 at 3:16:26 PM CDT
**To:** <bart@fbcfarmersville.com>, <jcrook@bpbc.com>, <wdickard@aol.com>,
<dewing127@gmail.com>, <kirkland4christ@gmail.com>, <plevant@yahoo.com>,
<andrempalmer4@gmail.com>, <jocharuble@embarqmail.com>, <tom@eastwoodbc.org>,
<tpulley@plainscapital.com>, <pastor@fbcestancia.com>, <danny@nrhbc.org>, <kbowman@hpbc.org>,
<jhorn@namb.net>, <charleshott940@aol.com>, <leonstamm@aol.com>, <pkim@sbc.net>,
<Jamie.green@sbcglobal.net>, <Guy@therelationshipwarehouse.com>,
<connie@springborobaptist.org>, <tmhindman@charter.net>, <jaaronkelly@hotmail.com>,
<jdleeman@gmail.com>, <maron_e@comcast.net>, <CRMartinMD@aol.com>,
<eddie@sierrabaptists.com>, <pastormikefbc@valliant.net>, <mark@fsbcg.org>,
<ron@olivetwichita.com>, <bluriverhouse@gmail.com>, <hreavis@njbc.org>, <updom44@yahoo.com>,
<tynesgeorge@aol.com>, <donwhorton@gmail.com>, <calvinwittman@msn.com>,
<pastornth@gmail.com>, <kueckert@fbcgt.org>

Please see the attached letter to Mr. Ueckert & the Executive Committee.

GWL

LOVELESS 000049

HIGHLY CONFIDENTIAL

**Gary W. Loveless**
**5847 San Felipe, Suite 2900**
**Houston, Texas 77057**
**713-266-3741**
**gloveless@sqmenergy.com**

June 29, 2018

Mr. Kevin M. Ueckert and Members of the
Executive Committee of the Board of Trustees
Southwestern Baptist Theological Seminary
Fort Worth, Texas

Dear Mr. Ueckert and Executive Committee Members:

Please allow this letter to express our utter disdain for your actions on May 30,
2018, regarding Dr. Paige Patterson.

The illegal manner by which that meeting was called and conducted, your
statement on May 30, 2018 which was completely devoid of any specific charge against
Dr. Patterson, followed two days later by Kevin Ueckert's statement defaming Dr.
Patterson, all point to an abuse of power which is anathema to the moral and ethical
principles embraced by an honorable people.

The full meeting of the Board of Trustees held on May 22, 2018 determined the
professional fate of Dr. Patterson and his relationship with Southwestern Seminary.
Proper notice was afforded to Dr. Patterson, as he initiated that meeting himself,
nonetheless the protocol followed that day was anything but proper. Your failure to
afford even a modicum of due process to Dr. Patterson was a complete miscarriage of
justice. During that long 13-hour plus session, Dr. Patterson and his staff were allowed
very limited access to the information provided the Trustees, along with even more
limited opportunities to be present and participate in discussions with the Board. Further,
neither Dr. Patterson nor his attorney knew in advance the possibility that such extreme
action against him would take place. In fact, prior to that meeting the information
disseminated from members of the Trustee Board itself, was that any vote to remove Dr.
Patterson was neither anticipated, nor would it be appropriate.

With the one exception of not agreeing to meet with the Executive Committee
prior to the May 22nd full Trustee Board meeting, Dr. Patterson has never in all his time
at the Seminary ever refused to meet with either the Executive Committee or full Board
upon receiving such a request. On those few occasions when he was away from the

LOVELESS 000050

Mr. Kevin Ueckert
June 29, 2018
Page 2

Seminary, he always assured that a member of his cabinet was in attendance. The allegations made by Bart Barber on the floor at the SBC Convention were contrary to those facts and thus, in our opinion, were false and slanderous. Further, the fact that the presiding president, Steve Gaines, allowed such unacceptable statements to continue as he did without Mr. Barber being ruled out of order was, to our knowledge, the first time that a presiding officer of the SBC Convention has so flagrantly ignored the rules of the Convention to allow fallacious personal attacks by one member against another.

If all your actions toward Dr. Patterson had been limited to the events of May 22, 2018, your actions would have been completely unwarranted and unacceptable; however, you proceeded further. Your actions toward Dr. Patterson on May the 30th are as indefensible in their substance as they are legally illegitimate in the manner in which they took place. You were well aware at that time that Dr. and Mrs. Patterson were in Germany, and that he was preaching at an engagement that had been scheduled months earlier. This fact, apparently for your purposes, presented you with a convenient opportunity to hastily assemble (in complete violation of your By-laws) and take the most severe actions imaginable against Dr. Patterson, *without affording him or his counsel any notice whatsoever.* Interestingly, even if Dr. Patterson had independently learned of your May 30th meeting, it would have been impossible (as you well knew) for him to have made an emergency return to the Seminary. We submit that you conceived and executed your plan to remove Dr. Patterson in the darkest of secrecy.

