UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| JANE ROE | § | |
| | § | |
| v. | § | CIVIL NO. 4:19-CV-179-SDJ |
| | § | |
| LEIGHTON PAIGE PATTERSON, | § | |
| ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Leighton Paige Patterson's Motion for Summary Judgment and Brief in Support, (Dkt. #504), and the parties' subsequent briefing on the motion, (Dkt. #516, #523). Also before the Court is Plaintiff Jane Roe's Corrected Objections and Motion to Strike Leighton Paige Patterson's Summary Judgment Evidence, (Dkt. #520). After full consideration, the Court will deny both motions.

## I. BACKGROUND

### A. Factual Background

Southwestern Baptist Theological Seminary ("SWBTS") is a private nonprofit institution of higher education and is one of the largest seminaries in the world. (Dkt. #223 ¶¶ 16, 19). Defendant Leighton Paige Patterson served as SWBTS's president from 2003 to 2018. (Dkt. #223 ¶¶ 39, 110). Plaintiff Jane Roe enrolled as an undergraduate student at SWBTS in the fall of 2014 after being drawn to the school because of its commitment to conservative Christian beliefs. (Dkt. #223 ¶ 44). Roe alleges that, after her arrival on campus, she became the victim of repeated stalking, physical abuse, sexual abuse, and threats of violence toward herself and her

1

family at the hands of John Doe, a fellow student and student-employee at SWBTS. (Dkt. #223 ¶¶ 47–75).

Roe reported the sexual assaults to Patterson and SWBTS in August 2015, months after the assaults had allegedly occurred. (Dkt. #223 ¶¶ 76–78). Patterson notified the police, and Roe provided a statement to the responding officer. (Dkt. #223 ¶¶ 80, 82). During the ensuing investigation, university officials discovered a cache of firearms in Doe's room. (Dkt. #223 ¶ 83). SWBTS expelled Doe from the university for violating its campus firearms policy. (Dkt. #223 ¶ 84). He later died.

Several weeks after Roe first reported the assaults, Patterson emailed a SWBTS staff member that he planned to meet with Roe again to "break her down." *See* (Dkt. #223 ¶ 89). At the meeting, Patterson confronted Roe with Doe's version of events: that Roe and Doe's relationship was consensual and that Doe possessed proof in the form of nude photographs of Roe. (Dkt. #223 ¶¶ 90–97). Roe responded that she had not consented to a relationship with Doe, nor to being photographed. (Dkt. #223 ¶ 98). Shortly after the meeting, Roe withdrew from SWBTS. (Dkt. #223 ¶ 103).

Nearly three years later, in May 2018, the SWBTS board of trustees fired Patterson, citing in part his handling of Roe's allegations. (Dkt. #223 ¶¶ 107–112). Seeking Patterson's reinstatement, a group of donors wrote to the board. (Dkt. #223 ¶ 116). Prepared by Gary Loveless and Susan Oliver,[1] the donors' letter (the "Loveless

---

[1] Sometime after the events underlying this suit, Susan Oliver married and changed her last name to Pearson. *See* (Dkt. #516 at 14 n.3). For clarity, the Court will continue to refer to Susan Oliver by her maiden name.

Letter") was intended "to express [the signatories'] utter disdain for [SWBTS's] actions" in terminating Patterson's employment. (Dkt. #516-4 at 1). Among other things, the letter called into question Roe's allegations and defended Patterson's handling of those allegations:

> In contrast, the facts regarding the 2015 Southwestern event referenced by Mr. Ueckert in his June 1 statement are well known. It is our understanding that you knew full well that the female student's allegations of rape were false, that she had engaged in consensual sexual activities on more than one occasion and those acts had taken place in public buildings at the Seminary, and that campus security were shown the nude pictures she texted to the male student. It is our further understanding that she begged Dr. Patterson to not call the police, but he insisted he would and he did so within six minutes of hearing her allegation.

(Dkt. #516-4 at 5). Regarding the "break her down" email, the letter says:

> The full Board understood and accepted Dr. Patterson's explanation of the phrase "breaking her down" [sic] that appeared in that email as being a statement of his desire to meet with her (without the police present, but clearly, as was always his practice, with other Seminary personnel present) and attempt to help her recant her false allegations of rape before she continued with such false statements to the police. While the actual sentence for a criminal conviction of making a false statement to the police may vary from jurisdiction to jurisdiction, the criminal offense itself remains a permanent mark on an individual's record.

(Dkt. #516-4 at 5).

The Loveless Letter was distributed directly to more than 270 individual email recipients, including SWBTS faculty and alumni and church leaders. (Dkt. #516 at 12). It was then forwarded to media outlets and posted on social media. (Dkt. #516 at 12).