In legal terms, you conducted an *ex parte* hearing. Such "one party only" hearings are allowed in our civil courtrooms only when there exists such imminent harm to the petitioner and time is of such an essence, that immediate action must be taken to avoid perilous and irreputable harm. Such was not the case on May the 30th. *Rather, the only assumption to be drawn is that you assembled and took the action you did regarding Dr. Patterson because you believed that you could.* You are not bound by the same professional ethics that govern attorneys and our Court proceedings. In truth, you are actually bound by higher Biblical standards of honesty and fairness as set forth in Leviticus 19:35-37, which sadly, as your actions attest, you chose to abandon that day.

You are well aware of the legal problems associated with your failure to give timely Notice for the May 30th meeting, as required by your By-laws. You are also aware that you failed to give proper Notice regarding the drastic action you intended to address and thereafter take. We highlight those failures to acknowledge their on-going legal significance. We anticipate that as a result of your actions that day, the Seminary will face significant consequences both from its accrediting board, the Southern Association of Colleges and Schools, and the Texas Attorney General's office.

The May 30, 2018 Statement by the Executive Committee Board refers only to "new information" and "details presented" in a vague attempt to explain your

LOVELESS 000051

Mr. Kevin Ueckert
June 29, 2018
Page 3

indefensible actions against Dr. Patterson. We note the careful selection of your words,
you state that this new information involved a situation that occurred "**during** Dr.
Patterson's presidency at another institution," (emphasis added) but you intentionally
(and we might add, correctly) did not state that the situation involved Dr. Patterson
himself. We submit you chose your words as you did because while you knew Dr.
Patterson had not done anything wrong, you nonetheless wanted to create the impression
that he had. Your statement, while it clearly demonstrates a callus level of injustice and
dishonesty towards Dr. Patterson himself, of equally great harm is the damage it does to
the integrity of Southwestern Seminary itself.

Two days later, Mr. Kevin Ueckert issued a personal statement on June 1, 2018,
attempting, as he stated, to address a number of questions he received regarding the
Executive Committee's actions. First, (as noted above) he referred to an incident that
allegedly took place when Dr. Patterson was President of Southeastern Seminary.
However, rather than reveal and explain in any detail what such "information" involved
that appeared to have been pivotal to the Executive Committee's actions, Mr. Ueckert
states, "this information contradicts a statement previously provided by Dr. Patterson."
To this very day, no one outside of the few members of the Executive Committee knows
anything whatsoever about the information to which Mr. Ueckert was referring, although
requests for that information have been repeatedly made by Dr. Patterson and his counsel
and have been repeatedly denied by you.

All anyone knows is that Mr. Ueckert acknowledges the receipt of "information"
which he then unilaterally declares to have contradicted an earlier statement by Dr.
Patterson. Mr. Ueckert's statement implies the obvious, that Dr. Patterson had earlier lied
to the Board of Trustees at its May 22nd meeting. Mr. Ueckert's failure to provide any
details, facts, or any documentation to support his claim of a "contradictory" statement
having been made by Dr. Patterson obviates his assertion.

We are not aware that you made any request of Dr. Patterson for any information
or documents regarding the alleged 2003 Southeastern event to which Mr. Ueckert refers
in his June 1 statement, prior to the May 22nd meeting or prior to the May 30th meeting.
Dr. Patterson, when told about the alleged event at Southeastern during the May 22
meeting, honestly stated on that day that he had no recollection of the event as you
described it to him. You have no proof whatsoever that he was not speaking honestly
when he stated on May the 22nd that he had no such recollection.

It appears from Mr. Ueckert's June 1 statement that discussion of this alleged
Southeastern 2003 event resurfaced during the May 30th meeting. We reiterate our earlier
point, at no time prior to the May 30th meeting did you ask for any information or
documentation whatsoever from Dr. Patterson or from Southwestern Seminary regarding
that alleged 2003 event: however, it is readily apparent from Mr. Ueckert's statement that

LOVELESS 000052

Mr. Kevin Ueckert
June 29, 2018
Page 4

there were private and secretive discussions with individuals from Southeastern
Seminary.