## B. Procedural History

Roe sued Patterson and SWBTS in March 2019, bringing negligence and various other claims against each. *See* (Dkt. #1). She later added defamation claims against both Defendants. *See* (Dkt. #223 at 29). Relevant here are Roe's defamation claims based on the Loveless Letter. Although the Loveless Letter was not directly drafted by Patterson, SWBTS, or their employees, Roe maintains that they are responsible for its allegedly defamatory content. *See* (Dkt. #223 ¶¶ 116). Roe argues that Patterson was involved in the Loveless Letter through Scott Colter, Patterson's former chief of staff and personal assistant. (Dkt. #288 at 17–18). Roe argues that SWBTS was involved in the letter through its employees Scott Colter, Candi Finch, Dean Nichols, and John Nichols. (Dkt. #295 at 32).

Patterson and SWBTS each moved for partial summary judgment, and the Court granted summary judgment for Defendants on all claims—including Roe's defamation claims based on the Loveless Letter. (Dkt. #454 at 40); (Dkt. #462 at 51). As to Patterson, the Court found that "neither Gary Loveless, Susan Oliver, nor Scott Colter were agents of Patterson during the preparation and publication of the Loveless Letter." (Dkt. #462 at 42). The Court held that absent this principal–agent relationship, Patterson could not be held liable for the allegedly defamatory content of a letter he did not draft. (Dkt. #462 at 42–43). As to SWBTS, the Court took a different approach. Roe alleged, and SWBTS did not dispute, that its employees were involved in the preparation of the Loveless Letter. (Dkt. #462 at 47–48). Thus, unlike with Patterson, a principal–agent relationship *did* exist between SWBTS and

4

individuals involved in preparing the Loveless Letter. However, the Court found that those individuals—SWBTS employees—were acting outside the scope of their employment with SWBTS in preparing the letter. (Dkt. #462 at 48). Indeed, the Loveless Letter was "made directly *against* the interests of SWBTS, criticizing the institution for what the authors viewed as SWBTS's improper actions in terminating Patterson." (Dkt. #462 at 45). Thus, the Court held that the allegedly defamatory content of the Loveless Letter could not be attributed to SWBTS.

Roe appealed. The Fifth Circuit affirmed most of the Court's "comprehensive and well-reasoned opinions," saying: "We primarily agree with the district court's analysis and do not feel the need to address most of Roe's challenges, many of which are not responsive to the district court's decisions." *Roe v. Patterson*, No. 23-40281, 2024 WL 1956148, at *1 (5th Cir. May 3, 2024). However, the Fifth Circuit broke from this Court's judgment on one issue: With regard to the Loveless Letter, it found that "the summary judgment evidence creates a genuine issue over whether Colter was indeed acting as Patterson's agent." *Id.* at *2. Even still, the court found that it was unclear under Texas law "whether, assuming agency, Patterson can be liable for the allegedly defamatory statements in the letter." *Id.* Thus, the Fifth Circuit certified two questions to the Texas Supreme Court:

1. Can a person who supplies defamatory material to another for publication be liable for defamation?

2. If so, can a defamation plaintiff survive summary judgment by presenting evidence that a defendant was involved in preparing a defamatory publication, without identifying any specific statements made by the defendant?

*Id.* at *3.

The Texas Supreme Court answered yes to both questions. *Roe v. Patterson*, 707 S.W.3d 94, 96 (Tex. 2025). As to the first, the Supreme Court held that "a person who supplies defamatory material to another for publication may be liable if the person intends or knows that the defamatory material will be published." *Id.* Applying this principle here, "Roe must show that Colter [(Patterson's putative agent)] intended or knew that the defamatory statements in the [Loveless Letter] would be published." *Id.* at 99.

As to the second question, the Texas Supreme Court held that "a plaintiff may survive summary judgment without identifying the specific statements the defendant made in supplying the defamatory material if the evidence is legally sufficient to support a finding that the defendant was the source of the defamatory content." *Id.* at 96. "Evidence that the defendant was the source of defamatory content may include proof that the defendant made the same defamatory statement to others, that the defendant had unique or personal knowledge of the defamatory content and its details, or that the publishers relied on the defendant to support the truthfulness of the allegedly defamatory statements." *Id.* at 101. The plaintiff may meet its burden through direct or circumstantial evidence, but "[e]vidence that amounts to mere speculation or surmise does not suffice to survive summary judgment." *Id.*

After receiving the Texas Supreme Court's answers to its certified questions, the Fifth Circuit "vacate[d]" this Court's judgment "with respect to Roe's defamation claim" and remanded for further proceedings. *Roe v. Patterson*, No. 23-40281, 2025 WL 673436, at *1 (5th Cir. Mar. 3, 2025). The Court then held a status

conference and ordered the parties to submit supplemental briefing on the scope of remand. Specifically, the Court asked the parties to address "whether, with regard to the remaining defamation claim, the Fifth Circuit vacated this Court's judgment only as to Patterson or as to Patterson and [SWBTS]." (Dkt. #484 at 2).