Further, to Mr. Ueckert's assertion in his June 1 statement that Dr. Patterson
improperly took documents "upon his departure from Southeastern," we are well aware
that you are equally aware of the true facts surrounding the acquisition and dissemination
of the four documents referred to in his statement. These "documents" were among the
hundreds of personal letters that Dr. Patterson brought with him from his years at
Southeastern as part of his personal keepsakes.  On Tuesday, May 29, 2018, individuals
at Southwestern, upon looking into Dr. Patterson's personal keepsakes, located
correspondence between Dr. Patterson and Megan Lively (then Nicholas).  First, there is
*a personal letter dated, April 15, 2003 written from Megan Nicholas to Dr. Patterson
acknowledging that whatever event that did occur in 2003, all matters associated with it
were handled by Dr. Mosely and not by Dr. Patterson.* Dr. Patterson's reply of April 21,
2003, was kind and affirming of his confidence in her and the Lord.  A second written
exchange occurred three months later, when Megan again wrote to Dr. Patterson on July
23, 2003, sharing her thoughts about "how blessed the Southwestern faculty and
students" were going to be to have him as their President.  Dr. Patterson replied on July
30, 2003, thanking her for her "precious words of encouragement" and assuring her of his
continued prayers.

Those four personal letters, based upon a clear reading of them on their face,
confirm Dr. Patterson's statements to the full Trustee Board that he did not recall
anything associated with this event because he did not personally meet with this student
nor did he have any involvement in the alleged events that took place in her life at that
time. More importantly, their exchange revels a very affirming and favorable relationship
that they had with one another.  If you had you asked for any information or written
documentation between these parties, prior to your May 30th meeting, the personal
correspondence between Dr. Patterson and Ms. Nichols would have been provided.

Sadly, rather than accept responsibility for the Executive Committee's own
shortcomings, Mr. Ueckert wrongly asserts that the release of those letters by Sharayah
Colter, the wife of Dr. Patterson's chief of staff, was inappropriate and unethical.  In
truth, it was her courageous act in publishing those letters, along with her narrative, that
can best be described as "having struck the match that lit the first candle" of shedding
light on the darkness of your unconscionable actions.

It is doubtful that the true facts of what did or did not occur in 2003 at
Southeastern Seminary will ever be known. Countless facts are now available, of which
you are aware, presenting *prima facie* evidence of contradictory statements made
by the alleged victim. All told, there is no justification for the Southwestern Executive
Committee's failure to undertake an exhaustive investigation, including but not limited to

LOVELESS 000053

Mr. Kevin Ueckert
June 29, 2018
Page 5

extensive discussions with Dr. Patterson, in an effort to determine the truth of the events
that allegedly occurred more than 15 years ago at another institution, before acting as
irresponsibly as it did on May 30, 2018.

In contrast, the facts regarding the 2015 Southwestern event referenced by Mr.
Ueckert in his June 1 statement are well known. It is our understanding that you knew
full well that the female student's allegations of rape were false, that she had engaged in
consensual sexual activities on more than one occasion and those acts had taken place in
public buildings at the Seminary, and that campus security were shown the nude pictures
she texted to the male student. It is our further understanding that you knew full well that
she begged Dr. Patterson to not call the police, but he insisted that he would and he did so
within six minutes of hearing her allegation.

At the meeting of the Board of Trustees held on May 22, 2018, the email
subsequently referenced by Mr. Ueckert in his June 1 statement was presented to the
Trustee Board and discussed thoroughly. This email was written by Dr. Patterson to the
Chief of the Campus Security a full *five weeks after* he first met with the female student
and reported her allegation to the police. The full Board understood and accepted Dr.
Patterson's explanation of the phrase "breaking her down" that appeared in that email as
being a statement of his desire to meet with her (without the police present, but clearly, as
was always his practice, with other Seminary personnel present) and attempt to help her
recant her false allegations of rape before she continued with such false statements to the
police. While the actual sentence for a criminal conviction of making a false statement to
the police may vary from jurisdiction to jurisdiction, the criminal offense itself remains a
permanent mark on an individual's record.

The statement issued by the Board of Trustees on May 23rd is evidence that the
Trustee Board accepted Dr. Patterson's explanation and appropriately exonerated him
fully of all matters associated with the 2015 Southwestern event.

It is obvious from Mr. Ueckert's June 1 statement that discussion of that email
and the 2015 Southwestern event resurfaced at your May 30th meeting, although no direct
reference was made to it in your statement of that day. Mr. Ueckert's decision to *release
neither the full email nor the complete explanation provided by Dr. Patterson*, but rather
to release only the three-word phase, "breaking her down," can only be viewed as one of
the most perfidious, dishonorable, and manipulative ploys ever conceived to disseminate
false and deceptive information.

The only assumption that can be drawn is that Mr. Ueckert, in his June 1
statement, acted in a premeditated manner and with malice aforethought to intentionally
mislead others, while simultaneously defaming and disparaging the honorable name of
Dr. Patterson. It surely stretches the imagination to think that Mr. Ueckert would not

LOVELESS 000054

Mr. Kevin Ueckert
June 29, 2018
Page 6

have known in advance that by selectively using the phrase of "breaking her down" (without the complete explanation that earlier had been accepted by the full Board), that his phrase would be immediately and enthusiastically embraced by the media to further expand their false narrative and image of Dr. Patterson as gravely as possible.