After receiving the parties' briefing on the scope of remand, the Court issued an order clarifying that "the Fifth Circuit vacated the Court's defamation judgment only as to Patterson, and only as to the Loveless Letter." *Roe v. Patterson*, No. 4:19-CV-179-SDJ, 2025 WL 3443239, at *5 (E.D. Tex. Dec. 1, 2025). "That is, the Fifth Circuit only revived Roe's defamation claim against Patterson based on the Loveless Letter." *Id.* The Court further clarified that "[a]ll claims against SWBTS have been, and remain, dismissed." *Id.*

Around the same time, Patterson moved for leave to file another summary-judgment motion addressing "now-clarified Texas law" on defamation. *See* (Dkt. #487). The Court granted his request. (Dkt. #501). Now before the Court is Patterson's summary-judgment motion on the one remaining defamation claim in this case.

## II. LEGAL STANDARD

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd ex. rel. Est. Of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). If the moving party presents a motion for summary judgment that is properly supported by evidence, "the

7

burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).

Because Federal Rule of Civil Procedure 56 requires that there be no "genuine issue of *material* fact" to succeed on a motion for summary judgment, "the mere existence of *some* alleged factual dispute" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (first emphasis omitted). A fact is "material" when, under the relevant substantive law, its resolution might govern the outcome of the suit. *Id.* at 248. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton*, 232 F.3d at 477.

Courts consider the evidence in the light most favorable to the nonmovant, but the nonmovant may not rely on mere allegations in the pleading; rather, the nonmovant must respond to the motion for summary judgment by providing particular facts showing that there is a genuine issue for trial. *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000). If, when considering the entire record, no rational jury could find for the nonmoving party, the movant is entitled to summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

8

### III. DISCUSSION

## A. Motion for Summary Judgment

Patterson raises two issues in his summary-judgment motion. The first issue is "[w]hether Plaintiff has adduced evidence sufficient to raise a genuine issue of material fact that Dr. Patterson, either personally or through a purported agent, was the source of any allegedly false and defamatory statement in the Loveless Letter and intended or knew that the statement would be published." (Dkt. #504 at 2). Patterson's second issue is "[w]hether Plaintiff has adduced evidence sufficient to raise a genuine issue of material fact as to the requisite degree of fault" for defamation liability. (Dkt. #504 at 2). For the reasons below, there exists a genuine issue of material fact as to both issues. Accordingly, the Court will deny Patterson's summary-judgment motion.

### i. Source of the Allegedly Defamatory Material

Patterson argues that "there is no evidence that [he] or any alleged agent was the source of the allegedly defamatory content" in the Loveless Letter. (Dkt. #504 at 9). In support of his argument, Patterson alleges that Susan Oliver—the drafter of the allegedly defamatory statements in the Loveless Letter—"did not communicate with Dr. Patterson or Mr. Colter about the allegedly defamatory content at any time." (Dkt. #504 at 12); *see also* (Dkt. #519-9 at 14) (Colter deposition testimony, denying that he provided information to the Loveless Letter drafters regarding Jane Roe); (Dkt. #509-9 at 3) (Patterson deposition testimony, denying knowledge of the Loveless Letter before its publication); (Dkt. #509-7 at 30–31) (Loveless deposition

9

testimony, denying that Colter provided substantive information used in the Loveless Letter); (Dkt. #516-70 at 9–10) (Oliver deposition testimony, explaining that she does not recall whether she drafted any portion of the Loveless Letter). According to Patterson, Colter's involvement with the Loveless Letter was limited to "providing 'email addresses' and '[p]rocedural things for the board.'" (Dkt. #504 at 5–6) (quoting Loveless deposition testimony).

Patterson's position cannot be reconciled with the record, which is replete with evidence of Colter's involvement with the Loveless Letter—involvement that went beyond mere procedural assistance. While drafting her portion of the Loveless Letter, Susan Oliver sent several emails to Gary Loveless (her co-drafter) and Dale and Linda Behan (signatories to the letter)—with Scott Colter occasionally copied—in which she references Colter's substantive assistance with the letter. In one such email, Oliver writes:

> I am trying to be especially careful about only addressing the allegations which we can back up with evidence. *Speaking of which – I do need Scott Colter to call me so I can verify the information about the 2015 event.* I'm sure he will.