Mr. Ueckert, with the release of that three-word portion of the email in the deceitful manner in which he did, thereby attempted to create out of whole cloth the foundation for his next statement, which we contend is the most abhorrent of all: "The attitude expressed by Dr. Patterson in that email is antithetical to the core values of our faith and to SWBTS." Mr. Ueckert's actions were alarming. The statement is patently false, and we submit that Mr. Ueckert knew it was false at the time he made it.

We submit that Mr. Ueckert should bear personal responsibility for the irreputable harm his statements created. We further submit that all the members of the Executive Committee, as trustees of the Seminary, bear equal responsibility for allowing his statements to go uncorrected and by failing to so act, they gave their blessings to his statements. The legal definition of a trustee is that of one who acts in a fiduciary capacity on behalf of the individual or institution they serve. This is not an ecclesiastical term with ecclesiastical responsibilities. This is a legal term with legal responsibilities. Your legal fiduciary obligations to speak truthfully and act honorably, in all your actions and in all matters involving your association with the Seminary, we submit, were grievously and irresponsibly ignored from May 23 forward.

Dr. and Mrs. Patterson continue to have our absolute and unwavering support. They are both esteemed scholars and were stately ambassadors for the Seminary. Your treatment of them is a travesty that must not go unaddressed. You have clearly failed to produce any convincing documentation for so drastic an action, against so significant an individual, in so sudden and short a period of time. Moreover, we submit, there is now evidence that acts of a dishonest and disreputable nature occurred.

We acknowledge that we have been greatly blessed financially by our wonderful God, in ways far beyond anything we could begin to deserve. It has been because of Dr. Patterson's unwavering commitment to proclaiming the entire truth of God's Holy Word in his preaching, teaching and the building up of Southwestern Seminary, that we have enthusiastically given large financial gifts to the Seminary. We have always had complete confidence that under Dr. Patterson's wise stewardship, our financial gifts were Kingdom gifts to the Glory of our Lord and Savior, Jesus Christ. We believe our investment in the Seminary has been substantial in the commitment of our time, talents, prayers, and financial support. Our past financial gifts to the Seminary total in the millions of dollars. Our future possible gifts, and bequests from our estates, we estimate could be well in excess of tens of millions of dollars.

LOVELESS 000055

HIGHLY CONFIDENTIAL

Mr. Kevin Ueckert
June 29, 2018
Page 7

        Please know that until the serious wrongs against Dr. and Mrs. Patterson are
righted, we will be unable to continue our financial support of the Seminary.

        We ask that the full Board of Trustees meet forthwith, and in accordance with its
fiduciary responsibilities, appoint an investigative committee to review thoroughly all
recent actions involving Dr. Patterson.  The By-laws allow a majority of the members of
the full Trustee Board to call such a meeting and thus the convening of the full Board
does not rest solely in the hands of its chairman.   We ask that the composition of this
investigative committee consist of ten individuals - five members selected by the full
Board of Trustees, from either the Trustee Board or from individuals officially associated
with the Seminary, and five individuals to be selected by the signatories of this letter. The
chairman of the Board of Trustees shall not serve as an *ex officio* member.

        If the results of this investigation fail to substantiate the allegations made and the
actions taken against Dr. Patterson, or if the investigation reveals evidence of dishonest
or deceptive activity by anyone associated with the recent actions taken against Dr.
Patterson, then it will be incumbent upon the full Board of Trustees to instruct Mr.
Ueckert and the Executive Committee to revoke its earlier statements, publicly apologize
to Dr. Patterson, and for the full Board of Trustees to restore Dr. Patterson to the financial
position he held at the conclusion of the May 22nd meeting. Should the Board of Trustees
elect to take the restorative action as noted herein, without creating the investigative
committee we request, we would be pleased with that action.

        We, as our names are listed below, are all co-signatories to this letter and we
appreciate your immediate attention to the issues we raise.

                                Sincerely,

                                Gary W. Loveless

Susan G. Oliver                         Stephanie Loveless
Dale & Linda Behan                      Maudi Eudora Fleming
John St. John                           Curtis & Oneta Tally
JC Humphrey                             Jim & Dorothy Merritt
Mollie Allen                            Fred & Pam Gough
Jim & Elaine Hastings                   Danielle Dearing
Richard & Gina Hendrick                 Brown & Barbara Adkins
Leonard & Lynette Hruzek                Mike & Zan Prince
CC:    Southwestern Baptist Theological Seminary Board of Trustees

LOVELESS 000056