(Dkt. #516-31 at 1) (emphasis added). Patterson does not dispute that "the 2015 event" referenced in this and other emails is the alleged sexual assault of Jane Roe, and Patterson's handling of that situation. *See* (Dkt. #523).

In a later email to Loveless and the Behans, Oliver explains that she "just talked with Scott Colter," who "suggested that if our letter were to enter the public arena before the 9th, that would help the Pattersons greatly." (Dkt. #516-32). Oliver goes on to tell the group they can "expect another draft" because she has "Scott's

10

additional info about the 2015 event." (Dkt. #516-32). Additional emails from Oliver similarly suggest Colter's substantive involvement with the letter and provision of information regarding "the 2015 event." *See, e.g.*, (Dkt. #516-37 at 1) ("[T]his afternoon when Gary and I talked, we both focused on the paragraphs dealing with the 2015 SW event. . . . I called Scott and he immediately answered and filled in the details.").

Patterson challenges the relevance of these emails, noting that they reference conversations between Oliver and Colter occurring *after* Oliver first drafted the allegedly defamatory statements in the Loveless Letter. (Dkt. #523 at 7–8). Patterson argues that because "the substance of [Oliver's] version of the Letter remained the same since its origination," evidence of subsequent conversations between Oliver and Colter do not establish Colter as the source of the allegedly defamatory material. (Dkt. #523 at 8). Oliver could have instead relied on a number of other potential sources of the allegedly defamatory material—a Washington Post article, for example. *See* (Dkt. #504 at 10–12); (Dkt. #510-4). Thus, says Patterson, Roe has not shown that Colter "must have been the source of the statements contained in the Loveless Letter." (Dkt. #523 at 7).

That may be true, but it is not Roe's burden at this stage to show that Colter *must* have been the source of the allegedly defamatory content. Rather, Roe need only show that there is a genuine issue for trial—i.e., that Colter *may* have been the source of the defamatory content. And as the Texas Supreme Court confirmed, Roe may demonstrate such a genuine issue for trial through direct or circumstantial evidence.

11

*Patterson*, 707 S.W.3d at 101. Roe has more than satisfied her burden. The conversations between Oliver and Colter referenced in Oliver's emails, though occurring after Oliver first drafted the allegedly defamatory statements, support an inference of prior, similar communications, and that Colter was the source of the defamatory content in the Loveless Letter. In any event, the evidence shows that Oliver relied on Colter to "verify the information about the 2015 event." (Dkt. #516-31 at 1). Thus, a reasonable jury could find that Colter was "a source" of the allegedly defamatory content—without which Oliver would not have published that content— even if he was not the initial source. *See Patterson*, 707 S.W.3d at 101 ("[Plaintiff's] evidence need not establish verbatim the underlying provision of defamatory content so long as the evidence demonstrates that the defendant was *a source* of the identified statements alleged to be defamatory." (emphasis added)).

In sum, the record demonstrates a genuine dispute as to whether Colter was a source of the allegedly defamatory content in the Loveless Letter, and whether "Colter intended or knew that the defamatory statements in the [Loveless Letter] would be published." *Id.* at 99. Indeed, the Fifth Circuit has already concluded that "Colter was well aware of the donors' intent to submit a letter to the Board." *Patterson*, 2024 WL 1956148, at *2.

### ii. Fault

In his second issue, Patterson argues that even if Roe could establish Colter as the source of the allegedly defamatory content, "Patterson cannot, as a matter of law, be held liable for [Colter's] state of mind." (Dkt. #504 at 13). In other words, Roe must

12

show that Patterson himself "knew or should have known" that the allegedly defamatory statements in the Loveless Letter were "false and defamatory." *See Patterson*, 707 S.W.3d at 99. Roe cannot make this showing, Patterson says, because Patterson was "unaware of the [Loveless Letter's] existence until after it was publicly disseminated." (Dkt. #504 at 14).

Patterson's argument misses the mark. For starters, the cases Patterson cites say only that an agent's *malice* cannot be imputed to his principal (outside of an employer–employee relationship, at least). *See McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1303 (D.C. Cir. 1996) ("[W]e doubt that actual malice can be imputed except under *respondeat superior*[.]"); *Secord v. Cockburn*, 747 F.Supp. 779, 787 (D.D.C. 1990) ("Actual malice must be proved separately with respect to each defendant and cannot be imputed from one defendant to another absent an employer–employee relationship giving rise to *respondeat superior*." (citations omitted)). But Roe's defamation claim does not require that she prove malice. Because Roe is a private figure, she need only prove negligence as to falsity. *See Patterson*, 707 S.W.3d at 99. Thus, Patterson has not met his burden of showing that the principle established in the referenced malice cases applies here.

More fundamentally, under Roe's agency-based theory of tort liability, the relevant question is whether "*the agent's* conduct is tortious." Restatement (Third) of Agency § 7.03 (2006) (emphasis added); *see also Bowman v. Home Life Ins. Co. of Am.*, 260 F.2d 521, 522 (3d Cir. 1958) ("Once the jury is properly instructed, as it was, on the matter of the responsibility of a principal for acts of its agent, then the question

13

becomes one of the tortious conduct of the agent—whether the acts done by the agent under the circumstances resulted in an actionable tort."). It therefore makes little sense to ask whether the principal's conduct (or state of mind) satisfies the elements of a tort committed by his agent.

To be sure, the principal must have done *something* to warrant holding him liable for his agent's tort. But that something is already accounted for by the ordinary principles of agency law: "A principal is liable for its agent's acts when the agent has actual or apparent authority to commit those acts, or when the principal ratifies them." *Schrum v. Land*, 12 F.Supp.2d 576, 582 (S.D. Tex. 1997); *see also* Restatement (Third) of Agency § 7.03 (2006). Importantly, at least two avenues for agency-based liability—apparent authority and ratification—do not require that the principal have advance knowledge of the agent's wrongful acts. *See* Restatement (Third) of Agency § 7.08 (2006); *Ray v. Dyer*, 20 S.W.2d 328, 332 (Tex. App.—Amarillo 1929, writ dism'd w.o.j.) (explaining that a principal may be liable for his agent's tort "even though he was ignorant thereof, and the agent in committing it exceeded his actual authority, or disobeyed the express instructions of his principal"; further explaining that a principal may be held liable to third parties "where his agent, while acting within the scope of his real or apparent authority, is guilty of . . . libel and slander"). Thus, Patterson is mistaken in suggesting that the principal himself must have "possessed the requisite state of mind at the time the allegedly defamatory publication was made." *See* (Dkt. #504 at 14).

14

Put simply, the Fifth Circuit has decided the question of agency for purposes of summary judgment and foreclosed Patterson's theory. It held that "the summary judgment evidence creates a genuine issue over whether Colter was indeed acting as Patterson's agent . . . during his involvement with the [Loveless Letter]." *Patterson*, 2024 WL 1956148, at *2. Given the Fifth Circuit's ruling, Patterson cannot now claim that, as to Colter's actions regarding the Loveless Letter, Patterson is immune from agency-based liability as a matter of law.

*   *   *   *

For these reasons, there exist genuine issues of material fact as to Roe's remaining defamation claim, so the Court must deny Patterson's summary-judgment motion.

## B. Motion to Strike

Roe objects to Patterson's Exhibit L, a Washington Post article titled "Controversial Southern Baptist leader still set to give prominent sermon in front of thousands." *See* (Dkt. #520 at 1); (Dkt. #510-4). Roe argues that the article is inadmissible hearsay under Federal Rule of Evidence 801, and irrelevant and unduly prejudicial under Federal Rules of Evidence 401 and 403. (Dkt. #520 at 1–2). She therefore asks that the Court strike the article from the record.

Roe's objections are without merit. The Washington Post article is not hearsay because Patterson is not offering it for the truth of any matter asserted therein. *See* FED. R. EVID. 801(c)(2). Patterson is not, for example, offering the article as evidence that Roe in fact recanted her allegations of rape. Rather, Patterson is offering the

15

article as a potential alternative source of the allegedly defamatory content in the Loveless Letter, to rebut Roe's claim that Patterson (or his agent) must have supplied that content. *See* (Dkt. #504 at 10–12). The article is therefore relevant and admissible.

For these reasons, the Court will overrule Roe's objections and deny her motion to strike.

## IV. CONCLUSION

It is therefore **ORDERED** that Defendant Leighton Paige Patterson's Motion for Summary Judgment and Brief in Support, (Dkt. #504), is **DENIED**.

It is further **ORDERED** that Plaintiff Jane Roe's Corrected Objections and Motion to Strike Leighton Paige Patterson's Summary Judgment Evidence, (Dkt. #520), is **DENIED**. Plaintiff's objections are **OVERRULED**.

**So ORDERED and SIGNED this 22nd day of May, 2026.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE

16